

**0651**

PODER JUDICIAL DE LA FEDERACIÓN

**SENTENCIA:** --- **Hermosillo, Sonora, a cuatro de febrero del dos mil quince.**

Visto para resolver en grado de apelación el toca penal número 6/2015; y,

**R E S U L T A N D O :**         651

I.- El veintiséis de noviembre de dos mil catorce, el Juez Décimo de Distrito en el Estado de Sonora con sede en Hermosillo, dictó resolución de plazo constitucional en la causa penal número 163/2014, cuyos puntos resolutivos son los siguientes: PRIMERO. Siendo las CATORCE HORAS CON DOS MINUTOS DEL VEINTISÉIS DE NOVIEMBRE DE DOS MIL CATORCE, se dicta AUTO DE FORMAL PRISIÓN a Jesús Raúl Beltrán León, alias "CHUY RAÚL", por considerarlo probable responsable en la comisión de los delitos 1) Contra la Salud, en la modalidad de posesión con fines de comercio de Clorhidrato de Cocaína y Clorhidrato de Metanfetamina, previsto y sancionado en el artículo 195, primer párrafo, en relación con el 193, párrafos primero y segundo, todos del Código Penal Federal; 2) Acopio de armas de fuego, previsto y sancionado en el artículo 83 Bis, fracción I, en relación con el 11, inciso a) y b), de la Ley Federal de Armas de Fuego y Explosivos; 3) Portación de armas de fuego de uso exclusivo del Ejército, Armada y Fuerza Aérea, previsto y sancionado el artículo 83, fracción III, con la agravante en su penúltimo

0652

términos del considerando décimo segundo de esta resolución; solicítese posibles antecedentes que pudiera tener registrados y recábese la ficha signalética de los procesados de referencia en términos del citado considerando.--- CUARTO. Se suspende a los encausados en sus derechos políticos, para lo cual, comuníquese esta determinación a la Dirección Ejecutiva del Instituto Nacional Electoral, conforme al considerando décimo tercero.--- QUINTO. Hágase saber al procesado que en caso de optar por el procedimiento ordinario deberá hacerlo saber a este juzgador al momento mismo de notificarse o dentro de los tres días siguientes, así como el derecho y término de tres días que la ley les concede para inconformarse con esta resolución, y en su caso requiérasele para que designe defensor que lo patrocine en segunda instancia y nifieste si lo autoriza para recibir en su nombre toda clase de notificaciones aun las de carácter personal, toda vez, que de no hacerlo se le designará al defensor Público Federal adscrito.--- OCTAVO. Se deja a Jesús Raúl Beltrán León, alias "CHUY RAÚL", a disposición del Hospital "Dr, Carlos Nava Muñoz", con residencia en esta ciudad, para efecto de que sea tratado de la toxicomanía que padece.--- NOVENO. Dese vista a la agente del Ministerio Público de la Federación adscrita, en términos del considerando décimo segundo de la presente resolución.--- Comuníquese esta determinación al director del Centro Federal de Readaptación Social número 11 "CPS Sonora", de esta ciudad, para su conocimiento y efectos legales correspondientes.--- Notifíquese personalmente a las partes". (sic)



SEGUNDO TRI
DEL QUIN
HERMOSI

II.- El procesado JESÚS RAÚL BELTRÁN LEÓN (alias) "CHUY RAÚL" y su defensor particular, interpusieron recurso de apelación en contra de la precitada resolución, el cual se admitió en el efecto devolutivo. Abierto el toca y substanciada la impugnación por todos sus trámites, tuvo lugar la audiencia de vista y ahora se procede a dictar sentencia.

C O N S I D E R A N D O :

**1o.-** Este Segundo Tribunal Unitario del Quinto Circuito, es legalmente competente para conocer del recurso de apelación, de conformidad con el artículo 29, fracción II de la Ley Orgánica del Poder Judicial de la

**2**

0653





JDER JUDICIAL DE LA FEDERACIÓN

Federación, toda vez que fue interpuesto contra resolución de plazo constitucional en la que se decretó auto de formal prisión, dictada en la Primera Instancia por un Juez de Distrito de la jurisdicción de éste Organo Judicial, conforme al acuerdo general 3/2013, del Pleno del Consejo de la Judicatura Federal, publicado el quince de febrero de dos mil trece, en el Diario Oficial de la Federación, relativo a la determinación del número y límites territoriales de los circuitos en que se divide la república mexicana; y al número, a la jurisdicción territorial y especialización por materia de los Tribunales Colegiados y Unitarios de Circuitos y de los Juzgados de Distrito.

    2o.- El presente recurso es procedente toda vez que se interpuso en contra de una resolución, de conformidad con el artículo 367, fracción IV del Código Federal de Procedimientos Penales, además de que fue interpuesto dentro del término legal por el procesado y su defensor particular, mismos que por haber sido partes en el proceso de donde deriva dicho recurso, se encuentran legitimados para solicitar la apertura de esta segunda instancia, tal como lo prescriben los artículos 364, 365 y 368 del Código Procesal de la materia.



IBUNAL UNITARIO
TO CIRCUITO
LLO, SONORA

    3o.- Para pronunciar la resolución apelada, el Juez del conocimiento se apoyó en los siguientes razonamientos: *"...SEGUNDO. FUNDAMENTOS LEGALES.- La norma 19 Constitucional (anterior a la reforma publicada en el Diario Oficial de la Federación, el dieciocho de junio de dos mil ocho), en lo que hace al caso que interesa, establece:--- "Ninguna detención ante autoridad judicial podrá exceder del término de setenta y dos horas, a partir de que el indiciado sea puesto a su disposición, sin que se justifique con un auto de formal prisión en el que se expresarán: el delito que se impute al acusado; el lugar, tiempo y circunstancias de ejecución, así como los datos que arroje la averiguación previa, los que deberán ser bastantes para comprobar el cuerpo del delito y hacer probable la responsabilidad del indiciado."--- Por su parte, el numeral 168, del Código Federal de Procedimientos Penales dispone:--- "El Ministerio Público acreditará el cuerpo del delito de que se trate y la probable responsabilidad del indiciado, como base del ejercicio de la acción penal; y la*

TOCA PENAL No. 6/2015



*autoridad judicial a su vez, examinará si ambos requisitos están acreditados en autos.--- Por cuerpo del delito se entiende el conjunto de elementos objetivos o externos que constituyen la materialidad del hecho que la ley señala como delito, así como los normativos, en el caso de que la descripción típica lo requiera.--- La probable responsabilidad del indiciado se tendrá por acreditada cuando, de los medios probatorios existentes se deduzca su participación en el delito, la comisión dolosa o culposa del mismo y no exista acreditada a favor del indiciado, alguna causa de licitud o alguna excluyente de culpabilidad.--- El cuerpo del delito de que se trate y la probable responsabilidad se acreditarán por cualquier medio probatorio que señale la ley."--- En esa virtud, habrá de analizarse si en este caso se encuentran reunidos tales requisitos para emitir un auto de esa naturaleza, o bien, en caso contrario, como lo dispone el artículo 167 del Código Federal de Procedimientos Penales, se decrete la libertad de los inculpados por falta de elementos para procesar.--- TERCERO. ELEMENTOS DE PRUEBA.- Las pruebas del caso a estudio, son las siguientes:--- 1. Parte informativo de dieciséis de noviembre de dos mil catorce, suscrito por Isaac Pineda López, Javier Ávila Santiago, elementos de la Secretaría de la Marina, Armada de México, debidamente ratificado ante el órgano técnico investigador (fojas 15 a 22, 27 a 32).--- 2. Certificado médico de dieciséis de noviembre de dos mil catorce, practicado al indiciado Jesús Raúl Beltrán León, alias "CHUY RAÚL", por el médico explorador Itzel Dayana García Domínguez, Teniente de Corbeta del Servicio de Sanidad Naval, Médico Cirujano Naval, de la milicia permanente de la Armada de México (fojas 23 y 24).--- 3. Diligencia de inspección ocular y fe ministerial de diecisiete de noviembre de dos mil catorce, practicadas por el agente del Ministerio Público de la Federación respecto de las armas de fuego, cartuchos, drogas, y objetos (fojas 43 a 48).--- 4. Dictamen de integridad física, de diecisiete de noviembre de dos mil catorce, practicado al indiciado de referencia, suscrito por María Bautista García, Karla Corral González, peritos médicos forenses adscritos a la Agencia de Investigación Criminal, de la Coordinación General de Servicios Periciales, Dirección General de Especialidades Médico Forense, Departamento de Medicina Forense (fojas*



SEGUNDO TRIU
DEL QUIN
HERMOSII

**4**



TOCA PENAL No. 6/2015

0654

FORMA A-55

)DER JUDICIAL DE LA FEDERACIÓN

50 y 51).--- 5. Dictamen en la Especialidad de Fotografía Forense, de diecisiete de Noviembre de dos mil catorce, suscrito por María Concepción Puente Arce, perito en Materia de Fotografía Forense adscrito a la Agencia de Investigación Criminal, de la Coordinación General de Servicios Periciales, Dirección General de Laboratorios Criminalísticos, Departamento de Fotografía Forense (fojas 68 a 135).--- 6. Dictamen en materia de balística forense de diecisiete de noviembre de dos mil catorce, suscrito por José Velázquez García, perito adscrito a la Agencia de Investigación Criminal, Coordinación General de Laboratorios Criminalísticos, departamento de Balística Forense, de la Procuraduría General de la Republica (fojas 138 a 146).--- 7. Dictamen químico de dieciocho de noviembre de dos mil catorce, suscrito por Moisés Ramírez Medina y Leonardo Guerrero López, peritos oficiales adscritos a la Agencia de Investigación Criminal, Coordinación General de Servicios Periciales, Dirección General de Laboratorios Criminalísticos , Dirección de Laboratorios de Química, Departamento de Química Forense, de la Procuraduría General de la Republica (fojas 151 a 181).--- 8. Declaraciones ministeriales del inculpado Jesús Raúl Beltrán León, alias "CHUY RAÚL", rendidas el dieciocho u diecinueve de noviembre de dos mil catorce (fojas 188 a 192, 243 y 244).--- 9. Declaración preparatoria del inculpado Jesús Raúl Beltrán León, alias "CHUY RAÚL", de veintiuno de noviembre de dos mil catorce (fojas 325 a 329).--- 10. Ampliación de declaración del encausado Jesús Raúl Beltrán León, alias "CHUY RAÚL", de veinticuatro de noviembre de dos mil catorce (fojas 380 a 382).--- 11. Declaraciones testimoniales de Brianda Lizbeth Félix Beltrán, María Manuela León Ríos, María Del Refugio Araujo López, Ma de Jesús Lugo Estala y Lesley Zelina Félix Salazar, celebradas el veinticinco de noviembre de dos mil catorce.-- CUARTO. CUERPO DEL DELITO. Los elementos del cuerpo del delito contra la salud, en la modalidad de posesión con fines de comercio de Clorhidrato de Cocaína y Clorhidrato de Metanfetamina, previsto y sancionado en el artículo 195, primer párrafo, en relación con el 193, párrafos primero y segundo, todos del Código Penal Federal, se encuentran demostrados en autos.--- Los artículos 193 y 195, párrafo primero, ambos del Código Penal Federal, disponen:--- "193.

3UNAL UNITARIO
ГО CIRCUITO
LO, SONORA

5



*Se consideran narcóticos a los estupefacientes, psicotrópicos y demás sustancias o vegetales que determinen la Ley General de Salud, los convenios y tratados internacionales de observancia obligatoria en México y los que señalen las demás disposiciones legales aplicables en la materia."--- "195. Se impondrá de cinco a quince años de prisión y de cien a trescientos cincuenta días multa, al que posea alguno de los narcóticos señalados en el artículo 193, sin la autorización correspondiente a que se refiere la Ley General de Salud, siempre y cuando esa posesión sea con la finalidad de realizar alguna de las conductas previstas en el artículo 194, ambos de este código.--- … Cuando el inculpado posea alguno de los narcóticos señalados en la tabla prevista en el artículo 479 de la Ley General de Salud, en cantidad igual o superior a la que resulte de multiplicar por mil las ahí referidas, se presume que la posesión tiene como objeto cometer alguna de las conductas previstas en el artículo 194 de este código."--- Por su parte, el artículo 194, en su fracción I, de la codificación en consulta, señala:--- "194. Se impondrá prisión de diez a veinticinco años y de cien hasta quinientos días multa al que: --- I.- Produzca, transporte, trafique, comercie, suministre aun gratuitamente o prescriba alguno de los narcóticos señalados en el artículo anterior, sin la autorización correspondiente a que se refiere la Ley General de Salud.--- Para los efectos de esta fracción, por producir se entiende: manufacturar, fabricar, elaborar, preparar o acondicionar algún narcótico, y por comerciar: vender, comprar, adquirir o enajenar algún narcótico. ..."* --- De ello deriva que el cuerpo del delito en estudio, se compone de los siguientes elementos:--- *a)* La existencia de una sustancia considerada como estupefaciente y psicotrópico en los artículos 234 y 245, de la Ley General de Salud, respectivamente, y catalogada como narcótico por el artículo 193, del Código Penal Federal, en el caso Clorhidrato de Cocaína y Clorhidrato de Metanfetamina, catalogados como estupefacientes y psicotrópico, en los numerales 234 y 245, tabla II, respectivamente, de la Ley General de Salud; --- *b)* Que el activo posea dicho narcótico; es decir, lo tenga dentro de su radio de acción y ámbito de disponibilidad; --- *c)* Que la posesión sea con la finalidad de realizar alguna de las conductas a que se refiere el artículo 194 del Código



SEGUNDO TRI
DEL QUIN
HERMOSI

6



0655

## TOCA PENAL No. 6/2015

FORMA A-55



PODER JUDICIAL DE LA FEDERACIÓN

*Penal Federal, en particular comercio en su variante de venta; y, --- d) Que tal acto de posesión se realice sin la autorización de la autoridad sanitaria correspondiente.--- Ciertamente, el primero de los elementos del cuerpo del delito, se encuentra acreditado con la diligencia de inspección y fe ministerial que practicó el agente del Ministerio Público de la Federación, de diecisiete de noviembre de dos mil catorce, en la que dio fe de tener ante la vista, entre otras cosas:--- a) INDICIO NÚMERO 17, treinta y un paquetes de forma rectangular; todos ellos con una sustancia en polvo y piedra, color blanco con las características de la cocaína, con un peso bruto en conjunto de treinta y dos kilos con ochocientos treinta gramos (32,830.0 Kgms).--- b) INDICIO NÚMERO 18: Una bolsa de plástico trasparente, con una sustancia blanca, granulosa y cristalina, con las características de la metanfetamina, con un peso bruto de ciento cincuenta y cinco gramos con cien miligramos (155.1 gramos).--- Y, toda vez que fue practicada por servidor público, investido de fe pública y con los requisitos señalados por los artículos 208 y 209 del Código Federal de Procedimientos Penales, tiene valor probatorio pleno, de conformidad con el artículo 284 del propio conjunto de normas adjetivas.--- Sirve de apoyo a lo anterior el criterio sustentado por el Segundo Tribunal Colegiado del Quinto Circuito, publicado en el Semanario Judicial de la Federación, Tomo XI-Febrero, año 1993, visible en la página 280, Octava Época, cuyo rubro es: "MINISTERIO PÚBLICO, FACULTADES CONSTITUCIONALES. EN LAS DILIGENCIAS DE AVERIGUACIÓN PREVIA, INSPECCIÓN OCULAR."--- Aunado a ello, obra el dictamen en materia de química de dieciocho de noviembre del dos mil catorce, signado por Moisés Ramírez Medina y Leonardo Guerrero López, peritos oficiales adscritos a la Agencia de Investigación Criminal, Coordinación General de Servicios Periciales, Dirección General de Laboratorios Criminalísticos, Dirección de Laboratorios de Química, Departamento de Química Forense, de la Procuraduría General de la República, en el que concluyeron:--- "...PRIMERA.- La sustancia sólida blanca, marcada como indicio 17, descrita con anterioridad y motivo del presente dictamen, corresponde a CLORHIDRATO DE COCAINA, sustancia considerada como estupefaciente por la Ley*

7

General de Salud.--- SEGUNDA.- La sustancia granulada cristalina marcada como indicio 18, motivo del presente dictamen, corresponde a CLORHIDRATO DE METANFETAMINA, sustancia considerada como PSICOTROPICO por la Ley General de Salud...".--- En razón de que se trata de una pericial que cumple con los requisitos establecidos en los artículos 234 y 235, del Código Adjetivo de la Materia y Fuero, porque de las constancias se advierte que fue emitido por órgano especializado de prueba, quien practicó todas las operaciones y experimentos que su ciencia le sugirió, expresando los hechos y circunstancias que le sirvieron para fundamentar su opinión, además está acorde con el resto del material probatorio, y por ello se le confiere valor probatorio de indicio de acuerdo con los dispositivos 285, 286 y 288, del Código Procesal en cita, así como con la tesis 256, visible en la página 188, del Tomo II, Materia Penal, del Apéndice al Semanario Judicial de la Federación 1917 - 2000, titulada: "PERITOS. VALOR PROBATORIO DE SU DICTAMEN."--- En suma, con esos medios de convicción se acredita la existencia de treinta kilos, quinientos sesenta y cuatro gramos con cien miligramos (30,564.1 Kgms), peso neto de Clorhidrato de Cocaína, y ciento cuarenta y seis gramos con setecientos miligramos (146.7 Gms), peso neto de Clorhidrato de Metanfetamina (según dictamen químico foja 152), cantidades que rebasan los límites de quinientos y cuarenta gramos de esos estupefaciente y psicotrópico, respectivamente, que resulta de multiplicar por mil los quinientos miligramos de Clorhidrato de Cocaína y los cuarenta miligramos de Clorhidrato de Metanfetamina que contemplan la cuarta y octava línea horizontal de narcóticos de la tabla de orientación de dosis máximas de consumo personal e inmediato, que contiene el artículo 479 de la Ley General de Salud, en los rubros Clorhidrato de Cocaína y Clorhidrato de Metanfetamina.--- El segundo elemento de la modalidad de que se trata, están demostrados en autos, esencialmente con las siguientes probanzas:--- Parte informativo de dieciséis de noviembre de dos mil catorce, suscrito y ratificado por Isaac Pineda López, Javier Ávila Santiago, elementos de la Secretaría de la Marina, Armada de México; y, en el cual, hicieron constar textualmente:--- "... Que en cumplimiento a labores de inteligencia, se obtuvo información de que



0656

## TOCA PENAL No. 6/2015

FORMA A-55



ODER JUDICIAL DE LA FEDERACIÓN

65

*Iván Archivaldo Guzmán Salazar hijo de Joaquín Archivaldo Guzmán Loera jefe de Cartel de Sinaloa y quien fue capturado por esta institución y que por fuentes abiertas como el internet, se sabía que actualmente lleva las actividades relacionadas a la Delincuencia Organizada y que llegaba constantemente a la casa marcada con el número 1819 de la calle de los Aguacates, perteneciente a la Colonia el Piñón, del Municipio de Culiacán, Sinaloa; razón por la cual, el día 16 del mes de noviembre del año dos mil catorce, a partir de las 2 de la mañana procedimos a establecernos en dicha calle como a media cuadra del domicilio ya conocido anteriormente, a fin de vigilar el movimiento de la calle y constatar si en verdad esta persona llegaba al domicilio, tal es el caso que después de dos horas, de estar vigilando la calle es decir aproximadamente a las 04:00 hora local observamos que en sentido contrario a donde nos encontrábamos venia circulando un vehículo compacto dándonos cuenta que se estaciono a la altura de la casa marcada con el número 1819 de la calle de los Aguacates, Colonia el Piñón, del Municipio de Culiacán, Sinaloa; en el momento en que se estaciono los suscrito avanzamos en nuestra unidad y detuvimos la marcha a la altura del vehículo que ahora sabemos es de las siguientes características un vehículo tipo camioneta de Marca Ford, Modelo Eco Esport, de color blanca con placas de circulación VPK-58-45 del estado de Sinaloa, número de serie MAJUP3SF1EC123561, por lo que de inmediato el suscrito marino Isaac Pineda López quien me encontraba en el asiento del copiloto descendí de inmediato acercándome al lado del conductor y con las luces de mi lámpara alumbre en el interior observando que dentro del automotor en el lado del conductor se encontraba una persona del sexo masculino quien vestía playera azul con rayas blancas y pantalón mezclilla azul, observando que en el interior del vehículo entre el asiento del copiloto se encontraba un arma larga, conocido como cuerno de chivo, por lo que ante la presencia del arma que es de uso exclusivo para las fuerzas armadas, y ante la flagrancia que se estaba presentando con gritos fuertes le indique que levantara las manos y que descendiera del vehículo, ya estando abajo le indique que me mostrara el documento que le autorizaba portar el arma que tenía en el asiento manifestando que no contaba con el permiso ya*

JUNAL UNITARIO
TO CIRCUITO
LO, SONORA

9

*que era para su seguridad personal, por lo que procedí a efectuarle una revisión corporal a quien dijo llamarse JESÚS RAÚL BELTRÁN LEÓN y de la bolsa derecha de su pantalón saco dos celulares: (INDICIO 01) Un teléfono de marca blackberry de color blanco con negro, IMEI 357861058375688, chip telcel de número 89520 20614 32078 5882F H4, con su tapa y batería (INDICIO 02) Un teléfono de marca blackberry de color negro con plateado, IMEI 353099050871768, sin chip, con su tapa y batería. Después de la revisión corporal le indique que se separara como a un metro de distancia del vehículo porque iba a recoger el arma que se encontraba en el asiento del copiloto, quedando citada persona bajo seguridad del marino Javier Ávila Santiago; por lo que el suscrito marino Isaac Pineda López procedí a recoger el arma antes mencionada siendo de las siguientes características (INDICIO 03) un arma*



*calibre 7.62x 39 MM. de las conocidas comúnmente como cuerno de chivo, con matrícula en la tapa del cajón del mecanismo 2935, de color negro con cromado, con su respectivo cargador abastecido, mismo que por medidas de seguridad fue desabastecido, contabilizando un total de 30 cartuchos del mismo calibre, asimismo en el momento en que estaba recogiendo esta arma me di cuenta que el asiento posterior venia abatido y encima se encontraban una caja de cartón y (INDICIO 04) una caja de color azul turquesa y de esta caja sobresalía el cañón de un arma, por lo que procedí a efectuar una revisión en su interior localizando en su interior todo lo siguiente: (INDICIO 05) Un arma calibre 7.62x 39 MM. de las conocidas comúnmente como cuerno de chivo, con matrícula 87566, de color negro, con su respectivo cargador abastecido, mismo que por medidas de seguridad fue desabastecido, contabilizando un total de 30 cartuchos del mismo calibre. (INDICIO 06) Un arma corta calibre .38 súper con partes doradas, marcada con la leyenda The Billionaire, Forbes, el número 701 y Sinaloa, con matrícula THEB 701, con su respectivo cargador insertado y abastecido con 9 cartuchos útiles. (INDICIO 07) Un arma corta marca calibre .38 súper cromada, matrícula ELS085H, con su respectivo cargador insertado y abastecido con 9 cartuchos útiles. (INDICIO 08) Un arma corta Colt calibre .38 súper de color negra con partes doradas y la imagen de un caballo, matrícula 42020, con su*

10



0657

# TOCA PENAL No. 6/2015

FORMA A-55



ODER JUDICIAL DE LA FEDERACIÓN

*respectivo cargador insertado y abastecido con 9 cartuchos útiles. (INDICIO 09)*

*Un arma corta marca colt, matrícula 6872 calibre .38 súper de color dorada con*

*partes plateadas y la imagen del Chapo Guzmán, con las letras JGL, con su*

*respectivo cargador insertado y abastecido con 9 cartuchos útiles. (INDICIO 10)*

*Un arma corta marca colt calibre .38 súper de color negra con partes de color*

*cobre, y brillantes con matrícula 2053, de marca Colt, con su respectivo*

*cargador insertado y abastecido con 9 cartuchos útiles. (INDICIO 11) Un arma*

*corta revolver calibre .44 MM. cromado, de la marca SPORTING ARMS*

*abastecido con 6 cartuchos útiles del mismo calibre, N/S 44SH-2010S. (INDICIO*

*12) Un arma corta DESERT EAGLE PISTOL calibre .44 MM. de color dorada*

*con negro, de la marca magnum RESEARCH INC., con matrícula MR004304,*

*con su respectivo cargador abastecido con 8 cartuchos útiles del mismo calibre.*

*(INDICIO 13) Un arma calibre 38 súper color negro, matrícula CS004849, de la*

*marca Colts P.T.F.A. MFG.CO HARTFORD. CONV USA con su cargador*

*insertado, que por medidas de seguridad se procedió a desabastecer citada*

*arma y se contabilizó un total de 9 cartuchos útiles. (INDICIO 14) 14 cargadores*

*para arma calibre 7.62 por 39 MM. Dos magazines más para calibre 7.62 por 39*

*MM. 02 cargadores para pistolas. (INDICIO 15) 67 cartuchos calibre .25. 52*

*cartuchos calibre .44, 63 cartuchos útiles calibre 9 MM., 264 cartuchos útiles*

*calibre .223., 60 cartuchos útiles calibre .45, 20 cartuchos útiles calibre 40., 266*

*cartuchos útiles calibre 7.62 por 39 MM., 74 cartuchos útiles calibre 5.7 POR 28*

*MM., 70 cartuchos útiles calibre 38 súper.--- Posteriormente procedí a efectuar*

*una revisión en la (INDICIO 16) caja de cartón que se encontraba encima de los*

*asientos observando que en su interior contenía lo siguiente lo siguiente:*

*(INDICIO 17) 31 paquetes en forma de ladrillo confeccionada con cinta canela*

*de las siguientes características de 13 por 23 por 4 centímetros que al hacerle la*

*abertura a uno de los paquetes se observó que contenía una sustancia*

*compacta de color blanca de las características similares a la cocaína. Con peso*

*aproximado de 01 kilogramo cada uno. (INDICIO 18) una bolsa transparente*

*conteniendo en su interior una sustancia tipo piedra cristalina el cual tiene las*

*características de la droga conocida comúnmente como cristal, de un peso*

**11**

TOCA PENAL No. 6/2015

*aproximado de 100 gramos. (INDICIO 19). 08 logotipos de material de plástico duro que contienen grabaciones utilizados para dejar marca en los paquetes de droga ya confeccionados con los siguientes logotipo, letra "H" numero "2014" logotipo de "Chevrolet" figura de un "puma" números "2014" números " 7 y una estrella" letras " FEF" letra "Q". (INDICIO 20). 03 logotipos de material de madera que contienen grabaciones utilizados para dejar marca en los paquetes de droga ya confeccionados con los siguientes logotipo, numero "5" letras "RCA" FIGURA "UNA CORONA" (INDICIO 21). Un Sobre que contiene en su interior 03 fotografías que según el ahora asegurados son los lugares donde almacenan las ganancias de la Organización del Cartel de Sinaloa y que las fachadas que se observan únicamente es para que pasen desapercibidos y las autoridades no se den cuenta de los movimiento que se realizan en su interior. Una fotografía de la unidad médica san francisco; la segunda fotografía de una Agrícola TITÁN y la tercera fotografía de un consultorio médico.--- Es de señalar que quien dijo llamarse JESÚS RAÚL BELTRÁN LEÓN, refirió que trabaja directamente para el Hijo del Chapo Guzmán Iván Archivaldo Guzmán Salazar, que distribuye droga y que a cada ladrillo de droga la vende en 20, 000 ( VEINTE MIL DÓLARES), que otra de las funciones que realiza es la de ser espejo, es decir que transmite las ordenes que gira Guzmán Salazar a personas de las Organización y que es el encargado de recoger el dinero de diferentes personas y que los lleva a depositar el dinero en las bóvedas que tienen las siguientes fachadas, UNIDAD MEDICA SAN FRANCISCO que se ubica en la Avenida Juárez Colonia numero 883 B, de la colonia centro en Culiacán Sinaloa; la otra en la misma avenida Juárez con fachada medica en la colonia centro, y la tercera bóveda se encuentran en el lugar conocido como Agrícola Titan localizado en la Avenida Revolución y Francisco Madero de la Colonia Hidalgo en Culiacán Sinaloa; que regularmente ya que acumulan los dólares el extraía entre 200, 000 (doscientos mil dólares) a 300, 000 dólares los cuales los ingresaba a los Estados Unidos de Norteamérica; y que toda la información de los movimientos se encuentra en su teléfono celular de color blanco.--- Motivo por el cual, procedimos al traslado de personas e indicios, a las instalaciones de la Procuraduría General de la*



**12**



# TOCA PENAL No. 6/2015

0653

FORMA A-55



DER JUDICIAL DE LA FEDERACIÓN

*República, con sede en la Ciudad de Culiacán, Sinaloa, pero durante el trayecto quien dijo llamarse JESÚS RAÚL BELTRÁN LEÓN refirió nuevamente que su jefe Iván Archivaldo Guzmán Salazar uno de los líderes del Cartel de Sinaloa ya que su papa el Chapo Guzmán así lo designo, que cuando llegará a las instalaciones de la Procuraduría General de la República en Culiacán, Sinaloa, iba a ser rescatados, ante estas amenazas y toda vez que se considera que depende directamente del hijo del Chapo Guzmán, aunado que durante el trayecto a las instalaciones de PGR se encontraban tirados artefacto metálicos conocidos como Poncha llantas y que fue uno de estos objetos que poncho la llanta de nuestra unidad, por lo que se procedió a su reparación y ya después reparados continuamos el trayecto, observando que había más de estos artefactos metálicos por lo que se consideró a fin de no correr el riesgo de una emboscada, cuando estuviéramos reparando nuestras unidades con motivos de los poncha llantas, que a fin de no poner en peligro al personal de la PGR, la integridad del asegurado y la de nosotros en esa ciudad, se consideró que por tales motivos, la autoridad para conocer de estos hechos es la Subprocuraduría Especializada en Investigación en Delincuencia Organizada, solicitando la coordinación de una aeronave para el traslado a estas instalaciones, y por la falta de disponibilidad de las aeronaves en ese momento, arribo la aeronave al Aeropuerto de Culiacán Sinaloa Aproximadamente a las 16:30 horas local de estas ciudad, y posteriormente se coordinó la logística despegando de esa ciudad arribando a esta ciudad aproximadamente a las 22:10 horas y por el tráfico que nos encontramos en esta ciudad, arribamos a las instalaciones de esta subprocuraduría a las 23:15 horas del día de la fecha. Utilizando el tiempo de espera en embalar el armamento, elaborar el parte de puesta a disposición toda vez que la ley nos exige un informe pormenorizado de los hechos, alimentación de la persona asegurada. Por lo anteriormente expuesto, a Usted C. Agente del Ministerio Público de la Federación, pongo a su disposición lo siguiente: PERSONAS. JESÚS RAÚL BELTRÁN LEÓN, de 30 años de edad, originario de Torrance Los Ángeles California Estados Unidos de Norteamérica y de padres mexicanos. INDICIOS.- Se ponen a disposición todos los indicios*

**13**



*descritos en el presente cuerpo del escrito, enumerados de 01, 02, 03, 04,05, 06, 07, 08, 09, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21 Y 22. En la inteligencia que el indicio 22, corresponde al vehículo tipo camioneta de Marca Ford, Modelo Eco Esport, de color blanca con placas de circulaciónVPK-58-45 del estado número de serie MAJUP3SF1EC123561 se deja a su entera disposición en las instalaciones ubicada en Parque 68, entre Avenida Obregón y Calle México 68, Municipio de Culiacán, Sinaloa."---* El indicado medio de prueba, al haber sido ratificado ministerialmente hace que el dicho de los agentes se considere testimonios que tienen valor indiciario de conformidad con los artículos 285, 286 y 287, último párrafo, del Código Federal de Procedimientos Penales, porque cumplen con los requisitos exigidos por el numeral 289 del ordenamiento legal citado, pues dada su mayoría de edad, capacidad e instrucción, se estima que los emitentes tienen criterio suficiente para juzgar el acto, además por su probidad e independencia de posición se considera tienen completa imparcialidad, máxime que conocieron esos hechos con motivo de sus funciones, pues son susceptibles de conocerse por los sentidos, y en el caso, los testigos los conocieron por sí, y no por referencia de otros, sus declaraciones son claras, precisas y congruentes, sin dudas ni reticencias, tanto en la sustancia como en las circunstancias esenciales del hecho, y de autos no se advierte que hayan emitido su testimonio obligados por fuerza o miedo, ni impulsados por engaño, error o soborno.--- En apoyo a estas consideraciones se citan las jurisprudencias 257 y 376, visibles a fojas 188 y 275, respectivamente, ambas en el Tomo II, Materia Penal, del Apéndice al Semanario Judicial de la Federación 1917-2000, intituladas: "POLICÍAS APREHENSORES, VALOR PROBATORIO DE TESTIMONIOS DE.", y "TESTIGOS. APRECIACIÓN DE SUS DECLARACIONES."--- Asimismo, la tesis del Primer Tribunal Colegiado del Décimo Primer Circuito, publicada en el Semanario Judicial de la Federación, Octava Época, Tomo XIII, Junio de 1994, Materia Penal, página 587, que dice:--- "INFORMES POLICIACOS RATIFICADOS POR AGENTES DE LA AUTORIDAD. DEBEN VALORARSE DE ACUERDO CON LAS REGLAS DE LA PRUEBA TESTIMONIAL."* --- El tercero



**14**

0659

# TOCA PENAL No. 6/2015

FORMA A-55



)DER JUDICIAL DE LA FEDERACIÓN

de los elementos que configura el delito contra la salud, relativo a que el Clorhidrato de Cocaína y Clorhidrato de Metanfetamina aseguradas estaban destinadas para realizar alguna de las conductas previstas por el dispositivo 194 del Código Penal Federal, también se encuentra acreditado en autos, pues el solo peso de treinta kilos, quinientos sesenta y cuatro gramos con cien miligramos (30,564.1 Kgms), peso neto de Clorhidrato de Cocaína, y ciento cuarenta y seis gramos con setecientos miligramos (146.7 Gms), peso neto de Clorhidrato de Metanfetamina (según dictamen químico foja 152) es suficiente para colmar ese extremo, ya que exceden de las cantidades de quinientos y cuarenta gramos de esos estupefaciente y psicotrópico, respectivamente, que resultan de multiplicar por mil los quinientos miligramos de Clorhidrato de Cocaína y los cuarenta miligramos de Clorhidrato de Metanfetamina que contemplan la cuarta y octava línea horizontal de narcóticos de la tabla de orientación de dosis máximas de consumo personal e inmediato, que contiene el artículo 479 de la Ley General de Salud; por tanto, es evidente que se actualiza el supuesto de presunción legal prevista en el párrafo tercero del arábigo 195 del Código Penal Federal.--- Por las razones que la informan y ser sustancialmente aplicable al caso, se cita la jurisprudencia número 48/2006, sustentada por la Primera Sala de la Suprema Corte de Justicia de la Nación, publicada en la página 82 del Tomo XXIV del Semanario Judicial de la Federación y su Gaceta correspondiente al mes de octubre de 2006, Novena Época, cuyo rubro dispone:--- "DELITO CONTRA LA SALUD, EN SU MODALIDAD DE POSESIÓN. LA CIRCUNSTANCIA DE QUE LA CANTIDAD DEL NARCÓTICO EXCEDA EL LÍMITE MÁXIMO PREVISTO EN LA TABLA DEL APÉNDICE 1 DEL ARTÍCULO 195 BIS DEL CÓDIGO PENAL FEDERAL, ES SUFICIENTE POR SÍ SOLA PARA TENER POR DEMOSTRADO QUE DICHA POSESIÓN TENÍA COMO FINALIDAD REALIZAR ALGUNA DE LAS CONDUCTAS PREVISTAS EN EL ARTÍCULO 194 DEL PROPIO CÓDIGO."--- El último de los elementos que conforman el delito en estudio, también está acreditado en autos, toda vez que el sujeto activo del delito no justificó con medio de convicción alguno contar con la autorización respectiva, expedida por la autoridad correspondiente para



NAL UNITARIO)
) CIRCUITO
), SONORA

**15**

*poser la droga afecta.--- Como corolario de todo lo anterior, se determina que con los medios de prueba analizados y valorados en párrafos precedentes, adminiculados entre sí en forma lógica y jurídica, conforme a los artículos 279, 284, 285, 288 y 289, en relación con el 286, este último relacionado con la prueba indiciaria, todos del Código Federal de Procedimientos Penales, hacen prueba plena y se consideran idóneos y suficientes para comprobar todos y cada uno de los elementos constitutivos del cuerpo del delito contra la salud, en la modalidad de posesión de Clorhidrato de Cocaína y Clorhidrato de Metanfetamina con fines de comercio (en la variante de venta),previsto y sancionado por el artículo 195, en relación con el 193, párrafo primero, ambos del Código Penal Federal; pues con ese material de convicción, se llega a la apreciación legal de que alguien, aproximadamente a las cuatro horas del dieciséis de noviembre de dos mil catorce, dentro del vehículo tipo camioneta de Marca Ford, Modelo Eco Esport, color blanca con placas de circulación VPK-58-45 del estado de Sinaloa, número de serie MAJUP3SF1EC123561, que se estaciono a la altura de la casa marcada con el número 1819 de la calle de los Aguacates, Colonia el Piñón, del Municipio de Culiacán, Sinaloa, mantuvo dentro de su radio de acción y ámbito de disponibilidad material y jurídica treinta kilos, quinientos sesenta y cuatro gramos con cien miligramos (30,564.1 Kgms), peso neto de Clorhidrato de Cocaína, continentes en treinta y un paquetes de forma rectangular, confeccionados en plástico, y ciento cuarenta y seis gramos con setecientos miligramos (146.7 Gms), peso neto de Clorhidrato de Metanfetamina, contenidos en una bolsa de plástico transparente(según dictamen químico foja 152); cantidades superiores de quinientos y cuarenta gramos, que multiplicados por mil los quinientos miligramos de Clorhidrato de Cocaína y los cuarenta miligramos de Clorhidrato de Metanfetamina que contemplan la cuarta y octava línea horizontal de narcóticos de la tabla de orientación de dosis máximas de consumo personal e inmediato, que contiene el artículo 479 de la Ley General de Salud, en los rubros Clorhidrato de Cocaína y Clorhidrato de Metanfetamina, respectivamente;por lo que estaban destinadas a realizar alguna de las conductas a que se refiere el numeral 194, del Código*



16

0660

## TOCA PENAL No. 6/2015

FORMA A-55



ODER JUDICIAL DE LA FEDERACIÓN

*Penal Federal, específicamente la de comercio, en la variante de venta, sin la autorización de la autoridad sanitaria correspondiente, poniendo en peligro el bien jurídico protegido, que es la salud pública.--- Sirve de apoyo a lo anterior la jurisprudencia VI.2º. J/174, visible a foja 96, Tomo IX, Febrero de 1992, del Semanario Judicial de la Federación, cuyo rubro es:--- "PRUEBA CIRCUNSTANCIAL. VALORACIÓN DE LA. La prueba circunstancial se basa en el valor incriminatorio de los indicios y tiene como punto de partida, hechos y circunstancias que están probados y de los cuales se trata de desprender su relación con el hecho inquirido, esto es, ya un dato por complementar, ya una incógnita por determinar, ya una hipótesis por verificar, lo mismo sobre la materialidad del delito que sobre la identificación del culpable y acerca de las circunstancias del acto incriminado." --- QUINTO. ACLARACIÓN PREVIO AL ESTUDIO DEL DELITO DE PORTACIÓN DE ARMAS DE FUEGO DEL USO EXCLUSIVO DEL EJÉRCITO, ARMADA Y FUERZA AÉREA Y AGRAVANTE. Previo al examen del delito de portación de armas de fuego del Uso Exclusivo de los Institutos Armados, éste Juzgador precisa destacar que en el particular el activo fue detenido con dos armas de fuego largas, de las enumeradas en el inciso c) y d) del artículo 11 de la Ley Federal de Armas de Fuego y Explosivos y además ocho armas cortas de las anotadas en los diversos incisos a) y b), del precitado numeral, siendo que respecto a estas últimas ocho armas se configura el delito de acopio de armas, es por eso que en estricto acatamiento al principio de exacta aplicación de la ley penal previsto en el artículo 14 Constitucional y conforme a las facultades conferidas al suscrito en el artículo 163 del Código Federal de Procedimientos Penales, se ubican los hechos, por lo que respecta a las ocho armas de fuego afectas el delito de acopio de armas de fuego, previsto y sancionado en el artículo 83 Bis, fracción I de la Ley Federal de Armas de Fuego y Explosivos, en relación con el 11, inciso a) y b), de la indicada Ley.--- Lo anterior, dado que el activo fue encontrado por elementos de la marina en posesión de más de cinco armas de fuego de las que están reservadas a los institutos armados del país, en el presente caso ocho armas de fuego cortas en el interior de un vehículo, sin que el activo sea integrante de las Fuerzas*



NAL UNITARIO
) CIRCUITO
O, SONORA

**17**

TOCA PENAL No. 6/2015

*Armadas, pues desde la perspectiva de quien esto resuelve, se encuentran demostrados los elementos de la descripción típica del delito de referencia, sobre todo, porque no es jurídicamente viable establecer la portación de más de cinco armas de fuego de uso de los Institutos Armados del País, pues el que se configura es el delito de Acopio de armas de fuego.--- Al respecto resulta aplicable, la Jurisprudencia 1ª./J.6372013(10a.), sustentada por la Primera Sala de la Suprema Corte de Justicia de la Nación, Materia Penal, Libro XXIV, Septiembre de 2013, del Tomo I, del Semanario Judicial de la Federación y su Gaceta, Décima Época, consultable en la página 845, que textualmente dice:--- "ACOPIO DE ARMAS DE FUEGO. EL DELITO PREVISTO Y SANCIONADO EN EL ARTÍCULO 83 BIS DE LA LEY FEDERAL DE ARMAS DE FUEGO Y EXPLOSIVOS, SE ACTUALIZA POR LA POSESIÓN DE MÁS DE CINCO ARMAS DE FUEGO RESERVADAS PARA LAS FUERZAS ARMADAS DEL PAÍS, SIN CONTAR CON LA AUTORIZACIÓN CORRESPONDIENTE Y CON INDEPENDENCIA DEL LUGAR EN DONDE SE DESCUBRA LA EXISTENCIA DEL ARMAMENTO. De la interpretación sistemática del artículo 10 de la Constitución Federal, relacionado con los numerales 15, 31, 83 y 83 Bis, de la Ley Federal de Armas de Fuego y Explosivos, deriva que el concepto de posesión que como elemento normativo del delito de acopio de armas de fuego de uso reservado a las fuerzas armadas del país, prevé y sanciona el numeral citado en último lugar, no tiene incidencia en el lugar donde se ejerza tal tenencia, pues la descripción típica no lo incluye; por tanto, dicho ilícito se actualiza cuando alguien tiene bajo su control personal y radio de disponibilidad más de cinco armas de fuego cuyo uso exclusivo corresponde a los citados institutos de seguridad nacional, sin la autorización correspondiente y con independencia del lugar donde se descubra la existencia del armamento.".--- De igual forma resulta aplicable, la tesis III.2o.P.60 P (10a.), sustentada por el Segundo Tribunal Colegiado en Materia Penal del Tercer Circuito, publicada el diecinueve de septiembre de dos mil catorce, Materia Penal, Libro 10, Septiembre de 2014, del Tomo III, del Semanario Judicial de la Federación y su Gaceta, Décima Época, consultable en la página 2517, que textualmente dice:--- "PORTACIÓN DE*

**18**

0661

## TOCA PENAL No. 6/2015



FORMA A-55



PODER JUDICIAL DE LA FEDERACIÓN

*ARMA DE FUEGO DE USO EXCLUSIVO DEL EJÉRCITO, ARMADA O FUERZA AÉREA. LA AGRAVANTE PREVISTA EN EL ARTÍCULO 83, PÁRRAFO PENÚLTIMO, DE LA LEY FEDERAL DE ARMAS DE FUEGO Y EXPLOSIVOS, NO SE ACTUALIZA POR PORTAR MÁS DE CINCO, SINO QUE SE CONFIGURA EL DIVERSO DE ACOPIO DE ARMAS. El artículo 83, párrafo penúltimo, de la Ley Federal de Armas de Fuego y Explosivos prevé la agravante relativa cuando el sujeto activo porte dos o más armas de fuego de uso reservado a las fuerzas armadas del país, en este supuesto, la pena correspondiente se aumentará hasta en dos terceras partes. De la interpretación sistemática de esta disposición, se concluye que dicha agravante no se actualiza cuando el imputado es detenido por portar y traer consigo en un vehículo o tener en algún domicilio más de cinco armas, sino que se configura el diverso delito de acopio de armas de fuego, previsto y sancionado en el artículo 83 Bis de la ley especial invocada.".--- En base a lo anterior y en el presente caso, se tiene por actualizado el delito de acopio de armas, previsto y sancionado en el artículo 83 Bis, fracción I de la Ley Federal de Armas de Fuego y Explosivos, cuando alguien tiene bajo su control personal y dentro del radio de acción de su disponibilidad más de cinco armas de fuego de las reservadas para el uso exclusivo de las Fuerzas Armadas, hipótesis que se actualizó, pues se detuvo al imputado con ocho armas de fuego en el interior del vehículo que tripulaba, tal y como se desprende del parte informativo del dieciséis de noviembre de dos mil catorce.--- Dicho lo anterior, el cuerpo del delito de acopio de armas de fuego, previsto y sancionado en el artículo 83 Bis, fracción I, en relación con el 11, inciso a) y b), de la Ley Federal de Armas de Fuego y Explosivos, se encuentra debidamente acreditado en autos, respecto de ocho armas cortas de las aseguradas al inculpado.--- SEXTO. CUERPO DEL DELITO DE ACOPIO DE ARMAS DE FUEGO. El delito de acopio de armas de fuego, previsto y sancionado en el artículo 83 Bis, fracción I, en relación con el 11, inciso a) y b), de la Ley Federal de Armas de Fuego y Explosivos, y su descripción típica, es la siguiente:--- "Artículo 83 Bis. Al que sin el permiso correspondiente hiciere acopio de armas, se le sancionará:--- I. Con prisión de dos a nueve años y de diez a trescientos días multa, si las armas están*



\L UNITARIO
IRCUITO
SONORA

**19**

**TOCA PENAL No. 6/2015**

*comprendidas en los incisos a) o b) del artículo 11, de esta Ley. En el caso del inciso i) del mismo artículo, se impondrá de uno a tres años de prisión y de cinco a quince días multa; y --- II. Con prisión de cinco a treinta años y de cien a quinientos días multa, si se trata de cualquiera otra de las armas comprendidas en el artículo 11 de esta Ley.--- Por acopio debe entenderse la posesión de más de cinco armas de las de uso exclusivo del Ejército, Armada y Fuerza Aérea.--- Para la aplicación de la sanción por delitos de portación o acopio de armas, el Juez deberá tomar en cuenta la actividad a que se dedica el autor, sus antecedentes y las circunstancias en que fue detenido.".--- Conforme a lo anterior, el cuerpo del delito indicado lo integran los elementos siguientes:--- a) La existencia de cinco o más armas de fuego de las reservadas para el uso exclusivo del Ejército, Armada y Fuerza Aérea, en los términos del artículo 11, incisos a) y b) de la Ley Federal de Armas de Fuego y Explosivos; en el caso, seis armas de fuego, tipo pistola, calibre .38" Súper Auto, marca Colt; y dos armas arma de fuego, tipo revolver, calibre .44" MAG.--- b) Que el sujeto activo tenga bajo su radio de acción y esfera de disponibilidad las armas de fuego aludidas; y, --- c) Que esa conducta sea desplegada por el agente activo sin contar con el permiso correspondiente, o bien, sin ser miembro de alguna de las instituciones armadas del país.--- El primer elemento se tiene por demostrado con la fe ministerial practicada el diecisiete de noviembre de dos mil catorce, en la que dio fe de tener ante su vista, entre otras cosas:--- 1) Un arma de fuego, tipo pistola, calibre .38" Súper Auto, marca colt, matrícula THE B 701, sin modelo ni país de fabricación a la vista, cuenta con en una de sus caras con una placa en color dorado con la leyenda "THE BILLIONAIRE", otra leyenda con el numero "701", una placa en color dorado con la leyenda "Sinaloa", en otra de sus caras presente un circulo con la leyenda "Billionaire Phorbes 701", decorado con piedras pequeñas en color blanco y piedras pequeñas en color negro; nueve cartuchos útiles para arma de fuego, calibre .38" súper auto y un cargador metálico color negro con dorado, calibre .38" súper auto, cuenta con grabados en relieve (INDICIO NÚMERO 6).--- 2) Un arma de fuego, tipo pistola, calibre .38" Súper Auto, de la marca Colt, matrícula ELS085H, modelo Government, con*



SEGUNDO TRIB
DEL QUINT
HERMOSIL

# TOCA PENAL No. 6/2015

FORMA A-55



PODER JUDICIAL DE LA FEDERACIÓN

país de fabricación U.S.A., con estructura metálica cromada y en una de sus caras presenta la leyenda "El Senador"; nueve cartuchos útiles para arma de fuego, calibre .38" súper auto y un cargador metálico color negro, calibre .38" súper auto (INDICIO NÚMERO 7).--- 3) Un arma de fuego, tipo pistola, calibre .38" Súper Auto, de la marca Colt, matrícula 42020, sin modelo ni país de fabricación visible, misma que en una de sus caras laterales presenta la leyenda "El Capitán", y en la otra cara la leyenda "El Piro", con cachas, con grabados en relieve en color dorado, con la figura de un corcel en color dorado; nueve cartuchos útiles para arma de fuego, calibre: .38" súper auto y un cargador metálico color negro calibre: .38" súper auto (INDICIO NÚMERO 8).--- 4) Un arma de fuego, tipo pistola, calibre .38" Súper Auto, de la marca colt, matrícula 6872, modelo Combat Commander, país de fabricación U.S.A., cuenta con grabados en relieve, y con cachas de material sintético color beige, en las que se observa grabada una fotografía con las iniciales "JGL"; nueve cartuchos útiles para arma de fuego, calibre: .38" súper auto y un cargador metálico color gris, calibre: .38" súper auto (INDICIO NÚMERO 9).--- 5) Un arma de fuego, tipo pistola, calibre .38" Súper Auto, de la marca colt, matrícula 2053, modelo súper match, país de fabricación U.S.A., en ambas cachas cuenta con un circulo con incrustaciones de piedras pequeñas color blanco; nueve cartuchos útiles para arma de fuego, calibre .38" súper auto y un cargador metálico color gris, calibre .38" súper auto (INDICIO NÚMERO 10).--- 6) Un arma de fuego, tipo revolver, calibre .44" MAG, de la marca Sporting Arms Inc., modelo sheriff, sin matrícula visible, país de fabricación U.S.A., cuenta con cachas de madera en color café y seis cartuchos útiles para arma de fuego, calibre .44" REM MAG (INDICIO NÚMERO 11).--- 7) Un arma de fuego, tipo pistola, calibre .44", de la marca Magnum Research Inc., matrícula MR004304, modelo Desert Eagle Pistol, y país de fabricación U.S.A.; ocho cartuchos útiles para arma de fuego, calibre .44" REM MAG y un cargador metálico color gris, calibre .44" (INDICIO NÚMERO 12).--- 8) Un arma de fuego, tipo pistola, calibre .38" súper auto, marca colt, matrículaCS004849, país de fabricación U.S.A.; nueve cartuchos útiles para arma de fuego, calibre .38" súper auto y un cargador metálico color

AL UNITARIO
CIRCUITO
SONORA

21

## TOCA PENAL No. 6/2015

*negro, calibre .38" súper auto (INDICIO NÚMERO 13).--- Tal probanza en el*

*considerando que antecede fue tasada con valor probatorio pleno por*

*disposición del artículo 284 del Código Federal de Procedimientos Penales, al*

*reunir los requisitos de los diversos numerales 208 y 209, razonamiento y tesis*

*aplicables que se tienen por reproducidas en obvio de repeticiones*

*innecesarias.--- Sumado a lo anterior, se cuenta con el dictamen pericial en*

*materia de balística forense, de diecisiete de noviembre de dos mil catorce,*

*emitido por José Velázquez García, perito adscrito a la Agencia de Investigación*

*Criminal, Coordinación General de Laboratorios Criminalísticos, departamento*

*de Balística Forense, de la Procuraduría General de la Republica, en el cual se*

*determinó.--- "... SEGUNDA: LAS ARMAS DE FUEGO TIPO: PISTOLA,*

*CALIBRE: .38" SUPER AUTO, DESCRITAS EN LOS INDICIOS 06, 07, 08, 09,*

*10 Y 13 DEL PRESENTE DICTAMEN; POR SU TIPO Y CALIBRE, LA LEY*

*FEDERAL DE ARMAS DE FUEGO Y EXPLOSIVOS LA CONTEMPLA EN SU*

*ARTICULO 11 INCISO b), COMO DE LAS ARMAS DE FUEGO RESERVADAS*

*PARA USO EXCLUSIVO DEL EJERCITO ARMADA Y FUERZA AÉREA*

*NACIONALES. --- TERCERA: EL ARMA DE FUEGO TIPO: REVOLVER,*

*CALIBRE: .44" MAG, DESCRITA EN EL INDICIO 11 DEL PRESENTE*

*DICTAMEN; POR SU TIPO Y CALIBRE, LA LEY FEDERAL DE ARMAS DE*

*FUEGO Y EXPLOSIVOS LA CONTEMPLA EN SU ARTICULO 11 INCISO a),*

*COMO DE LAS ARMAS DE FUEGO RESERVADAS PARA USO EXCLUSIVO*

*DEL EJERCITO ARMADA Y FUERZA AÉREA NACIONALES. --- CUARTA: EL*

*ARMA DE FUEGO TIPO: PISTOLA, CALIBRE: .44", DESCRITA EN EL*

*INDICIOS 12 DEL PRESENTE DICTAMEN; POR SU TIPO Y CALIBRE, LA LEY*

*FEDERAL DE ARMAS DE FUEGO Y EXPLOSIVOS LA CONTEMPLA EN SU*

*ARTICULO 11 INCISO b), COMO DE LAS ARMAS DE FUEGO RESERVADAS*

*PARA USO EXCLUSIVO DEL EJERCITO ARMADA Y FUERZA AÉREA*

*NACIONALES...".--- Toda vez de que se trata de una pericial que cumple con*

*los requisitos establecidos en los numerales 234 y 235, del código adjetivo de la*

*materia y fuero, porque de las constancias se advierte que fue emitida por*

*órgano especializado de prueba, quien practicó todas las operaciones y*



SEGUNDO TRIBUN
DEL QUINTO (
HERMOSILLO,

0663

## TOCA PENAL No. 6/2015

FORMA A-55



PODER JUDICIAL DE LA FEDERACIÓN

*experimentos que su ciencia le sugirió, expresando los hechos y circunstancias que le sirvieron para fundamentar su opinión, además está acorde con el resto del material probatorio, y por ello se le confiere valor probatorio de indicio de acuerdo con los dispositivos 285, 286 y 288, del código procesal en cita, así como con la tesis 256, visible en la página 188, del Tomo II, Materia Penal, del Apéndice al Semanario Judicial de la Federación 1917 - 2000, titulada: "PERITOS. VALOR PROBATORIO DE SU DICTAMEN."--- Por lo que al enlazar estos medios de prueba con los anteriores, se llega a la certeza de la actualización del primer elemento de la descripción típica de que se trata.--- Artefactos bélicos que son más de cinco, mismos que por sus características, son de los considerados de uso exclusivo del Ejército Armada y Fuerza Aérea Nacionales, según el artículo 11, incisos a) y b, respectivamente, de la Ley Federal de Armas de Fuego y Explosivos.--- El segundo elemento integrante del cuerpo de los delitos en estudio, esto es, que el activo tengan bajo su radio de acción y esfera de disponibilidad dichas armas de fuego, se encuentra probado, queda demostrado con el parte informativo de dieciséis de noviembre de dos mil catorce, suscrito por Isaac Pineda López, Javier Ávila Santiago, elementos de la Secretaría de la Marina Armada de México, debidamente ratificado ante el órgano técnico investigador, cuyo contenido y valoración quedó establecido considerandos precedentes, cuyos razonamientos y tesis aplicables, se tienen por reproducidos en obvio de repeticiones innecesarias, de conformidad con el artículo 95, fracción IV, del código adjetivo para la materia.--- Luego, de tales probanzas se deriva que el activo del delito portó un arma de fuego en las circunstancias de tiempo, lugar y modo que se precisan con antelación.--- El tercer elemento del delito, consistente en que esa conducta sea desplegada por los agentes activos sin ser miembros de alguna de las instituciones armadas del país; se advierte que es de carácter negativo y debe tenerse actualizado por exclusión, pues no existe en autos dato objetivo alguno o prueba fehaciente de que los agentes activos del delito formen parte de alguna de las instituciones armadas del país; lo que hace concluir, que se tiene por satisfecho este elemento del delito.--- En suma, de los anteriores elementos de prueba*



L UNITARIO
RCUITO
ONORA

*adminiculados entre sí, en los términos de lo previsto por los artículos 284, 285, 286, 288 y 289, del Código Federal de Procedimientos Penales, deriva prueba con valor probatorio pleno y apta para acreditar el cuerpo del delito de acopio de armas de fuego, previsto y sancionado en el artículo 83 Bis, fracción I, en relación con el 11, inciso a) y b), de la Ley Federal de Armas de Fuego y Explosivos, toda vez que se acreditó que aproximadamente a las cuatro horas del dieciséis de noviembre de dos mil catorce,   dentro del vehículo tipo camioneta de Marca Ford, Modelo Eco Esport, color blanca con placas de circulaciónVPK-58-45 del estado de Sinaloa, número de serie MAJUP3SF1EC123561, que se estaciono a la altura de la casa marcada con el número 1819 de la calle de los Aguacates, Colonia el Piñón, del Municipio de Culiacán, Sinaloa, alguien mantuvo dentro de su radio de acción y ámbito de disponibilidad personal y material 1) Un arma de fuego, tipo pistola, calibre .38" Súper Auto, marca colt, matrícula THE B 701, sin modelo ni país de fabricación a la vista, cuenta con en una de sus caras con una placa en color dorado con la leyenda "THE BILLIONAIRE", otra leyenda con el numero "701", una placa en color dorado con la leyenda "Sinaloa",  en otra de sus caras presente un circulo con la leyenda "Billionaire Phorbes 701", decorado con piedras pequeñas en color blanco y piedras pequeñas en color negro; nueve cartuchos útiles para arma de fuego, calibre .38" súper auto y un cargador metálico color negro con dorado, calibre .38" súper auto,  cuenta con grabados en relieve (INDICIO NÚMERO 6); 2) Un arma de fuego, tipo pistola, calibre .38" Súper Auto, de la marca Colt, matrícula ELS085H, modelo Government, con país de fabricación U.S.A., con estructura metálica cromada y en una de sus caras presenta la leyenda "El Senador"; nueve cartuchos útiles para arma de fuego, calibre .38" súper auto y un cargador metálico color negro, calibre .38" súper auto (INDICIO NÚMERO 7); 3) Un arma de fuego, tipo pistola, calibre .38" Súper Auto, de la marca Colt, matricula 42020, sin modelo ni país de fabricación visible, misma que en una de sus caras laterales presenta la leyenda "El Capitán", y en la otra cara la leyenda "El Piro", con cachas, con grabados en relieve en color dorado, con la figura de un corcel en color dorado; nueve cartuchos útiles para arma de*

24

**TOCA PENAL No. 6/2015**

0604



PODER JUDICIAL DE LA FEDERACIÓN

*tercerolas en calibre .223, 7 mm., 7. 62 mm. y carabinas calibre .30 en todos sus modelos.--- d) Pistolas, carabinas y fusiles con sistema de ráfaga, subametralladoras, metralletas y ametralladoras en todos sus calibres.... ".---*

*Bajo ese contexto, los elementos corporales del delito son:--- a) La existencia de armas de fuego del uso exclusivo del Ejército, Armada y Fuerza Aérea, en el caso, dos armas de fuego, tipo fusil, calibre 7.62 x 39 mm, marca Norinco.--- b) Que el activo porte dichas armas; es decir, las traiga consigo.--- c) Que la acción de portar se lleve a cabo respecto de dos o más armas de fuego del uso exclusivo, y; --- d) Que no cuente con la autorización expedida por las autoridades correspondientes para ello.-- Ciertamente, el primer elemento se encuentra acreditado con la inspección efectuada por el agente del Ministerio Público de la Federación, de diecisiete de noviembre de dos mil catorce, en la que dio fe de tener ante su vista, entre otras cosas:--- 1) Un arma de fuego, tipo fusil, calibre 7.62 x 39 mm, marca Norinco, matrícula visible 12*3*, pues el tercer y quinto dígito no son legibles, modelo MAK-90, de fabricación china; con treinta cartuchos útiles para arma de fuego, calibre 7.62 x 39 mm.;un cargador metálico color negro para arma de fuego calibre 7.62 x 39 mm (INDICIO NÚMERO 3).--- 2) Un arma de fuego, tipo fusil, calibre 7.62 x 39 mm, de la marca Norinco, con matrícula 87566 y modelo MAK-90 Sporter, de fabricación china; treinta cartuchos útiles para arma de fuego, calibre: 7.62 x 39 mm.; un cargador metálico color negro calibre 7.62 x 39 mm. (INDICIO NÚMERO 5).--- Tal probanza en el considerando que antecede fue tasada con valor probatorio pleno por disposición del artículo 284 del Código Federal de Procedimientos Penales, al reunir los requisitos de los diversos numerales 208 y 209, razonamiento y tesis aplicables que se tienen por reproducidas en obvio de repeticiones innecesarias.--- Sumado a lo anterior, se cuenta con el dictamen pericial en materia de balística forense, de diecisiete de noviembre de dos mil catorce, emitido por José Velázquez García, perito adscrito a la Agencia de Investigación Criminal, Coordinación General de Laboratorios Criminalísticos, departamento de Balística Forense, de la Procuraduría General de la Republica, en el cual se determinó:--- "... PRIMERA: LAS ARMAS DE FUEGO TIPO:*

TOCA PENAL NO. 6/2015

*FUSIL; CALIBRE: 7.62 X 39 mm, DESCRITAS EN LOS INDICIOS 03 Y 05, RESPECTIVAMENTE EN EL PRESENTE DICTAMEN, POR SU CALIBRE Y SISTEMA DE DISPARO, LA LEY FEDERAL DE ARMAS DE FUEGO Y EXPLOSIVOS, LA CONSIDERA EN SU ARTÍCULO 11, INCISO d), COMO DE LAS ARMAS DE FUEGO RESERVADAS PARA USO EXCLUSIVO DEL EJERCITO ARMADA Y FUERZA AÉREA NACIONALES. ...".---* Toda vez de que se trata de una pericial que cumple con los requisitos establecidos en los numerales 234 y 235, del código adjetivo de la materia y fuero, porque de las constancias se advierte que fue emitida por órgano especializado de prueba, quien practicó todas las operaciones y experimentos que su ciencia le sugirió, expresando los hechos y circunstancias que le sirvieron para fundamentar su opinión, además está acorde con el resto del material probatorio, y por ello se le confiere valor probatorio de indicio de acuerdo con los dispositivos 285, 286 y 288, del código procesal en cita, así como con la tesis 256, visible en la página 188, del Tomo II, Materia Penal, del Apéndice al Semanario Judicial de la Federación 1917 - 2000, titulada: "PERITOS. VALOR PROBATORIO DE SU DICTAMEN."--- Con lo anterior queda acreditada la existencia de diez armas de fuego, y su clasificación jurídica, que constituyen el objeto material del delito.--- El segundo de los elementos del cuerpo del delito, consistente en que el sujeto activo portó las armas de fuego de referencia, queda demostrado con el parte informativo de dieciséis de noviembre de dos mil catorce, suscrito por Isaac Pineda López, Javier Ávila Santiago, elementos de la Secretaría de la Marina, Armada de México, debidamente ratificado ante el órgano técnico investigador, cuyo contenido y valoración quedó establecido considerandos precedentes, cuyos razonamientos y tesis aplicables, se tienen por reproducidos en obvio de repeticiones innecesarias, de conformidad con el artículo 95, fracción IV, del código adjetivo para la materia.--- Luego, de tales probanzas se deriva que el activo del delito portó un arma de fuego en las circunstancias de tiempo, lugar y modo que se precisan con antelación.--- Los medios de prueba antes señalados acreditan el tercero de los elementos en comento, en tanto que de la fe ministerial, y del parte informativo, se advierte que se portaron dos armas de

**28**

**TOCA PENAL No. 6/2015**





PODER JUDICIAL DE LA FEDERACIÓN

*fuego, que son del uso exclusivo de nuestras fuerzas armadas, según se obtiene del dictamen en materia de identificación de armas de fuego ya valorado, lo que configura la agravante de que se trata.--- El último de los elementos que configuran el cuerpo del delito, relativo a que la portación de las armas de fuego se llevó a cabo sin contar los activos con la autorización correspondiente, quedó acreditado con el hecho de que el activo no demostró con documento alguno, que tenía autorización de la Secretaría de la Defensa Nacional, para portar los instrumentos bélicos en cuestión; extremo que a ellos correspondía demostrar porque como constituye un hecho negativo no podía hacerlo el órgano consignador y su ausencia entre las constancias es indicador de que no se tenía.--- En suma, de los anteriores elementos de prueba adminiculados entre sí, en los términos de lo previsto por los artículos 284, 285, 286, 288 y 289, del Código Federal de Procedimientos Penales, deriva prueba con valor probatorio pleno y apta para acreditar el cuerpo del delito de portación de armas de fuego del uso Exclusivo del Ejército, Armada y Fuerza Aérea, previsto y sancionado por el artículo 83, fracción III, con la agravante del penúltimo párrafo, en relación con el 11, incisos c) y d), ambos de la Ley Federal de Armas de Fuego y Explosivos, toda vez que se acreditó que aproximadamente a las cuatro horas del dieciséis de noviembre de dos mil catorce, dentro del vehículo tipo camioneta de Marca Ford, Modelo Eco Esport, color blanca con placas de circulación VPK-58-45 del estado de Sinaloa, número de serie MAJUP3SF1EC123561, que se estacionó a la altura de la casa marcada con el número 1819 de la calle de los Aguacates, Colonia el Piñón, del Municipio de Culiacán, Sinaloa, alguien portó 1) Un arma de fuego, tipo fusil, calibre 7.62 x 39 mm, marca Norinco, matrícula visible 12\*3\*, pues el tercer y quinto digito no son legibles, modelo MAK-90, de fabricación china; con treinta cartuchos útiles para arma de fuego, calibre: 7.62 x 39 mm. (INDICIO NÚMERO 3); y 2) Un arma de fuego, tipo fusil, calibre 7.62 x 39 mm, de la marca Norinco, con matricula 87566 y modelo MAK-90 Sporter, de fabricación china; treinta cartuchos útiles para arma de fuego, calibre: 7.62 x 39 mm. (INDICIO NÚMERO 5); que como se acreditó con el dictamen pericial correspondiente de identificación de armas,*

29

TOCA PENAL NO. 6/2013

*resultaron ser para el uso exclusivo del Ejército, Armada y Fuerza Aérea, de lo cual se advierte que se portaron dos armas de fuego, que son del uso exclusivo de nuestras fuerzas armadas; ello sin contar con la autorización expedida por la autoridad competente, con lo cual se puso en peligro el bien jurídico tutelado que es la seguridad pública y tranquilidad de las personas.--- SEXTO. CUERPO DEL DELITO DE POSESIÓN CARTUCHOS PARA ARMAS DE FUEGO DE USO EXCLUSIVO DEL EJÉRCITO, ARMADA Y FUERZA AÉREA. Está acreditado el cuerpo del delito de posesión de cartuchos para armas de fuego de uso exclusivo del Ejército, Armada y Fuerza Aérea, previsto y sancionado por el artículo 83 Quat, fracciones I y II, en relación con el diverso 11, incisos a), b), c) y f), ambos de la Ley Federal de Armas de Fuego y Explosivos, siendo importante destacar que se agregaron los incisos a), b) y c) del artículo 11 toda vez que los cartuchos son para armas contenidas en esos incisos.--- Los numerales de referencia establecen:--- "Artículo 83 Quat. Al que posea cartuchos en cantidades mayores a las permitidas, se le sancionará:--- I. Con prisión de uno a cuatro años y de diez a cincuenta días multa, si son para armas que están comprendidas en los artículos 9, 10 y 11, incisos a) y b) de esta ley; y --- II. Con prisión de dos a seis años y de veinticinco a cien días multa, si son para las armas que están comprendidas en los restantes incisos del artículo 11 de esta Ley."--- "Artículo 11. Las armas, municiones y material para el uso exclusivo del Ejército, Armada y Fuerza Aérea, son las siguientes:--- a) Revólveres calibre .357 Magnum y los superiores a .38 Especial.--- b) Pistolas calibre 9 mm. Parabellum, Luger y similares, las .38 Super y Comando, y las de calibres superiores.--- c) Fusiles, mosquetones, carabinas y tercerolas en calibre .223, 7 mm., 7. 62 mm. y carabinas calibre .30 en todos sus modelos.--- d) Pistolas, carabinas y fusiles con sistema de ráfaga, sub-ametralladoras, metralletas y ametralladoras en todos sus calibres.... --- f) Municiones para las armas anteriores y cartuchos con artificios especiales como trazadores, incendiarios, perforantes, fumígenos, expansivos, de gases y los cargados con postas superiores al "00" (.84 de diámetro) para escopeta. ..."--- De ello deriva, que el cuerpo de tal ilícito se compone de estos elementos:--- a).- La existencia*



SEGUNDO TRIBU
DEL QUINTO
HERMOSILL

30



PODER JUDICIAL DE LA FEDERACIÓN

de cartuchos de los considerados de los reservados para el uso exclusivo del Ejército, Armada y Fuerza Aérea.--- b).- Que el activo posea dichos cartuchos, y, --- c).- Que el activo no contaba con la autorización a que se refiere el último párrafo del artículo 11 de la Ley Federal de Armas de Fuego y Explosivos.--- Ciertamente, el primer elemento se encuentra acreditado con la inspección efectuada por el agente del Ministerio Público de la Federación, de diecisiete de noviembre de dos mil catorce, en la que dio fe de tener ante su vista, entre otras cosas:--- 1) Sesenta y siete cartuchos útiles para arma de fuego, calibre .25" Auto; --- 2) Veinte cartuchos útiles para arma de fuego, calibre .40" S&W; --- 3) Setenta y cuatro cartuchos útiles para arma de fuego, calibre: 5.7 x 28 MM.; --- 4) Sesenta y tres cartuchos útiles para arma de fuego, calibre 9 MM.; --- 5) Cincuenta y dos cartuchos útiles para arma de fuego, calibre .44" REM MAG; --- 6) Setenta cartuchos útiles para arma de fuego, calibre .38" Súper Auto; --- 7) Sesenta cartuchos útiles para arma de fuego, calibre .45" Auto.; --- 8) Doscientos sesenta y seis cartuchos útiles para arma de fuego, calibre 7.62 x 39 MM.;--- 9) Doscientos sesenta y cuatro cartuchos para arma de fuego, calibre: .223".--- Sumado a lo anterior, se cuenta con el dictamen pericial en materia de balística forense, de diecisiete de noviembre de dos mil catorce, emitido por José Velázquez García, perito adscrito a la Agencia de Investigación Criminal, Coordinación General de Laboratorios Criminalísticos, departamento de Balística Forense, de la Procuraduría General de la República, en el cual se determinó que los cartuchos con los calibres indicados en el párrafo que antecede se encuentran contemplados en el artículo 11, inciso f), de la Ley Federal de Armas de Fuego y Explosivos.--- El valor probatorio pleno concedido a la inspección ministerial y al dictamen pericial quedó establecido en los considerandos precedentes, cuyos razonamientos se tienen por reproducidos en obvio de repeticiones.--- Por lo que se refiere al segundo de los elementos que componen el cuerpo del delito, consistente en que el activo mantenga dentro de su radio de acción y ámbito de disponibilidad los cartuchos afectos, se encuentra demostrado primordialmente con el parte informativo de dieciséis de noviembre de dos mil catorce, suscrito por Isaac Pineda López, Javier Ávila Santiago,

TOCA PENAL NO. 6/2015

*elementos de la Secretaría de la Marina, Armada de México, debidamente*

*ratificado, en el que dieron la noticia de que aproximadamente a las cuatro horas*

*del dieciséis de noviembre de dos mil catorce, un vehículo tipo camioneta de*

*Marca Ford, Modelo Eco Esport, color blanca con placas de circulaciónVPK-58-*

*45 del estado de Sinaloa, número de serie MAJUP3SF1EC123561, que se*

*estacionó a la altura de la casa marcada con el número 1819 de la calle de los*

*Aguacates, Colonia el Piñón, del Municipio de Culiacán, Sinaloa, el cual era*

*conducido por Jesús Raúl Beltrán León, alias "CHUY RAÚL", por lo que al*

*revisar dicho automotor en el asiento posterior el cual venia abatido y encima se*

*encontraban una caja de cartón en la cual se localizó 1) Sesenta y siete*

*cartuchos útiles para arma de fuego, calibre .25" Auto; 2) Veinte cartuchos útiles*

*para arma de fuego, calibre .40" S&W; 3) Setenta y cuatro cartuchos útiles para* 

*arma de fuego, calibre: 5.7 x 28 MM.; 4) Sesenta y tres cartuchos útiles para*

*arma de fuego, calibre 9 MM.; 5) Cincuenta y dos cartuchos útiles para arma de*

*fuego, calibre .44" REM MAG; 6) Setenta cartuchos útiles para arma de fuego,*

*calibre .38" Súper Auto; 7) Sesenta cartuchos útiles para arma de fuego, calibre*

*.45" Auto.; 8) Doscientos sesenta y seis cartuchos útiles para arma de fuego,*

*calibre 7.62 x 39 MM.; 9) Doscientos sesenta y cuatro cartuchos para arma de*

*fuego, calibre: .223";parte informativo cuyo contenido y valoración quedó*

*establecido considerandos precedentes, cuyos razonamientos y tesis aplicables,*

*se tienen por reproducidos en obvio de repeticiones innecesarias.--- El último de*

*los elementos que configuran el cuerpo del delito, relativo a tener los cartuchos*

*descritos dentro de su ámbito de disponibilidad material y jurídica sin contar el*

*activo con la autorización correspondiente, quedó acreditado con el hecho de*

*que el encausado no demostró con documento alguno, que tenía autorización de*

*la Secretaría de la Defensa Nacional, para mantener dentro de su radio de*

*acción y ámbito de disponibilidad los cartuchos para arma de fuego en cuestión;*

*extremo que a él correspondía demostrar porque como constituye un hecho*

*negativo no podía hacerlo el órgano consignador y su ausencia entre las*

*constancias es indicador de que no se tenía.--- Como corolario de todo lo*

*anterior, se determina que con los medios de prueba analizados y valorados en*





PODER JUDICIAL DE LA FEDERACIÓN

UNITARIO
RCUITO
ONORA

*párrafos precedentes, adminiculados entre sí en forma lógica y jurídica, conforme a los artículos 279, 284, 285, 288 y 289, en relación con el 286, este último relacionado con la prueba indiciaria, todos del Código Federal de Procedimientos Penales, hacen prueba plena y se consideran idóneos y suficientes para comprobar todos y cada uno de los elementos constitutivos del cuerpo del delito de posesión de cartuchos para armas de fuego de uso exclusivo del Ejército, Armada y Fuerza Aérea, previsto y sancionado por el artículo 83 Quat, fracciones I y II, en relación con el diverso 11, incisos a), b), c) y f), ambos de la Ley Federal de Armas de Fuego y Explosivos, atento a que con ese material de convicción se llega a la apreciación fáctica de que aproximadamente a las cuatro horas del dieciséis de noviembre de dos mil catorce, dentro del vehículo tipo camioneta de Marca Ford, Modelo Eco Esport, color blanca con placas de circulación VPK-58-45 del estado de Sinaloa, número de serie MAJUP3SF1EC123561, que se estaciono a la altura de la casa marcada con el número 1819 de la calle de los Aguacates, Colonia el Piñón, del Municipio de Culiacán, Sinaloa, alguien tuvo dentro de su radio de acción y ámbito de disponibilidad 1) Sesenta y siete cartuchos útiles para arma de fuego, calibre .25" Auto; 2) Veinte cartuchos útiles para arma de fuego, calibre .40" S&W; 3) Setenta y cuatro cartuchos útiles para arma de fuego, calibre: 5.7 x 28 MM.; 4) Sesenta y tres cartuchos útiles para arma de fuego, calibre 9 MM.; 5) Cincuenta y dos cartuchos útiles para arma de fuego, calibre .44" REM MAG; 6) Setenta cartuchos útiles para arma de fuego, calibre .38" Súper Auto; 7) Sesenta cartuchos útiles para arma de fuego, calibre .45" Auto.; 8) Doscientos sesenta y seis cartuchos útiles para arma de fuego, calibre 7.62 x 39 MM.; 9) Doscientos sesenta y cuatro cartuchos para arma de fuego, calibre: .223"; mismos que resultaron ser para armas de fuego del uso exclusivo del Ejército, Armada y Fuerza Aérea, ello sin contar con permiso expedido por la autoridad competente, con lo cual se lesionó el bien jurídico tutelado que es la seguridad pública.--- Cabe hacer mención que la posesión debe analizarse bajo la idea de que el sujeto activo mantenga dentro de su radio de acción y ámbito de disponibilidad los cartuchos afectos.--- Como ilustración se invoca la tesis de jurisprudencia*

TOCA PENAL No. 6/2015

1/2003, aprobada por la Primera Sala de este Alto Tribunal, en sesión de cuatro de diciembre de dos mil dos, visible a foja 96 del Tomo XVII, Febrero de 2003, del Semanario Judicial de la Federación, Novena Época, que dice: "CARTUCHOS PARA ARMAS DE USO EXCLUSIVO DEL EJÉRCITO, ARMADA Y FUERZA AÉREA. SU POSESIÓN ES PUNIBLE EN TÉRMINOS DE LA LEY FEDERAL DE ARMAS DE FUEGO Y EXPLOSIVOS. De la interpretación sistemática de los artículos 9o., 10, 10 Bis, 11, 50, 77, fracciones I y IV, y 83 Quat de la Ley Federal de Armas de Fuego y Explosivos, se desprende que el legislador excluyó a los particulares la posibilidad de poseer o portar armas reservadas para el uso exclusivo del Ejército, Armada y Fuerza Aérea, así como los cartuchos correspondientes para aquéllas, por lo que la posesión de éstos sí puede ser objeto de las penas que prevé el último numeral citado. Esto es así porque si bien en la ley no se señaló cantidad alguna para la posesión de los cartuchos correspondientes a las armas de uso exclusivo, ello fue, precisamente, porque las diversas conductas de posesión o portación de este tipo de armas se consideran constitutivas de delito cuando se llevan a cabo por quien no pertenece a los institutos armados, por lo que si no existe autorización a este respecto, tampoco puede haberla para poseer los cartuchos correspondientes. No es óbice a lo anterior, el que la fracción I del referido numeral 83 Quat se refiera a la expresión "cantidades mayores a las permitidas", pues ello no debe entenderse en forma gramatical, sino de manera sistemática, esto es, si se parte de la premisa de que el legislador expresamente prohíbe la posesión o portación de armas reservadas para el uso exclusivo de las instituciones castrenses a los particulares, es evidente que la posesión de los cartuchos, que resultan accesorios a dichas armas, también está prohibida y, por ende, la tenencia de cualquier cantidad de ellos resulta punible, además de que tal expresión se refiere a cartuchos pertenecientes a armas permitidas a los particulares en términos del artículo 50 de la ley referida. Estimar lo contrario llevaría a la conclusión errónea de que existe autorización para contar con cartuchos para armas que están expresamente prohibidas para los particulares."--- SÉPTIMO. PROBABLE RESPONSABILIDAD.- Por lo que hace a

**34**

FORMA A-55



PODER JUDICIAL DE LA FEDERACIÓN

*la probable responsabilidad penal del indiciado Jesús Raúl Beltrán León, alias "CHUY RAÚL" en la comisión de los delitos:--- 1) Contra la Salud, en la modalidad de posesión con fines de comercio de Clorhidrato de Cocaína y Clorhidrato de Metanfetamina, previsto y sancionado en el artículo 195, primer párrafo, en relación con el 193, párrafos primero y segundo, todos del Código Penal Federal; 2) Acopio de armas de fuego, previsto y sancionado en el artículo 83 Bis, fracción I, en relación con el 11, inciso a) y b), de la Ley Federal de Armas de Fuego y Explosivos; 3) Portación de armas de fuego del uso exclusivo del Ejército, Armada y Fuerza Aérea, previsto y sancionado por el artículo 83, fracción III, con la agravante en su penúltimo párrafo, en relación con el 11, incisos c) y d), ambos de la Ley Federal de Armas de Fuego y Explosivos; y 4) Posesión de cartuchos para armas de fuego de uso exclusivo del Ejército, Armada y Fuerza Aérea, previsto y sancionado por el artículo 83 Quat, fracciones I y II, en relación con el diverso 11, incisos a), b), c) y f), ambos de la Ley Federal de Armas de Fuego y Explosivos, se encuentra acreditada en autos.--- Dichas conductas que realizaron de manera dolosa, en términos del artículo 9, párrafo primero, del Código Penal Federal, que dispone:--- "ARTÍCULO 9. Obra dolosamente el que, conociendo los elementos del tipo penal, o previendo como posible el resultado típico, quiere o acepta la realización del hecho descrito por la ley, y.".--- Así se tiene que el cúmulo de pruebas que justifica el extremo en comento lo constituyen el parte informativo de dieciséis de noviembre de dos mil catorce, suscrito por Isaac Pineda López, Javier Ávila Santiago, elementos de la Secretaría de la Marina, Armada de México, debidamente ratificado, en el que se anotaron las circunstancias de lugar, tiempo y modo en las que se logró el hallazgo de las porciones de Clorhidrato de Cocaína y Clorhidrato de Metanfetamina, así como el aseguramiento de las diez armas de fuego calibre (dos armas de fuego, tipo fusil, calibre 7.62 x 39 mm, marca Norinco; seis armas de fuego, tipo pistola, calibre .38" Súper Auto, marca colt; dos armas arma de fuego, tipo revolver, calibre .44" MAG) y cartuchos de diversos calibres al encausado Jesús Raúl Beltrán León, alias "CHUY RAÚL"; así como con las inspecciones y fe*

35

TOCA PENAL No. 6/2015

*ministeriales, sumado a los dictámenes periciales de identificación de drogas, armas y cartuchos, que al poner de manifiesto su existencia otorgan indirectamente verosimilitud al dicho de los agentes de referencia.--- Con lo anterior se demuestra que la participación de Jesús Raúl Beltrán León, alias "CHUY RAÚL", fue por sí, esto es, en calidad de autores materiales, en términos del artículo 13, fracción II, del Código Penal Federal, en atención a que portó las armas de fuego (dos armas de fuego, tipo fusil, calibre 7.62 x 39 mm, marca Norinco); además tuvo la posesión de más de cinco armas de las de uso exclusivo del Ejército, Armada y Fuerza Aérea (seis armas de fuego, tipo pistola, calibre .38" Súper Auto, marca colt; dos armas arma de fuego, tipo revolver, calibre .44" MAG) , y poseyó los cartuchos afectos a la causa, que sirven para abastecer armas de fuego del uso exclusivo del Ejército, Armada y Fuerza Aérea, así como los narcóticos antes referidos.--- Ello aunado a que no se acreditó causa de exclusión del delito a favor de los inculpados, ni se probó en su beneficio alguna causa de justificación como son la legítima defensa, el estado de necesidad, el cumplimiento de un deber y el ejercicio de un derecho, por lo que las referidas conductas son antijurídicas al no existir constancia de que los activos se encontraban amparados en alguna de las mencionadas causas de justificación.--- Tampoco se probó que al consumarse aquéllos comportamientos, los inculpados no tenían la capacidad de comprender el carácter ilícito de esos hechos, ni de conducirse de acuerdo a esa comprensión, menos aún se justificó la existencia de algún error de prohibición que les hiciera creer que sus conductas eran lícitas; máxime que actuaron dentro de un amplio margen de libertad, al no mediar coacción física o moral en su contra, exigiéndoles por tanto un comportamiento diverso al realizado, es decir, ajustado a derecho, pues además los procesados son mayores de dieciocho años y al momento de cometerse los ilícitos de referencia no se encontraban bajo los efectos de algún trastorno mental transitorio o padecieran desarrollo intelectual retardado; por ello, su comportamiento les es reprochable a título penal y se estima acreditada su probable responsabilidad.--- No es obstáculo a lo anterior que Jesús Raúl Beltrán León, alias "CHUY RAÚL", hayan negado los hechos*



SEGUNDO TRIE
DEL QUINT
HERMOSIL



0669



PODER JUDICIAL DE LA FEDERACIÓN

que se les atribuyen, toda vez que su versión, en aquello que pudiera favorecerles, carecen del valor que se pretende, ya que los testimonios de cargo desvirtúan su dicho, además de que su versión en ese aspecto es poco creíble, dado que presuponen la actuación ilegal de los agentes, de ser cierto lo que dicen, en cuanto a que fue detenido en distintas condiciones precisadas por los agentes aprehensores, ya que dicen se introdujeron a su domicilio y fue golpeado, lo torturaron y amenazaron, que el vehículo afecto donde se localizó la droga, las armas y los cartuchos desconoce de quien sea, que no son de él; sin embargo a solicitud de la defensa se le puso la placas fotográficas de las armas que fueron aseguradas el día de su detención quien manifestó que de todas las armas sólo reconocía una, que es la que obra a fojas 102, 103 y 104 de la averiguación previa, y estaba abastecida con seis cartuchos útiles, siendo esta un arma, calibre .38 Súper, color negro, matrícula CS004849, marca Colts P.T.F.A. MFG.CO HARTFORD. CONN USA con su cargador insertado, aspecto que le perjudica al inculpado en tanto que de alguna manera admite que esa arma es de su propiedad; además, aquélla versión de los hechos no fue corroborado con pruebas aptas y suficientes, por lo que hasta este momento debe prevalecer el valor de indicio otorgado al parte informativo elaborado por los elementos aprehensores; de tal suerte que hacer valer una postura contraria implicaría trastocar las normas que regulan la prueba circunstancial y facilitar la impunidad de los inculpados con su sola negativa, cuando en el caso la serie de indicios que se desprenden de las probanzas que obran en el sumario, valoradas en su conjunto conforme al precepto 286 del Código Federal de Procedimientos Penales, acreditan la probable responsabilidad penal del inculpado en la comisión del delito que se le imputa.--- A lo anterior, resulta aplicable la tesis de jurisprudencia visible en la página 376, del Tomo II, Materia Penal, Segunda Parte, el Último Apéndice al Semanario Judicial de la Federación 1917-2000, que dice: 'CONFESIÓN, FALTA DE. Cuando del conjunto de circunstancias se desprende una presunción en contra del inculpado, debe él probar en contra y no simplemente negar los hechos dando una explicación no corrobora da con prueba alguna, pues admitir como válida la

TOCA PENAL No. 6/2015

*manifestación unilateral sería destruir todo el mecanismo de la prueba presuncional y facilitar la impunidad de cualquier acusado, volviendo ineficaz toda una cadena de presunciones por la sola manifestación del producente, situación jurídica inadmisible."--- En efecto, para destruir la serie de indicios que pesan en su contra no basta la simple negativa que de los hechos imputados se haga, sino que es menester que ésta encuentre sustento en otros medios probatorios, que en la especie no fueron aportados, ya que el inculpado se limitó a invocar versiones exculpatorias insostenibles y omitieron desvirtuar los indicios de cargo que operan en su contra.--- De igual forma no pasa desapercibido para este juzgador el dictamen de integridad física del diecisiete de noviembre de dos mil catorce, practicado al indiciado de referencia, suscrito por María Bautista García, Karla Corral González, peritos médicos forenses adscritos a la Agencia de Investigación Criminal, de la Coordinación General de Servicios Periciales, Dirección General de Especialidades Médico Forense, Departamento de Medicina Forense (fojas 50 y 51), en el que asentaron que el inculpado Jesús Raúl Beltrán León, alias "CHUY RAÚL", presentaba lesiones que no ponen en peligro la vida en virtud de que no provocan una disfunción de un órgano o facultad que ponga riesgo inminente de muerte, y que tardan en sanar más de quince días, de las cuales adujo le fueron producidas por los elementos de la Marina de México, quienes lo detuvieron y torturaron a fin de que les diera información, sin embargo, se toma en consideración que el inculpado en su declaración ministerial se reservó declarar en términos del artículo 20 Constitucional, por lo cual no se advierte coacción alguna, ya que no fue torturado al momento de declarar y de haber existido ésta (sin aceptar), de todas formas no existió confesión de su parte; de ahí que lo anotado da lugar en su caso a alguna posible acción penal en contra de los aprehensores, pero no lleva a desvirtuar al menos hasta este momento, el parte informativo que obra en autos y que indica que el inculpado portó los artefactos bélicos y poseyó los narcóticos y cartuchos, así como la posesión de más de cinco armas de las de uso exclusivo del Ejército, Armada y Fuerza Aérea afectos; lo anterior, con independencia que el tema de violencia o tortura en contra del inculpado será*



38

# TOCA PENAL No. 6/2015

0670



PODER JUDICIAL DE LA FEDERACIÓN

*tratado más adelante en esta resolución.--- Por lo que hace al acuse de recibo e la oficina de correspondencia de los Juzgados de Distrito de dieciocho de noviembre de dos mil catorce, de la demanda de amparo promovida por Jesús Raúl Beltrán León, alias "CHUY RAÚL", en su propio derecho y copia certificada de la suspensión concedida por el Juzgado Séptimo de Distrito de Amparo en Materia Penal en el Distrito Federal, en el cual se le concedió referente a la privación ilegal a la libertad, y de la queja promovida ante la Comisión Nacional de Derechos Humanos, referente a su detención; sin embargo dicha documental no se contrapone al parte informativo signado por los elementos marinos, pues la detención del inculpado se realizó aproximadamente a las cuatro horas del dieciséis de noviembre de dos mil catorce, para posteriormente ser puesto a disposición de la autoridad correspondiente, por lo que acredita es la existencia de una investigación que puede tener como resultado alguna posible acción penal en contra de los aprehensores, pero de igual forma no lleva a desvirtuar al menos hasta este momento, el parte informativo que obra en autos y que indica que el inculpado portó las armas de fuego, y poseyó la droga y los artefactos bélicos afectos.--- Los testimonios de María Del Refugio Araujo López, Ma de Jesús Lugo Estala y Lesley Zelina Félix Salazar, no son eficaces para apoyar la versión exculpatoria del inculpado, dado que ni siquiera presenciaron la detención del encausado, ya que coinciden que el día domingo, es decir el diecisiete de noviembre de dos mil catorce, se percataron que en el domicilio donde habita el encausado se encontraban marinos, sin embargo no narran aspecto importantes de la detención o bien que se hubieran percatado del aseguramiento de la droga, armas o cartuchos afectos; de que lo narrado por los citados testigo es ajeno y lejano al hecho investigado, por lo que no reúne los extremos del artículo 289 del Código Federal de Procedimientos Penales, además de que ni siquiera fueron introducidos en la ampliación de declaración del encausado, cuando bien pudo, de ser auténtico, ser mencionado desde la declaración inicial.--- Ilustra lo anterior la tesis emitida por la Primera Sala de la Suprema Corte de Justicia de la Nación, publicada en el Semanario Judicial de la Federación, Quinta Época, Tomo CXXIV, página 1040, que dice:---*

IBUNAL UNITARI
NTO CIRCUITO
ILLO, SONORA

39

*"TESTIGOS EN MATERIA PENAL. Conforme a la lógica jurídica, la no contradicción del testimonio determina su eficiencia probatoria, pero si existe tal contradicción, ella determina un vicio procesal que inhabilita el valor probatorio del testimonio y determina la insuficiencia de la prueba."*--- También es aplicable la tesis 3177, sustentada por la Primera Sala de la Suprema Corte de Justicia de la Nación, publicada en el Apéndice al Semanario Judicial de la Federación, 1917-2000, Séptima Época, tomo II, Materia Penal, página 1474, que dice:--- *"TESTIMONIO INOPERANTE. Carece de aptitud probatoria el testimonio que va más allá del dicho del acusado, como en el caso en que éste afirme que portaba el arma instrumento del delito y los testigos depongan que la portaba el pasivo."*--- En cuanto a los testimonio de Brianda Lizbeth Félix Beltrán, quien adujo ser la esposa del encausado de referencia adujo:--- *"... Estábamos en el domicilio Aguacate número 1819, en la colonia la Campiña, en Culiacán Sinaloa, estaba mi Hija Isabela Beltrán Félix, de un año de edad, mi esposo Jesús Raúl Beltrán León, y la señora Manuela León Ríos, aproximadamente a las una hora con veinte minutos del dieciséis de noviembre del año en curso, escuche ruidos Salí del cuarto, y me encuentro a muchos elementos de la marina, mi primer reacción fue asustarme y les dije que si me dejaban tomar a mi hija que estaba en el último cuarto, me dijeron que me callará y pasará, entre al cuarto tome a la niña, ya en eso se empezaron a escuchar ruidos se fueron contra mi esposo, lo sacaron del cuarto sin ropa, al cuarto con nosotras se metieron cinco personas, preguntándome quien era mi esposo, y yo le conteste, ya después le ordenaron a mi esposo que se cambiara, no sé cuánto tiempo pasaría, yo me quede en el cuarto principal con la señora Manuela León Ríos no sé cuánto tiempo pasaría, se escuchaban voces altas después de aproximadamente dos horas me mandaron llamar, baje y tenían a mi esposo con venda en los ojos, las manos amarradas y me dijeron que él tenía que decirme unas cosas, ellos querían que él dijera cosas que él no sabía, me volvieron a subir otra vez al cuarto, y se lo llevaron y que nosotras teníamos que permanecer ahí con los otros oficiales, la mayoría se fueron junto con él, hicieron con la señora Manuela León Ríos el mismo procedimiento que conmigo, y seguían esculcando cosas abriendo y*



SEGUNDO TR
DEL QUIN
HERMOSI



**TOCA PENAL No. 6/2015**

0671

PODER JUDICIAL DE LA FEDERACIÓN

cerrando cajones, yo le pregunte que si tenían alguna orden de aprehensión o de cateo y me dijeron que estuviera calladas y que ellos no podían contestar nada, y me hablaban en voz fuerte, nos tuvieron ahí aproximadamente de diez a doce horas, salimos como a las doce horas del domingo cuando vimos que ya no había nadie, de hecho se acercaron a mi casa personas que trabajan en un Centro de rehabilitación que se encuentra contra esquina de mi casa, y la persona de nombre Yolanda me dijo que si estábamos bien, que si no nos habían hecho nada nosotras, me comento que había entrado un elemento de la marina al centro y que había retirado el disco durado de las cámaras y les dijeron que no se metieran en problemas, mientras tenían a mi esposo se escuchaba como que tocía no sé si lo estarían golpeando, a mí no me mostraron ninguna orden, simplemente entraron tu casa sin autorización o al menos a mí no me mostraron nada. A LA DOS. Que diga la testigo si nos puede proporcionar las características físicas del domicilio en el que refiere se encontraba el día de la detención de su esposo Jesús Raúl Beltrán León. Calificada de legal contestó: Es una casa color blanca, portón de madera, tiene un balcón resaltado en el cuarto principal, es la segunda casa de esa calle número 1819. Siendo todas las preguntas que le desea realizar a la testigo.--- En base a preguntas formuladas por el agente del Ministerio Público de la Federación agregó:--- "A LA UNO. Que diga la testigo si cuenta con medidas de seguridad, como cámaras en el domicilio. Calificada de legal contestó: No, solo tenemos vecinos alrededor que si la tiene, nuestro vecino de lado derecho y el de enfrente que ya comente del centro de Rehabilitación. A LA DOS. Que diga la testigo si observó o percato en que vehículo se llevaron a su esposo. Calificada de legal contestó: No, no nos dejaban salir del cuarto ni asomarnos ni nada.".--- En cuanto a María Manuela León Ríos, manifestó textualmente:--- "… Yo estaba cuidando a mi sobrina de nombre Isabela, en calle Aguacate, no recuerdo el número, en la colonia La Campilla, en Culiacán, Sinaloa, ya como a las once y media de la noche del sábado ya que me acosté y como una hora y media después sentí la presencia Brianda con la niña en brazos, entonces me dijo que había alguien en la casa, ya yo volteo y veo a los marinos, parados en la puerta de la recama, ya entonces



UNAL UNITAR
O CIRCUITO
O, SONOR

41

TOCA PENAL No. 8/2013

*calme Brianda, alcanzo a ver que llevan a mi sobrino a una sala de estancia que está en la parte de arriba de la segunda planta, iba en ropa interior, y para eso se acercaron dos elementos femeninos de la marina, le preguntan a Brianda que si sentía mal con una voz golpeada y le contesto ella no, y como sufro de la enfermedad de hipertensión y ya a los minutos regresa mis sobrino acompañado de todas esas personas, ya lo veo que lo bajan cambiado, escucho los pasos, estábamos nosotras en la habitación y no nos dejaban salir y en la puerta estaban dos personas de la marina, solo nos dejaban salir al baño, pero acompañadas, ya una de la marina me dejo tomar mi medicamento, y de reojo alcance a ver que llevaba una pantalón de mezclilla y playera tipo polo azul, escuche que le levantaban la voz, no alcanzaba a escuchar que decían, escuchaba como que golpeaban algo pero no puedo asegurar a que fue, ya después le hablan a su esposa y bajo con su hija, ya después subió Brianda y un marino para decirme que bajara, ya que baje lo vi vendado de los ojos, no dije nada y se lo llevaron y a nosotros nos volvieron a subir, ya me puse mal de la presión, ya después nos dijeron que nos podíamos dormir, y se quedaron dos elementos de la marina dentro del cuarto, pero dentro de la casa habían más personas, la primera vez vi como a diez pero ya después no puedo describir cuantos quedaron, ya que nos quedamos en el cuarto, ya como a las doce del día domingo nos percatamos que se quedaron solas, que ya se habían ido los marinos, y al bajar nos dimos cuenta que habían buscado algo en la casa, yo acudí a ese domicilio a cuidar a la niña, ya que yo no vivo ahí. A LA DOS. Que diga la testigo si los elementos que refiere de la marina que se encontraban en el interior del domicilio donde se encontraba el día de la detención de su sobrino Jesús Raúl Beltrán León le mostraron algún documento para ingresar al ya mencionado domicilio. Calificada de legal: No, jamás mostraron nada, ni a mí ni a su señora. A LA TRES. Que diga la testigo si nos puede proporcionar las características físicas del domicilio en el que se encontraba el día de la detención de su sobrino ya mencionado. Calificada de legal contestó: Es una casa blanca con un portón café de madera es la fachada, tiene una puerta de herrería Fuerte, entra a la casa y se encuentra con una puerta de madera para*



SEGUNDO T?
DEL QUE
HERMOS

**42**

0672
FORMA A-55



PODER JUDICIAL DE LA FEDERACIÓN

*poder entrar al domicilio, al entrar a la casa. Siendo todas las preguntas que desea realizar.---- En cuanto a los anteriores testimonios, en nada le favorecen al inculpado dado que si bien coincide en algunos aspectos con lo declarado por el inculpado en su ampliación de declaración, sin embargo coinciden en que ambas testigos siempre permanecieron en una habitación y no las dejaban salir, pero la primera de la testigo en mención aduce que no se percató en que vehículo se llevaron a su esposo detenido, dado que siempre estuvo en una habitación del inmueble encerrada, máxime que se suma las circunstancias que la testigo Félix Beltrán es esposa del inculpado y María Manuela León Ríos, es tía, por lo que tiene vínculos de parentesco con el encausado Jesús Raúl Beltrán León, alias "CHUY RAÚL", lo que si bien no invalidan sus declaraciones, hace evidente que se condujeron con parcialidad, por el interés manifiesto que tienen en favorecerlo.--- Como sustento se invoca el criterio del Segundo Tribunal Colegiado del Sexto Circuito, consultable en el Semanario Judicial de la Federación, Octava Época, Tomo XIV, agosto de 1994, página 671, que dice: "TESTIGOS. PARIENTES O AMIGOS DE LA PERSONA A FAVOR DE QUIEN DEPONEN. VALOR DE SUS DECLARACIONES. Si bien en materia penal no existen tachas y el hecho de que un testigo tenga lazos de parentesco o íntimos de amistad con la persona a favor de cuyos intereses depone, no invalida su declaración, justificadamente, debe negársele eficacia probatoria cuando con relación al testimonio concurra otro dato que permita desconfiar de su veracidad, como sería que fuera lejano de los hechos, detallado o coincidente con otro también extemporáneo". --- En tales condiciones, al encontrarse reunidos los requisitos exigidos por el artículo 19 Constitucional, procede a dictar AUTO DE FORMAL PRISIÓN en contra del indiciado Jesús Raúl Beltrán León, alias "CHUY RAÚL", en la comisión de los delitos 1) Contra la Salud, en la modalidad de posesión con fines de comercio de Clorhidrato de Cocaína y Clorhidrato de Metanfetamina, previsto y sancionado en el artículo 195, primer párrafo, en relación con el 193, párrafos primero y segundo, todos del Código Penal Federal; 2) Acopio de armas de fuego, previsto y sancionado en el artículo 83 Bis, fracción I, en relación con el 11, inciso a) y b), de la Ley Federal de Armas*



IBUNAL UNITA
JTO CIRCUIT
LLO, SONC

43

TOCA PENAL NO. 8/2015

*de Fuego y Explosivos; 3) Portación de armas de fuego del uso exclusivo del Ejército, Armada y Fuerza Aérea, previsto y sancionado por el artículo 83, fracción III, con la agravante en su penúltimo párrafo, en relación con el 11, incisos c) y d), ambos de la Ley Federal de Armas de Fuego y Explosivos; y 4) Posesión de cartuchos para armas de fuego de uso exclusivo del Ejército, Armada y Fuerza Aérea, previsto y sancionado por el artículo 83 Quat, fracciones I y II, en relación con el diverso 11, incisos a), b), c) y f), ambos de la Ley Federal de Armas de Fuego y Explosivos, ésta se encuentra acreditada en autos.--- OCTAVO. APERTURA DEL PROCEDIMIENTO SUMARIO.- Ahora bien, en el presente caso, los indiciados Jesús Raúl Beltrán León, alias "CHUY RAÚL" fueron detenidos en flagrante delito, lo que actualiza el supuesto que prevé el precepto 152, inciso b), fracción I, del Código Federal de Procedimientos Penales y, por consecuencia, se decreta la apertura del procedimiento SUMARIO; razón por la cual, requiérase a las partes a efecto de que ofrezcan las pruebas que estimen procedentes en la inteligencia de que se procederá a cerrar la instrucción en el término de treinta días, salvo que el indiciado opte por el procedimiento ordinario, lo cual deberá hacer saber a este Juzgado, dentro de los tres días siguientes al en que se le notifique esta determinación.--- NOVENO. IDENTIFICACIÓN ADMINISTRATIVA E INFORMES. Con fundamento en el artículo 165, del Código Federal de Procedimientos Penales, 25, fracción III, y 29, fracción IX, del Reglamento Interior de la Secretaría de Seguridad Pública, solicítese al titular de la Secretaría de Seguridad Pública, con residencia en la ciudad de México, Distrito Federal y al subdirector de Identificación Criminal de la Procuraduría General de Justicia del Estado de Sonora, se sirvan remitir dentro del término de cuarenta y ocho horas informe sobre los posibles antecedentes penales que pudieran tener registrados los procesados en la inteligencia de que tal informe se requerirá a la primera autoridad por telegrama y a la segunda por oficio, debiendo dar respuesta por la misma vía.--- Asimismo, tomando en cuenta que el procesado de referencia está privado de su libertad en el Centro Federal de Readaptación Social número 11 "CPS Sonora", con fundamento en el ordinal 41, del Código*



SEGUNDO T
DEL QUI
HERMOS

44



PODER JUDICIAL DE LA FEDERACIÓN

*Federal de Procedimientos Penales, solicítese al director del referido centro penitenciario, remita a este juzgado a la brevedad su ficha signalética; apercibido que en caso de ser omiso a lo anterior, se le aplicará multa por el equivalente a treinta días de salario mínimo general vigente en esta ciudad, de conformidad con lo dispuesto por el normativo 44, fracción II, del Código Federal de Procedimientos Penales.--- Sirve de apoyo a la anterior consideración, la jurisprudencia número 151, consultable en la página 105, Tomo II, Materia Penal del Apéndice al Semanario Judicial de la Federación 1917-2000, cuyo rubro es: "FICHAS SIGNALÉTICAS, FORMACIÓN DE. IDENTIFICACIÓN ADMINISTRATIVA DE PROCESADOS."--- DÉCIMO. SUSPENSIÓN DE DERECHOS Y PRERROGATIVAS.- Conforme a lo dispuesto por los artículos 38, fracción II, de la Constitución General de la República, 198.3 y 198.5, del Código Federal de Instituciones y Procedimientos Electorales, se suspende a Jesús Raúl Beltrán León, alias "CHUY RAÚL", en sus derechos y prerrogativas políticas; comuníquese esta determinación al Instituto Nacional Electoral, para su conocimiento y efectos legales a que haya lugar.--- DÉCIMO PRIMERO. TRATAMIENTO. Debido a que en su declaración ministerial, el inculpado Jesús Raúl Beltrán León, alias "CHUY RAÚL", manifestó ser adicto al consumo de cocaína; en consecuencia, con fundamento en lo dispuesto por el numeral 481 de la Ley General de Salud, gírese oficio al director del Hospital "Dr. Carlos Nava Muñoz", con residencia en esta ciudad, a efecto de que les sea aplicado el tratamiento a la toxicomanía que padecen a dicho estupefaciente, en el entendido de que el encausado se encuentra interno en el Centro Federal de Readaptación Social número 11 "CPS Sonora", de esta ciudad.--- DÉCIMO SEGUNDO. Debido a la manifestación del encausado Jesús Raúl Beltrán León, alias "CHUY RAÚL", al rendir su declaración preparatoria y su ampliación, en el sentido de que fue golpeado, torturado y amenazado por los elementos aprehensores el día de su detención, se da vista al agente del Ministerio Público que corresponda para que inicie la investigación relativa a efecto de determinar si se acredita o no el delito de tortura, o bien la posible comisión de un diverso delito." (sic)*



RIBUNAL UNITAR
NTO CIRCUITO
ILLO, SONORA

45

TOCA PENAL No. 6/2015

**4o.-** Los agravios expresados por la defensora particular de JESÚS RAÚL BELTRÁN LEÓN, obran agregados de las fojas treinta y cinco a noventa y tres del toca en que se actúa, cuya transcripción se omite al no existir disposición legal que obligue hacerlo.

**5o.-** La resolución de plazo constitucional apelada fue pronunciada el veintiséis de noviembre de dos mil catorce, por el Juez Décimo de Distrito en el Estado de Sonora, con sede en esta ciudad de Hermosillo, en la causa penal 163/2014, en la que en reclasificación de los hechos dictó auto de formal prisión a JESÚS RAÚL BELTRÁN LEÓN (alias) "CHUY RAÚL" por los siguientes delitos:

1.- Contra la Salud, en la modalidad de posesión con fines de comercio de Clorhidrato de Cocaína y Clorhidrato de Metanfetamina, previsto y sancionado en el artículo 195, primer párrafo, en relación con el 193, párrafos primero y segundo, del Código Penal Federal.

2.- Acopio de armas de fuego, previsto y sancionado en el artículo 83 Bis, fracción I, en relación con el 11, incisos a) y b), de la Ley Federal de Armas de Fuego y Explosivos.



SEGUNDO TRI
DEL QUEN
HERMOSIL

3.- Portación de armas de fuego del uso exclusivo del Ejército, Armada o Fuerza Aérea, previsto y sancionado por el artículo 83, fracción III, con la agravante en su penúltimo párrafo, en relación con el 11, incisos c) y d), de la Ley Federal de Armas de Fuego y Explosivos; y

4.- Posesión de cartuchos para armas de fuego de uso exclusivo del Ejército, Armada o Fuerza Aérea, previsto y sancionado por el artículo 83 Quat, fracciones I y II, en relación con el 11, incisos a), b), c) y f), de la Ley Federal de Armas de Fuego y Explosivos.

Tal resolución fue apelada por el inculpado y su defensor particular.

Este tribunal una vez que analizó las pruebas que obran en la causa y la resolución, en relación con los agravios expresados por la defensora particular, los considera parcialmente fundados, lo que aunado a la suplencia de la queja que este Tribunal hace valer de oficio, de conformidad con lo previsto

**46**



PODER JUDICIAL DE LA FEDERACIÓN

0674

por el artículo 364 del Código Federal de Procedimientos Penales, conduce a revocar la resolución de plazo constitucional venida en apelación, por la serie de motivos y fundamentos que seguidamente habrán de quedar asentados, mismos que hacen innecesario el estudio de los elementos que integran el cuerpo de los delitos atribuidos y por ende la probable responsabilidad penal del inculpado en su comisión.

Es infundado el agravio esgrimido por la defensora particular, que en esencia lo hace consistir que su representado al ser ciudadano americano, por haber nacido en el Estado de California, en los Estados Unidos de América, debió de haber sido notificada de su detención la representación consular de ese país más cercana al lugar de los hechos, como lo establece el artículo 128, fracción IV, del Código Federal de Procedimientos Penales, y los tratados internacionales que refiere, lo que en la especie no aconteció.



BUNAL UNITA.
ro CIRCUITO
LO, SONORA

Sostiene lo anterior al tomar como base el contenido del informe rendido por los marinos aprehensores, en que la detención aconteció a las cuatro horas del dieciséis de noviembre de dos mil catorce, en la ciudad de Culiacán, Sinaloa. Que a las cero horas quince minutos del diecisiete de noviembre de dos mil catorce, JESÚS RAÚL BELTRÁN LEÓN refirió al fiscal de la federación ser originario de Torrance, California, Estados Unidos de América.

Que no obstante lo anterior fue a las once horas treinta minutos del diecisiete de noviembre de dos mil catorce cuando se entabló comunicación con la embajada de los Estados Unidos de América, en la ciudad de México, Distrito Federal; y a las trece horas cincuenta minutos de ese día el detenido tuvo contacto con el consulado del mencionado país con motivo de la comparecencia voluntaria de la cónsul Stamper Moyer Audrey Fern.

Agrega la inconforme que de autos se desprende que JESÚS RAÚL BELTRÁN LEÓN fue puesto a disposición del Agente del Ministerio Público de la Federación a las veintitrés horas veinte minutos del dieciséis de noviembre de dos mil catorce, de los anteriores datos cronológicos se desprende que fue después de treinta y ocho horas contadas a partir de su arribo a las oficinas de la Subprocuraduría Especializada en Investigación de Delincuencia

TOCA PENAL No. 6/2015

Organizada, cuando tuvo contacto con representación oficial del mencionado país, lo que se traduce en que careció de la asistencia consular efectiva a la que tiene derecho.

Esa serie de consideraciones esgrimidas vía agravios por la defensa este Tribunal las considera infundadas, toda vez que de las constancias que integran la causa que se analiza, del informe rendido por los elementos de la marina captores, no se advierte alusión alguna a su lugar de nacimiento, sino que éste dato surge cuando a JESÚS RAÚL BELTRÁN LEÓN le practicó el examen correspondiente la médico explorador teniente de corbeta de servicio de sanidad naval Itzel Dayana García Domínguez, el cual obra a fojas 14 y 15 del duplicado del proceso, en cuyo número II literalmente consta en lo conducente: "de nacionalidad norteamericana originalmente (Torreance, Baja California Estados Unidos de Norteamérica) y mexicano (Culiacán, Sinaloa)" (sic).



A lo anterior se aúna que a fojas 183 y 184 del duplicado del proceso, obra el acta levantada por el Agente del Ministerio Público de la Federación, adscrito a la Unidad Especializada de Investigación de Delitos Contra la Salud, de la Subprocuraduría de Investigación Especializada de Delincuencia Organizada, con motivo de la comparecencia de Stamper Moyer Audrey Fern, en su carácter de Cónsul de la Embajada Norteamericana en la ciudad de México, con motivo de manifestar que sostuvo una plática con su connacional JESÚS RAÚL BELTRÁN LEÓN quien según datos del sistema de la Embajada Americana cuenta con pasaporte americano, sin mayor alusión al respecto.

Ahora bien, para este Tribunal la sola manifestación de JESÚS RAÚL BELTRÁN LEÓN, hecha por primera vez ante la prenombrada teniente de corbeta del servicio de sanidad naval, con las imprecisiones que se asentaron en forma literal, se considera insuficiente para tener como un hecho cierto que nació en el vecino país del norte.

A lo anterior se debe aunar que a foja 57 del duplicado del proceso, obra copia certificada del acta de matrimonio 434, del libro 2, de la oficialía 009, del Estado de Sinaloa, de fecha veintisiete de julio de dos mil siete,

48



**TOCA PENAL No. 6/2015**



PODER JUDICIAL DE LA FEDERACIÓN

relativa al matrimonio civil celebrado entre JESÚS RAÚL BELTRÁN LEÓN y

Brianda Lizbeth Félix Beltrán, exhibida por ésta al comparecer a las

instalaciones donde estaba detenido su esposo, según la constancia levantada

por ese motivo que obra a foja 55, en la que es inconcuso por la naturaleza del

acto la presencia de los contrayentes o contratantes, y de la que se destaca que

el primero dijo haber nacido en Culiacán, Sinaloa, México.

En consecuencia al no existir en autos certeza que JESÚS

RAÚL BELTRÁN LEÓN realmente nació en los Estados Unidos de América, y a

la fecha sea ciudadano de ese país, toda vez que ninguna de las partes agregó

a la causa el documento idóneo para acreditar la nacionalidad del inculpado,

aunado a que de autos se advierte que hubo entrevista de la Cónsul del vecino

país del norte con el inculpado, se declara infundado el agravio atendido.

En relación con lo anterior no se soslaya que de la foja 315 a

319 del duplicado del proceso, obra la declaración preparatoria de JESÚS RAÚL

BELTRÁN LEÓN, en la que de manera expresa se le hizo de su conocimiento

que tiene derecho a recibir la visita de los funcionarios consulares de los



'NAL UNITA,
CIRCUITO
), SONORA

Estados Unidos de América, a manifestar comunicación con éstos, a conversar,

y en su caso, organizar su defensa, razón por la cual se le preguntó si es o no

su voluntad que esté presente en la diligencia un representante de la embajada

de ese país, a lo que expresamente manifestó que no.

En apoyo a lo anterior y con las adecuaciones debidas se

invoca la tesis sostenida por el Noveno Tribunal Colegiado en materia Civil del

Primer Circuito, número 120, visible en la página 1738, tomo XIX, mayo de 2004,

del Semanario Judicial de la Federación y su Gaceta, Novena Epoca, del texto y

rubro siguientes:

"ACTAS DE NACIMIENTO. HACEN FE DE SU CONTENIDO

HASTA EN TANTO NO EXISTA UNA DECLARACIÓN JUDICIAL RESPECTO A

LOS VICIOS O DEFECTOS QUE CONTENGAN (CÓDIGO CIVIL PARA EL

DISTRITO FEDERAL EN MATERIA COMÚN Y PARA TODA LA REPÚBLICA

EN MATERIA FEDERAL). Los informes que se aporten ante el Registro Civil,

respecto del menor que fuere presentado como hijo de matrimonio, como los

49

TOCA PENAL No. 6/2015

*nombres, domicilio y nacionalidad de los padres, los nombres y domicilios de los abuelos y los de las personas que hubieren hecho la presentación, deben considerarse como datos proporcionados conforme a la ley, acorde con el artículo 59 del anterior Código Civil para el Distrito Federal en Materia Común y para toda la República en Materia Federal, y conforme al numeral 50 del citado Código Civil, las declaraciones de los comparecientes hechas en cumplimiento de lo mandado por la ley, hacen fe hasta que se pruebe lo contrario, por ello, los datos consignados en el acta de nacimiento de una persona, como es el nombre de los padres, constituyen datos que la ley exige que se otorguen, por ser información relacionada con los atributos de la personalidad del registrado, de ahí que al tratarse de un documento público, no pueda desconocerse como prueba para acreditar tal hecho, máxime si los apellidos de los padres coinciden con los que conforman el nombre del menor registrado; por ende, acorde con lo dispuesto en los artículos 47, 134 y 135 del referido Código Civil, los vicios o defectos que haya en las actas podrán ser enmendados mediante declaración judicial, cuando se solicite variar algún nombre o dato, esencial o accidental, entre tanto, se reitera, el documento hará fe de su contenido".*



También por identidad jurídica y en lo conducente es aplicable la tesis sostenida por el Sexto Tribunal Colegiado en materia del Trabajo del Primer Circuito, bajo el número 40, visible en la página 1703, tomo XXV, febrero de 2007, del Semanario Judicial de la Federación y su gaceta, Novena Epoca, que a la letra dice:

*"EDAD DE UNA PERSONA FÍSICA. EL ACTA DE NACIMIENTO EXPEDIDA POR EL REGISTRO CIVIL CONFORME A LA LEY ES LA PRUEBA IDÓNEA PARA DEMOSTRARLA. De acuerdo con el artículo 50 del Código Civil Federal las actas del Registro Civil extendidas conforme a las disposiciones que preceden al citado precepto, hacen prueba plena en todo lo que el Juez del Registro Civil, en el desempeño de sus funciones, da testimonio de haber pasado en su presencia; de ahí que la prueba idónea y suficiente para demostrar la edad de una persona física, sea el acta de nacimiento expedida por el Registro Civil conforme a la ley, por tratarse de un documento público a través*



**TOCA PENAL No. 6/2015**

0676

FORMA A-55

PODER JUDICIAL DE LA FEDERACIÓN

*del cual quedan plenamente acreditados tanto el hecho del nacimiento como el acto jurídico del registro respectivo, sin perjuicio de que a través de algún otro medio probatorio pueda acreditarse tal circunstancia."*

En consecuencia se considera que en el caso no se violentaron los derechos consulares del inculpado en los aspectos humanitario, de protección y asistencia técnico jurídica que refiere la suscriptora de los agravios.

Asimismo, también se considera fundado el diverso agravio de la defensa, que en lo medular consiste en violación al mandato de puesta a disposición sin demora de un detenido ante el Agente del Ministerio Público de la Federación correspondiente, atribuible a los elementos de la marina captores, previsto por el artículo 16, párrafo quinto, de la Constitución Política de los Estados Unidos Mexicanos, aunado al diverso generado con motivo de la dilación en la puesta a disposición del detenido ante el Juez competente, imputable a la autoridad consignadora.

Ambos aspectos se constriñen a datos cronológicos, que la defensa esgrime en forma correcta de la siguiente manera:



BUNAL UNITARIO
TO CIRCUITO
LO, SONORA

a).- Que los elementos de la Secretaría de Marina Armada de México, según lo asentaron en su parte informativo, supuestamente detuvieron a JESÚS RAÚL BELTRÁN LEÓN a las cuatro horas del dieciséis de noviembre de dos mil catorce, cuando llegó a su domicilio conduciendo el vehículo que describen sobre el cual ejercían vigilancia, número 1819, colonia Piñón, en Culiacán, Sinaloa; en tanto que el inculpado dijo que fue detenido dentro de su domicilio a la una hora de esa fecha.

b).- Que no obstante lo anterior JESÚS RAÚL BELTRÁN LEÓN fue llevado a las dieciséis horas treinta minutos de ese dieciséis de noviembre de dos mil catorce, al aeropuerto de la ciudad de Culiacán, Sinaloa para ser trasladado supuestamente por cuestiones de seguridad a la ciudad de México, Distrito Federal, sin que exista en autos dato alguno de dónde permaneció durante ese lapso superior a las doce horas.

c).- Que el avión de la Secretaría de Marina Armada de México en que fue trasladado JESÚS RAÚL BELTRÁN LEÓN de Culiacán, Sinaloa, a

51

TOCA PENAL No. 8/2015

México, Distrito Federal, arribó a ésta ciudad a las veintidós horas con diez minutos, sin que tampoco exista en autos dato alguno de dónde permaneció de las diecisiete a las diecinueve horas de esa fecha, cuando el avión en que fue trasladado recorre la distancia comprendida entre ambas ciudades en un plazo de hora y media.

d).- Que del informe rendido por los elementos de la Secretaría de Marina Armada de México, con motivo de la detención de JESÚS RAÚL BELTRÁN LEÓN, no se advierte dato alguno de dónde estuvo por ese segundo período de tiempo que en lo que a ellos respecta culminó a las veintitrés horas veinte minutos del dieciséis de noviembre de dos mil catorce, en que fue puesto a disposición del Agente del Ministerio Público adscrito a la Subprocuraduría Especializada en Investigación de Delincuencia Organizada de la Procuraduría General de la República con sede en México, Distrito Federal.

En base a lo anterior se considera que le asiste la razón legal a la suscriptora de los agravios, en cuanto a que se violentó en perjuicio de su representado lo dispuesto por el artículo 193 del Código Federal de Procedimientos Penales, en la parte que establece que "el indiciado deberá ser puesto sin demora a disposición de la autoridad competente", al estar frente a una dilación indebida injustificada.

Se afirma lo anterior puesto que en el caso aun tomando como momento de la detención las cuatro horas que señalan en su informe los marinos captores, hasta las veintitrés horas veinte minutos, del dieciséis de noviembre de dos mil catorce, en que el inculpado fue puesto a disposición del Agente del Ministerio Público de la Federación, aritméticamente se traduce en un lapso de diecisiete horas veinte minutos, y sin soslayar el tiempo que se requirió para el viaje aéreo de la ciudad de Culiacán, Sinaloa, a la de México, Distrito Federal, es inconcuso que en la especie se acredita circunstancialmente, en términos del artículo 286 del Código Federal de Procedimientos Penales, que fue transgredido el derecho fundamental del imputado de mérito de ser puesto sin demora ante la autoridad investigadora una vez hecha su detención, sin que en autos aparezca justificada esa transgresión de los captores.



SEGUNDO TRII
DEL QUIN
HERMOSII

52



FORMA A-55



PODER JUDICIAL DE LA FEDERACIÓN

En apoyo a lo anterior, es correcta la cita de la Tesis sostenida por la Primera Sala de la Suprema Corte de Justicia de la Nación, bajo el número LIII, visible en la página 643, libro 3, febrero de 2014, tomo I, de la gaceta del Semanario Judicial de la Federación, Décima Época, que a la letra dice:

*"DERECHO FUNDAMENTAL DEL DETENIDO A SER PUESTO SIN DEMORA A DISPOSICIÓN DEL MINISTERIO PÚBLICO. ALCANCES Y CONSECUENCIAS JURÍDICAS GENERADAS POR LA VULNERACIÓN A TAL DERECHO. El artículo 16 de la Constitución Política de los Estados Unidos Mexicanos consagra un régimen general de libertades a favor de la persona, entre las cuales, destaca el derecho a la libertad personal. Sin embargo, como todo derecho humano, éste no es absoluto, por lo que la citada norma fundamental también delimita exhaustivamente diversas hipótesis para su afectación, a saber: a) la orden de aprehensión; b) las detenciones en flagrancia; y, c) el caso urgente. En tratándose de la flagrancia, esta Primera Sala ha puntualizado que la misma constituye una protección a la libertad personal, cuyo control judicial ex post debe ser especialmente cuidadoso, ya que quien afirma la legalidad y constitucionalidad de una detención, debe poder defenderla ante el juez respectivo. Ahora bien, por cuanto se refiere al derecho fundamental de "puesta a disposición ministerial sin demora", es dable concluir que dentro del régimen general de protección contra detenciones que prevé el artículo 16 constitucional, se puede derivar la exigencia de que la persona detenida sea presentada ante el Ministerio Público lo antes posible, esto es, que sea puesta a disposición de la autoridad ministerial o judicial respectiva, sin dilaciones injustificadas. Así, se está ante una dilación indebida en la puesta a disposición inmediata del detenido ante el Ministerio Público, cuando no existan motivos razonables que imposibiliten esa puesta inmediata, los cuales pueden tener como origen impedimentos fácticos reales, comprobables y lícitos, los que deben ser compatibles con las facultades concedidas a las autoridades, lo que implica que los agentes aprehensores no pueden retener a una persona por más tiempo del estrictamente necesario para trasladarla ante el Ministerio Público;*



JN. ... ITARIO
O CIRCUITO
O, SONORA

53

TOCA PENAL NO. 6/2015

*desechando cualquier justificación que pueda estar basada en una supuesta búsqueda de la verdad o en la debida integración del material probatorio y, más aún, aquellas que resulten inadmisibles como serían la presión física o psicológica al detenido para que acepte su responsabilidad o la manipulación de las circunstancias y hechos de la investigación. En suma, esta Primera Sala de la Suprema Corte de Justicia de la Nación estima que la violación al derecho fundamental de "puesta a disposición del indiciado ante el Ministerio Público sin demora" genera como consecuencias: a) la anulación de la confesión del indiciado, obtenida con motivo de esa indebida retención; b) la invalidez de todos los elementos de prueba que tengan como fuente directa la demora injustificada, los cuales no producirán efecto alguno en el proceso ni podrán ser valorados por el juez; y, c) la nulidad de aquellas pruebas que a pesar de estar vinculadas directamente con el hecho delictivo materia del proceso penal, sean recabadas por iniciativa de la autoridad aprehensora so pretexto de una búsqueda de la verdad o debida integración del material probatorio -en el supuesto de prolongación injustificada de la detención-, sin la conducción y mando del Ministerio Público; es decir, sin la autorización de este último. No obstante, debe precisarse que las pruebas obtenidas estrictamente con motivo de una detención en flagrancia no pueden ser invalidadas por actos posteriores, como la obtención de pruebas que tengan como fuente directa la demora injustificada, a menos que se acredite la existencia de vicios propios de la misma detención del inculpado que determinen que ésta sea considerada inconstitucional."*



Del mismo modo, es fundado el diverso agravio que se hace consistir en que también existe dilación en la puesta a disposición del detenido ante la autoridad judicial, por parte del Agente del Ministerio Público consignador.

Que lo anterior es así, nuevamente en base a la naturaleza de lo reclamado, en aspectos cronológicos, mencionándose los más relevantes, como son:

a).- Que a las veintitrés treinta horas y veintitrés horas cuarenta

**54**

# TOCA PENAL No. 6/2015



**PODER JUDICIAL DE LA FEDERACIÓN**

y cinco minutos del dieciséis de noviembre de dos mil catorce, se practicaron las primeras diligencias ministeriales consistentes en la ratificación del informe por parte de los elementos de la Secretaría de la Marina Isaac Pineda López y Javier Avila Santiago, suscriptores del parte informativo.

b).- Que a las veintitrés horas cuarenta y siete minutos del dieciséis de noviembre de dos mil catorce, la teniente de corbeta del servicio de sanidad naval médico cirujano, inició la revisión médica del detenido, y la concluyó a las cero horas treinta y seis minutos del día siguiente.

c).- Que a las cero horas cinco minutos del diecisiete de noviembre de dos mil catorce, se admite el acuerdo de retención ministerial de JESÚS RAÚL BELTRÁN LEÓN.

d).- Que a las cero horas quince minutos del diecisiete de noviembre de dos mil catorce, se levanta el acta que contiene la constancia de derechos firmada por JESÚS RAÚL BELTRÁN LEÓN.

e).- Que a las cero horas cincuenta y cinco minutos del diecisiete de noviembre de dos mil catorce, peritos médicos forenses oficiales revisan el estado físico de JESÚS RAÚL BELTRÁN LEÓN.

f).- Que a la una hora del diecisiete de noviembre de dos mil catorce, se practica diligencia de fe ministerial de arma de fuego, cargadores, cartuchos, sustancias y diversos objetos.

g).- Que a las tres horas del diecisiete de noviembre de dos mil catorce, se practica diligencia de inspección ocular y fe ministerial de aparatos de comunicación.

h).- Que a las doce horas cincuenta minutos del diecisiete de noviembre de dos mil catorce, compareció Brianda Lizbeth Félix Beltrán, esposa de JESÚS RAÚL BELTRÁN LEÓN.

i).- Que a las doce horas del dieciocho de noviembre de dos mil catorce, se recibió la declaración ministerial de JESÚS RAÚL BELTRÁN LEÓN, en la que se reservó el derecho de hacerlo.

j).- Que a las veintitrés horas cinco minutos del dieciocho de noviembre de dos mil catorce, se acordó la duplicidad del plazo constitucional de

**TRIBUNAL UNITARIO
JUNTO CIRCUITO
OSILLO, SONORA**

55

TOCA PENAL No. 6/2015

retención.

k).- Que a las veintiuna horas cincuenta y cinco minutos del diecinueve de noviembre de dos mil catorce, se recibió segunda declaración ministerial de JESÚS RAÚL BELTRÁN LEÓN.

l).- Que a las veintiuna horas catorce minutos del veinte de noviembre de dos mil catorce, se recibió el acta de consignación en el Juzgado Décimo de Distrito en el Estado de Sonora, con sede en Hermosillo.

Del contenido de los incisos preinsertos en segundo término, claramente se advierte que si JESÚS RAÚL BELTRÁN LEÓN fue puesto a disposición de la autoridad ministerial a las veintitrés horas veinte minutos del dieciséis de noviembre de dos mil catorce, y fue hasta las veintiuna horas catorce minutos del día veinte de los mismos mes y año, cuando el acta que contiene la consignación de los hechos constitutivos de los delitos que se le atribuyen se recibió en el Juzgado Décimo de Distrito en el Estado de Sonora, con sede en esta ciudad, según la leyenda del sello correspondiente, ello se traduce en que transcurrió un período cercano a las noventa y tres horas, muy superior al término de cuarenta y ocho horas que la autoridad investigadora tenía para ejercer la acción penal.



SEGUNDO TR
DEL QUI
HERMOSI

Lo anterior es así, toda vez que como se señala en los agravios que se atienden, se violentó el artículo 16 Constitucional el cual de manera expresa establece en la parte conducente que ningún indiciado podrá ser retenido por el Ministerio Público por más de cuarenta y ocho horas, plazo en que deberá ordenarse su libertad o ponerse a disposición de la autoridad judicial; este plazo podrá duplicarse en aquéllos casos que la Ley prevea como delincuencia organizada.

Al respecto, se pone de relieve que si bien es cierto que de la foja 204 a la 215 del duplicado del proceso, obra el acuerdo emitido a las veintitrés horas cinco minutos del dieciocho de noviembre de dos mil catorce, relativo al acuerdo de duplicidad de plazo constitucional de retención en contra de JESÚS RAÚL BELTRÁN LEÓN, también cierto es que del acta de consignación que obra de las fojas 262 a 306, no se advierte que se haya

**56**



**TOCA PENAL No. 6/2015**

0679

PODER JUDICIAL DE LA FEDERACIÓN

ejercido acción penal por delincuencia organizada, por lo que es inconcuso que en el caso la autoridad investigadora estaba obligada a turnar el acta de consignación ante la autoridad judicial en el plazo máximo de cuarenta y ocho horas, lo que no hizo.

La anterior omisión también conculca en perjuicio del inculpado lo previsto por los párrafos conducentes del artículo 134 del Código Federal de Procedimientos Penales, en lo concerniente en que si el ejercicio de la acción penal es con detenido, el Tribunal que reciba la consignación radicará de inmediato el asunto, y se entenderá que el inculpado queda a disposición del juzgador, para los efectos constitucionales y legales correspondientes, desde el momento en que el Ministerio Público lo interne en el reclusorio o centro de salud correspondiente.



Que en caso de que la detención de una persona exceda los plazos señalados en el artículo 16 de la Constitución Política, se presumirá que estuvo incomunicada, y las declaraciones que haya emitido el indiciado no tendrán validez.

Por lo que hace a esa presunción de incomunicación a que alude tal precepto constitucional, para este Tribunal no pasa inadvertido que en autos no existen datos que permitan conocer de manera fehaciente la permanencia de JESÚS RAÚL BELTRÁN LEÓN, a partir de las cuatro horas del dieciséis de noviembre de dos mil catorce, en la ciudad de Culiacán, Sinaloa, hasta las veintitrés horas veinte minutos del mismo día, en que fue puesto a disposición de la autoridad ministerial en la ciudad de México, Distrito Federal.

Respecto de ese plazo ya considerado ilegal, no se soslaya que JESÚS RAÚL BELTRÁN LEÓN en su declaración vertida vía ampliación en el período de preinstrucción, que obra de la foja 393 a 395 del duplicado del proceso, en lo medular al caso dijo que los elementos de la marina entraron a su habitación ubicada en el segundo piso de su casa aproximadamente a la una de la mañana del catorce de noviembre, que lo bajaron a la cocina que está en la primera planta, donde a base de golpes y gritos y poniéndole una bolsa sobre la cabeza le dijeron que pensara, que tenía que cooperar.

57

TOCA PENAL NO. 6/2015

También refirió que poco después de ello lo sacan de su casa y lo suben en una camioneta Eco sport, y lo trajeron por distintos lugares de la ciudad de Culiacán, mencionando la ruta que va a comercial mexicana, la calle Doctor Mora, Avenida El Dorado, Bulevar Universitarios, y que durante todo el camino recibió golpes, maltratos y amenazas de regresar por su esposa e hija, y que también tuvo entendido que los marinos permanecieron en su casa por varias horas después de que a él lo sacaron de la misma.

En cuanto a esas imputaciones de malos tratos por parte de sus captores, cabe mencionar que en autos obra a fojas 41 y 42 del duplicado del proceso, el dictamen de integridad física signado por los peritos médicos forenses oficiales doctora María Bautista García y doctora Karla Corral González, de fecha diecisiete de noviembre de dos mil catorce, en el que asentaron que JESÚS RAÚL BELTRÁN LEÓN presentó lesiones de las que tardan en sanar menos de quince días.



En relación con lo anterior, también se debe tomar en consideración que en el acta que contiene la declaración preparatoria de JESÚS RAÚL BELTRÁN LEÓN, que obra de la foja 315 a 319 del duplicado del proceso, a petición de la defensa el personal actuante del juzgado literalmente asentó lo siguiente:

*"Se le aprecia a simple vista un hematoma de un tamaño aproximado de siete centímetros a la altura del abdomen del lado derecho, de color morado, y en las dos piernas a la altura de la pantorrilla en las dos presenta heridas punzantes de un centímetro dado que aduce que estuvo en posición hincado y uno de los elementos me puso un pie sobre mi pierna y sentía como toques, lo cual se hace constar para los efectos legales conducentes".*

Lo anterior permite corroborar la versión del inculpado en cuanto a que el tiempo que permaneció en contacto directo con los marinos captores, no sólo se le mantuvo incomunicado, sino también fue sujeto pasivo de actos de tortura.

Ante ello se tiene que en el caso se acredita indiciariamente, en

**58**



## TOCA PENAL No. 6/2015



PODER JUDICIAL DE LA FEDERACIÓN

términos del artículo 286 del Código Federal de Procedimientos Penales, que existió violación al mandato de puesta a disposición sin demora de un detenido ante el Ministerio Público, y por parte de este ante la autoridad judicial, todo ello sin justificación alguna, de lo que se concluye la ilegalidad de las pruebas obtenidas durante la averiguación previa, en base a los cuales el Juez Décimo de Distrito en el Estado de Sonora tuvo por acreditados los elementos que integran el cuerpo de los delitos y la probable responsabilidad penal en su comisión por parte del inculpado.

En apoyo a lo anterior se transcribe la Jurisprudencia sostenida por la Primera Sala de la Suprema Corte de Justicia de la Nación, derivada de la contradicción de tesis 33/2003-PS, entre las sustentadas por el Primer Tribunal Colegiado el Décimo Quinto Circuito y el Segundo Tribunal Colegiado del Décimo Primer Circuito, del trece de agosto de 2003, identificada bajo el número 46/2003, visible en la página 90, tomo XIX, Enero de 2004, Novena Epoca, del Semanario Judicial de la Federación, cuyo rubro y texto es el siguiente:

*"MINISTERIO PÚBLICO. EL TÉRMINO DE CUARENTA Y OCHO HORAS QUE PREVÉ EL ARTÍCULO 16 DE LA CONSTITUCIÓN FEDERAL, PARA QUE RESUELVA LA SITUACIÓN JURÍDICA DEL INDICIADO APREHENDIDO EN FLAGRANCIA, INICIA A PARTIR DE QUE ÉSTE ES PUESTO A SU DISPOSICIÓN. El precepto constitucional citado, a efecto de tutelar los derechos fundamentales del individuo, establece dos momentos para la integración de la averiguación previa, cuando se trata de la retención de un indiciado bajo la hipótesis de flagrancia: El primero, deriva de la aprehensión hecha por cualquier persona, al sorprender al indiciado en flagrancia, situación en la que debe ponerlo sin demora a disposición de la autoridad inmediata, y ésta, a su vez, con la misma prontitud, al Ministerio Público, lo que permite concluir que también puede darse el caso de que sea la autoridad la que aprehenda a aquél y entonces deberá sin demora ponerlo a disposición de la representación social; y el segundo, consiste en el plazo de las cuarenta y ocho horas que tiene el Ministerio Público para resolver la situación jurídica del indiciado, por lo que ese lapso único y exclusivo para que cumpla con tal fin,*

TOCA PENAL No. 6/2015

*inicia a partir de que aquél le es puesto a su disposición. Lo anterior, sin perjuicio de las sanciones administrativas o penales que puedan derivarse para quien no cumpla con poner sin demora a disposición de la representación social a la persona aprehendida, o que el órgano jurisdiccional realice los razonamientos que sean pertinentes para la valoración de las pruebas cuando derive del incumplimiento de ese primer momento denominado "sin demora".*

También es aplicable al caso la tesis sostenida por la Primera Sala, de la Suprema Corte de Justicia de la Nación, bajo el número LXXVII/2002, visible en la página: 193, Tomo XVI de octubre de 2002, novena época, del Semanario Judicial de la Federación, que a la letra dice:

*"MINISTERIO PÚBLICO. EL TÉRMINO DE CUARENTA Y OCHO HORAS QUE PREVÉ EL ARTÍCULO 16 DE LA CONSTITUCIÓN FEDERAL, PARA QUE DETERMINE LA SITUACIÓN JURÍDICA DE LOS INDICIADOS, DEBE RESPETARSE CON INDEPENDENCIA DEL FUERO AL QUE PERTENEZCAN LOS AGENTES QUE CONFORMAN AQUELLA INSTITUCIÓN. La diferenciación en cuanto al ámbito federal, local y militar, no es un aspecto que determine la existencia de distintas instituciones del Ministerio Público, con facultades diversas, sino que se relaciona con el ámbito de competencia de los agentes que conforman la institución representativa de la sociedad y titular del monopolio de la acción penal, en diferentes fueros, con jurisdicción propia, para el desarrollo de la función investigadora que tiene asignada la institución, de acuerdo con el tipo de delitos que se investiguen. En consecuencia, el término de cuarenta y ocho horas previsto en el artículo 16 de la Constitución Política de los Estados Unidos Mexicanos, para que el Ministerio Público determine la situación jurídica del indiciado, se establece de manera independiente del fuero al que pertenezcan los agentes de la referida institución que intervengan en la averiguación previa correspondiente, por lo que debe respetarse, aun cuando exista declaración de incompetencia para la integración de aquélla, toda vez que la garantía que salvaguarda la libertad de los gobernados se dirige a la institución que el Constituyente concibió como titular del monopolio de la acción penal y de la función investigadora en representación*



SEGUNDO
DEL QI
HERM(

60



**TOCA PENAL No. 6/2015**

0681

PODER JUDICIAL DE LA FEDERACIÓN

*de la sociedad, y no a cada una de las esferas de competencia de sus actividades, pues, de no considerarlo así se caería en el absurdo de contar tantos términos de cuarenta y ocho horas, como declaratorias de incompetencia entre agentes del Ministerio Público pudiera haber en una averiguación previa, lo que haría nugatoria la citada garantía".*

En apoyo a las anteriores consideraciones, este Tribunal de apelación al asumir jurisdicción, con fundamento en el artículo 364 del Código Federal de Procedimientos Penales, en suplencia oficiosa de la queja, considera que en el caso hubo transgresión a los principios reguladores de valoración de las pruebas, con motivo de tener por acreditado el cuerpo de los delitos atribuidos, así como la probable responsabilidad del inculpado en su comisión.

Se afirma lo anterior porque en la resolución constitucional impugnada se otorgó valor probatorio indiciario, en términos del artículo 285 del Código Federal de Procedimientos Penales, al informe rendido el dieciséis de noviembre de dos mil catorce, por Isaac Pineda López y Javier Avila Santiago, pertenecientes a la Secretaría de Marina, Armada de México.



Tal informe ratificado por sus suscriptores fue fundamental para tener por acreditados los elementos objetivos, normativos y subjetivos que integran el cuerpo de los delitos mencionados, así como la probable responsabilidad penal en su comisión por parte del inculpado, no obstante que como seguidamente se establecerá, tal documento quedó contradicho y desvirtuado en su eficacia convictiva con las diversas pruebas de descargo existentes en la causa, en cuanto a las circunstancias de tiempo, modo y lugar en que se efectuó la detención del inculpado y aseguramiento de los narcóticos y objetos bélicos afectos.

RIBUNAL UNITAR
NTO CIRCUITO
ILLO, SONORA

Al respecto, los suscriptores del referido informe en lo esencial al caso asentaron que al efectuar labores de inteligencia se obtuvo información que Iván Archivaldo Guzmán Salazar, hijo de Joaquín Archivaldo Guzmán Loera, jefe del cártel de Sinaloa, llegaba constantemente a la casa número 1819, de la calle Los Aguacates, de la colonia El Piñón, en Culiacán, Sinaloa.

Que por ese motivo a las dos de la mañana del dieciséis de

TOCA PENAL No. 6/2015

noviembre de dos mil catorce, establecieron vigilancia como a media cuadra del citado domicilio; y, aproximadamente a las cuatro horas observaron que en sentido contrario al que ellos estaban, circulaba un vehículo compacto que se estacionó a la altura de la casa vigilada.

Que tal vehículo resultó ser una camioneta marca Ford, tipo Eco Sport, color blanco, con placas de circulación VPK5845, del Estado de Sinaloa, y al acercarse al mismo por el lado del conductor el marino Isaac Pineda López, observó a un sujeto cuya vestimenta describe y en el asiento del copiloto una arma larga, de las conocidas como cuerno de chivo.

Con motivo de la existencia del arma de fuego dentro de la unidad, lo que constituye flagrancia, se le ordenó al conductor que dijo llamarse JESÚS RAÚL BELTRÁN LEÓN, que descendiera y al solicitarle el permiso o autorización para portarla, dijo no tener, que era para su seguridad personal, encontrándosele en su vestimenta dos teléfonos celulares de las características anotadas (indicios 1 y 2).



Que el antes nombrado quedó bajo la seguridad del marino Javier Avila Santiago, en tanto que el marino Isaac Pineda López recogió el arma antes aludida, de las conocidas como cuerno de chivo, calibre 7.62 X 39 mm., color negro con matrícula 2935 y su cargador estaba abastecido con treinta cartuchos útiles, que para su identificación se marcó como indicio 3.

También consta en dicho informe que al revisar el resto de la unidad, sobre el asiento posterior el cual venia abatido estaba una caja de cartón color azul turquesa que para su identificación se marcó como (indicio 4) y en su interior se encontró lo siguiente:

1.- Un arma calibre 7.62 x 39 MM. de las conocidas como cuerno de chivo, con matrícula 87566, color negro, con su cargador abastecido con 30 cartuchos útiles (indicio 05).

2.- Un arma corta calibre .38 súper con partes doradas, con la leyenda The Billionaire, Forbes, número 701 y Sinaloa, con matrícula THEB 701, con su cargador abastecido con 9 cartuchos útiles (indicio 6).

3.- Un arma corta calibre .38 súper cromada, matrícula

**62**



PODER JUDICIAL DE LA FEDERACIÓN

ELS085H, con su cargador abastecido con 9 cartuchos útiles (indicio 7).

4.- Un arma corta Colt calibre .38 súper, color negro con partes doradas y la imagen de un caballo, matrícula 42020, con su cargador abastecido con 9 cartuchos útiles (indicio 8).

5.- Un arma corta marca colt, matricula 6872 calibre .38 súper, color dorada con partes plateadas y la imagen del Chapo Guzmán, con las letras JGL, con su cargador abastecido con 9 cartuchos útiles (indicio 9).

6.- Un arma corta marca colt, calibre .38 súper, colores negro y cobre, y brillantes, con matrícula 2053, con su cargador abastecido con 9 cartuchos útiles (indico 10)

7.- Un arma corta revolver calibre .44 mm. cromada, marca SPORTING ARMS abastecida con 6 cartuchos, con la leyenda N/S 44SH-2010S (indicio 11).

8.- Un arma corta DESERT EAGLE PISTOL calibre .44 mm. color dorado con negro, marca magnum RESEARCH INC., con matrícula MR004304, con su cargador abastecido con 8 cartuchos útiles (indicio 12).



JNAL UNITARIO
) CIRCUITO
Q, SONORA

9.- Un arma calibre 38 súper, color negro, matrícula CS004849, marca Colts P.T.F.A. MFG.CO HARTFORD. CONV USA con su cargador abastecido con 9 cartuchos útiles (indicio 13).

10.- 14 cargadores para arma calibre 7.62 x 39 mm.; 2 magazines para calibre 7.62 x 39 mm.; y 2 cargadores para pistolas (indico 14).

11.- Los siguientes cartuchos útiles en conjunto identificados como (indicio 15).

a).- 67 calibre .25

b).- 52 calibre .44

c).- 63 calibre 9mm.

d).- 264 calibre .223

e).- 60 calibre .45

f).- 20 calibre 40

g).- 266 calibre 7.62 x 39 mm.

h).- 74 calibre 5.7 x 28 mm.

TOCA PENAL No. 6/2015

i).- 70 calibre 38 súper.

Que también estaba encima de los asientos una caja de cartón que para su identificación se marcó como (indicio 16), con el siguiente contenido:

a).- 31 paquetes en forma de ladrillo confeccionados con cinta color canela de 13 x 23 x 4 centímetros, conteniendo una sustancia compacta color blanca con las características de la cocaína, con un peso aproximado de un kilogramo cada uno (indicio 17).

b).- Una bolsa transparente que contiene una sustancia cristalina tipo piedra con las características del cristal, con un peso aproximado a los cien gramos (indicio 18).

c).- Ocho logotipos de material de plástico duro que contienen grabaciones utilizados para marcar los paquetes con droga, con los logos letra "H", "2014", "Chevrolet" figura de "un puma", números "2014" y "7", una estrella con las letras "FEF" y "Q" (indicio 19).



d).- Tres logotipos de material de madera que contienen grabaciones utilizados para marcar los paquetes con droga, con los logos "5" letras "2RFC" y figura "una corona" (indicio 20).

SEGUNDO TRIBU
DEL QUINTC
HERMOSILL

e).- Un sobre con tres fotografías de inmuebles (indicio 21).

Ese informe que narra hechos acontecidos a partir de las dos horas del dieciséis de noviembre de dos mil catorce, en Culiacán, Sinaloa, fue ratificado en su contenido y firma por sus suscriptores los marinos Isaac Pineda López y Javier Avila Santiago mediante comparecencias efectuadas a las veintitrés treinta horas y veintitrés cuarenta y cinco horas, respectivamente, ante un Agente del Ministerio Público de la Federación en las oficinas de la Unidad de Investigación Especializada en Delitos Contra la Salud, en la ciudad de México, Distrito Federal.

Este informe, no obstante su ratificación y el valor de indicio que le reconoció el Juez de Distrito, conforme al artículo 285 del Código Federal de Procedimientos Penales, por reunir los requisitos que prevé el artículo 289 del mismo ordenamiento, es ineficaz para tener por demostrados los hechos que en



PODER JUDICIAL DE LA FEDERACIÓN

el mismo se narran, en cuanto a las circunstancias de tiempo, modo y lugar en que se efectuó la detención del inculpado y se aseguraron los narcóticos, armas de fuego y cartuchos útiles que en el mismo se describen.

Se afirma lo anterior, toda vez que JESÚS RAÚL BELTRÁN LEÓN vertió diversa manera en que incurrió su detención, en lo que se denominó ampliación de declaración, vertida a partir de las once horas con cinco minutos, del veinticuatro de noviembre de dos mil catorce, ante el Juez Décimo de Distrito en el Estado de Sonora, con sede en esta ciudad de Hermosillo, asistido de dos defensores particulares, visible de las fojas 393 a 395 del duplicado del proceso.

Previo a ello se deja asentado que el inculpado fue presentado a las doce horas del dieciocho de noviembre, ante el Agente del Ministerio Público de la Federación adscrito a la Unidad Especializada en Investigación de Delitos Contra la Salud de la Subprocuraduría Especializada en Investigación de Delincuencia Organizada, en la ciudad de México, según consta en el acta que obra de la foja 178 a 181 del duplicado del proceso, para rendir su declaración ministerial, y de manera expresa manifestó reservarse el derecho de hacerlo.



NAL UNITARIO
CIRCUITO
), SONORA

En tal declaración vertida ante el Juez, en lo medular al caso, dijo reconocer como suyas una de las firmas que obran al margen y calce de su declaración ministerial y que los hechos acontecieron de la siguiente manera:

Que su detención fue como a la una de la mañana del sábado quince de noviembre de dos mil catorce, dentro de su domicilio ubicado por la calle Aguacate 1816, en la colonia La Campiña, en Culiacán, Sinaloa, en presencia de su tía Lourdes León Ríos, su esposa Brianda Lizbeth Félix Beltrán y su hija de un año tres meses de edad de nombre Isabela Beltrán Félix, en la que fue torturado y asfixiado por elementos de la marina, motivo por el cual no declaró en las instalaciones de la SEIDO, ya que ahí lo tuvieron intimidado.

En el transcurso de tal diligencia a petición de la defensa se dio fe de que al inculpado se le aprecia a simple vista un hematoma de aproximadamente siete centímetros a la altura del abdomen lado derecho, color morado, y en las dos piernas a la altura de la pantorrilla dos heridas punzantes

65

TOCA PENAL NO. 6/2015

de un centímetro.

En el período de preinstrucción ampliado, a partir de las once horas cinco minutos del veinticuatro de noviembre de dos mil catorce, ante la presencia judicial se recibió la ampliación de declaración del inculpado, en la que en forma libre manifestó hechos que por su relevancia se transcriben de manera literal:

*"Llego el viernes catorce de noviembre a dormir a mi casa como de costumbre, en la colonia La Campiña, calle Aguacate, número 1819, en Culiacán, Sinaloa, aproximadamente a la una de la mañana, entran elementos de la marina a mi habitación que está en el segundo piso, estando yo en mi ropa interior, a punta de arma, inmediato me someten a golpes y gritos, y me bajan a la primera planta en la cocina, dentro del inmueble se encontraba mi tía de nombre María Manuel León Ríos, cuidando a mi hija menor de edad, y mi esposa Brianda Lizbeth Félix Beltrán, en cuestión de cinco minutos, a punta de arma, golpes y gritos, pasan a ponerme una bolsa sobre la cabeza, y uno de los militares me golpeaba sobre la cabeza, y me decía "piensa, piensa", vas a hacer lo que te digamos, "vas a cooperar, o crees que tu hija aguanta una bolsa", o "si quieres bajamos a tu esposa" y me amenazaban con golpearla, violarla y asfixiarla, por lo tanto de inmediato accedí a cualquier cosa que me pidieran, me vendaron de la cabeza, la vista y las manos por el frente para evitar huellas o rasguños, me pusieron dos toallas femeninas, una en cada brazo, y después me vendaban, de esa manera no deja fricción, antes de que me vendaran, veo que llega un elemento de la marina con cuatreo bolsas ziploc, traía guantes tipo látex, retira cuatro celulares de cada bolsa, los cuatro eran blackberry, uno era blanco, otro gris y dos negros, en mis pertenencias yo sólo tenía un iphone seis color gris, el cual me robaron, que era el único que tenía, me piden que los tocara todos los teléfonos, y les pusiera las siguientes claves, que al blanco le pusiera "blanco", al otro "negro" y "gris" y a otro "blackberry"; me sacan de la casa a golpes, y me suben a una camioneta eco sport, luego me quitan la venda y me dicen que si voy a seguir haciendo lo que ellos dicen o se regresan por mi esposa o mi hija, lo cual tengo entendido que los marinos permanecieron en mi*



SEGUNDO TRIBU
DEL QUINT
HERMOSILL

**TOCA PENAL No. 6/2015**



PODER JUDICIAL DE LA FEDERACIÓN

0684

casa por varias horas, no se que tanto, recuerdo que tomamos la ruta que sale directo a la comercial mexicana, a la izquierda por doctor Mora, a la derecha por avenida el Dorado, subiendo por la isla, todo derecho por el boulevard Universitarios, todo el camino fui recibiendo golpes, maltratos y amenazas de muerte, y con amenaza de regresar por mi esposa e hija, recuerdo que nos detuvimos sobe unos departamentos, y noté que tenían varios operativos en función, y la mayoría de mi tortura fue arriba de esa camioneta, me volvieron a vendar, y a poner una bolsa, luego me trasladaron al parque donde está el campamento de la marina no recuerdo si 68 u 86, me bajan de la camioneta, igual, golpes, amenazas, maltrato, me toman mis generales, me toman, altura, fotos de mis ojos, huellas, me percato que hay un helicóptero, y noto que había muchas otras personas ahí siendo sometidas y golpeadas brutalmente, porque se escuchaban los gritos a lo lejos, me sacan a la una de la mañana, y me doy cuenta cuando sale el sol, y me doy cuenta que no me llevaron a las oficinas de la Procuraduría, ni con mis licenciados, ni que me pusieran a disposición, vilmente en sus manos a los que ellos quisieran, me pedían que declarara ser parte del cártel de Sinaloa, o si no regresaban por mi esposa e hija, aun accediendo a sus peticiones, aproximadamente cada hora me asfixiaban con bolsas, no había manera de comprobarlo hasta que opuse un poco de resistencia, por las toallas femeninas a que me pusieron en las manos, y que no dejan marca ya que son de algodón, cuando comienzo a oponer resistencia, porque ya de plano no podía, me bajaron de la camioneta y en la tierra, me hincaron, me amarraron de los tobillos, me pusieron otra bolsa, esta vez la apretaron más, no dejaron nada de oxígeno, y sentí como algo me quemaba, no se si eran toques, electricidad, pero me quemó, me tenían hincado y el tipo me ponía su pie sobre mis pies, y con la mano izquierda me detenía mis manos por detrás que estaban vendadas, y me quemaba con electricidad o toques, y aún tengo los piquetes en mis piernas, y no se si traían una navaja pero me picaban el abdomen para que no pudiera respirar y me ardía; nuevamente me subieron a la camioneta, y me llevaron a patrullar a otro operativo, como un muñeco me traían en la cajuela, cuando llegamos a un domicilio, se bajaron de la camioneta



NAL UNITARIO
) CIRCUITO
O, SONORA

67

TOCA PENAL No. 6/2015

*como a un operativo, pude alzar la cabeza y logré ubicar donde me tenían, que era por la colonia las Quintas, por la calle estado de Chihuahua o Sonora, que por ahí deben estar las cámaras, ya que baja la noche, en ningún momento intenta llevarme a la procuraduría, ni se ponchó ninguna unidad de ellos, me llevaron nuevamente a la base de la marina, donde nuevamente me tuvieron arriba de la camioneta, y aun así vendado logré identificar una camioneta blanca, blindada, doble cabina, turbo diesel, de la marca Ford, de la marina, en la cual fui transportado al aeropuerto, al llegar me pidieron quitarme la venda para platicar con uno de los marinos, por eso me di cuenta del modelo de la camioneta, cuando nuevamente me amenazó que si no cumplía con sus peticiones regresarían por mi familia y les pasaría lo mismo, me suben a un avión de la marina que se abre la parte trasera, y me trasladan a Seido, donde llegué a las once de la noche, y como a las nueve de la mañana fui atendido por Ministerios Públicos de Seido, donde aun me sentí intimidado y amenazado por los Ministerios Públicos, razón por la que no quise declarar, ya que a pesar de haber sido torturado por la marina, sentí que tenían relación con los ministerios públicos, por lo que exigí ver a mis licenciados, y no se me concedió hasta el día de hoy, eso en cuanto a Seido aun teniendo un amparo no me permitieron ver a mis abogados particulares hasta el día de hoy; en relación a la droga, cartuchos y las armas las conocí hasta llegar a Seido, y aun así no supe que me las estaban atribuyendo, sólo las vi ahí los guardias me preguntaban que s porqué traía tantas armas y droga, por eso me di cuenta, y quiero agregar cuando se metieron a mi casa no me mostraron ninguna orden de cateo, ni yo tengo orden de aprehensión ni de presentación, me percaté que varios vecinos vieron cuando me sacaron de mi casa, un contador de nombre Julio, no recuerdo el apellido, un velador, y dos familias completas, que desconozco sus nombres; en cuanto al lugar de mi detención que aducen mis aprehensores, no fue en la vía pública, sino dentro de mi casa, ni tampoco fueron sólo dos elementos, y yo no tengo ningún vehículo Eco sport, ni nadie de mi familia, y es todo lo que deseo manifestar".* (sic)

A preguntas de la defensa entre otras cosas manifestó que los



SEGUNDO TR
DEL QUI
HERMOSI

**68**

**TOCA PENAL No. 6/2015** 0685



PODER JUDICIAL DE LA FEDERACIÓN

marinos que se introdujeron a su domicilio para detenerlo fueron de diez a veinte personas, iban en cuatro unidades; que en el momento de su detención no portaba arma alguna, que estaba en ropa interior, estaba dormido, que en un cajón de su recámara tenía una pistola .38 Super, color negro, con cachas de madera que le regaló su abuelo; que previo a su detención no tuvo a su disposición o posesión el vehículo eco sport que se menciona en el informe; que los elementos de la marina que iban con él en esa camioneta en que lo transportaron a la base de la marina eran tres, porque es pequeña, y lo que dicen que aseguraron no habría cabido en esa camioneta tan compacta, y cuando le pusieron ante su vista las fotografías de los aprehensores que signaron el informe, dijo que no son los que participaron en su detención ni estuvieron torturándolo cuando le cambiaban de bolsas para asfixiarlo ya que tenía oportunidad de verles el rostro, que fue tanto el contacto físico que tuvo con quienes lo torturaron que podría identificarlos.

En relación con lo manifestado en esa ampliación de declaración del inculpado, éste dijo que en el momento de su detención en el interior de su domicilio lo acompañaban su esposa Brianda Lizbeth y su tía María Manuela León Ríos, a petición de la defensa en el período de preinstrucción se recibieron el veinticinco de noviembre de dos mil catorce, los testimonios de ambas.

La primera, en lo medular al caso dijo que estaba en el domicilio Aguacate número 1819 en la colonia La Campiña, en Culiacán, Sinaloa, su hija Isabela Beltrán Félix, su esposo JESÚS RAÚL BELTRÁN LEÓN y la señora Manuela León Ríos, cuando aproximadamente a la una hora con veinte minutos del dieciséis de noviembre escuchó ruidos, salió del cuarto y se encontró con muchos elementos de la marina, que se asustó y les pidió que la dejaran tomar a su hija que estaba en el último cuarto, le dijeron que se callara y pasara y en eso escuchó ruidos y se fueron sobre su esposo, a quien lo sacaron del cuarto sin ropa.

Que al cuarto donde estaban ellas se metieron cinco personas, que ordenaron a su esposo que se cambiara y junto con Manuela León Ríos se

TRIBUNAL UNITARIO
ITO CIRCUITO
LLO, SONORA

TOCA PENAL NO. 6/2015

quedaron en el cuarto principal, que escuchaban voces altas y después de dos horas la mandaron llamar, bajó y tenían a su esposo con los ojos vendados, las manos amarradas y le dijeron que tenía que decirles algunas cosas que ellos querían pero ella no sabía, y la volvieron a subir al cuarto, y a su esposo se lo llevaron, y la mayoría de los agentes se fueron con él.

Que ella les preguntó si tenían alguna orden de aprehensión o de cateo y le dijeron que estuviera callada, que ellos no podían contestar nada, y le hablaban en voz fuerte, a ellas las tuvieron aproximadamente de diez a doce horas, ya que salieron como a las doce horas del domingo cuando vieron que ya no había nadie, y que incluso se acercaron a su casa personas que trabajan en un centro de rehabilitación que se encuentra contra esquina de su casa, y la persona de nombre Yolanda le preguntó si estaban bien, que si a ellas no les habían hecho nada, y le comentó que un elemento de la marina había entrado al centro y había retirado el disco duro de las cámaras, y le dijeron que no se metiera en problemas, y que mientras tenían a su esposo escuchaba como tosía como si lo estuvieran golpeando, y a ella no le mostraron ninguna orden, simplemente entraron a la casa sin autorización.



Por su parte, María Manuela León Ríos en lo esencial al caso manifestó que estaba cuidando a su sobrina Isabela, en la calle Aguacate, sin recordar el número, en la colonia La Campiña en Culiacán, Sinaloa, y como a las once y media de la noche del sábado se acostó, y como una hora y media después sentí la presencia de Brianda con la niña en los brazos, y le dijo que había alguien en la casa, y al voltear vio a los marinos parados en la puerta de la recámara, que calmó a Brianda, y alcanzó a ver que llevaban a su sobrino a una sala de estancia, que iba en ropa interior, y con ellas se acercaron dos elementos femeninos de la marina y le preguntaron a Brianda con voz golpeada que si se sentía mal, a lo que respondió que no.

Agregó, que a los minutos regresó su sobrino acompañado de todas esas personas, y para esto vio que ya venía cambiado, escuchó pasos, y los que estaban con ellas en la habitación no los dejaban salir, sólo ir al baño pero acompañadas. Que una de la marina le dejó tomar su medicamento

70

**TOCA PENAL No. 6/2015**    0686

FORMA A-55



PODER JUDICIAL DE LA FEDERACIÓN

porque padece hipertensión, y de reojo vio la ropa que llevaba; que escuchaba como que golpeaban algo pero sin asegurar que fue, y después le hablan a la esposa de su sobrino y luego subió, y también a ella un marino le dijo que bajara y vio a su sobrino vendado de los ojos, sin decir nada y luego se lo llevaron para ellas volverlas a subir.

Que fue como a las doce del domingo que se percataron que estaban solas, que ya se habían ido los marinos y al bajar se dieron cuenta que habían buscado algo en la casa. A preguntas dijo que no mostraron ningún documento para ingresar al domicilio, ni a ella ni a la señora, proporcionando las características del inmueble.

También en esa fecha se recibieron los testimonios de María del Refugio Araujo López, María de Jesús Lugo Estala y Lesley Zelina Félix Salazar, con el propósito de corroborar el dicho del inculpado en cuanto a la intromisión del personal que lo detuvo a su domicilio.

Para ese efecto María del Refugio Araujo López en concreto dijo que es vecina de la señora Manuela, y como a las ocho de la mañana del domingo una hija de ella de nombre Arlyn preocupada, porque su mamá no estaba en casa y no había tenido comunicación, le pidió que la acompañara a casa de JESÚS RAÚL BELTRÁN LEÓN, porque su mamá había ido a cuidar a la hija de éste, que fueron y se percataron que había marinos o militares ya que no supieron qué eran, y lo que hicieron fue retirarse, que ella vio a cuatro marinos y lo único que hizo fue regresarse a su casa y sugerir que pusieran una denuncia.



3UNAL UNITARIO
fO CIRCUITO
1O, SONORA

Por su parte, María de Jesús Lugo Estala, dijo que como de nueve a diez y media de la mañana dijo que fue a la casa de Brianda a trabajar, cuya ubicación menciona, que cuando entró a la casa escuchó hablar a la señora y entró una persona vestida de marino, volteó hacia la parte de arriba y vio otro marino, y el que estaba cerca de ella le dijo que se saliera, y afuera le preguntaron a qué había ido, respondiendo que era la señora de la limpieza, les da sus datos, vio a la señora y un marino le quita las llaves de la casa, a la vez que le dijo que se las diera para que no tuviera problemas, y vio desorden en la

71

TOCA PENAL No. 6/2013

casa.

La última de las nombradas Lesley Zelina Félix Salazar dijo que la madrugada del domingo como a la una o una veinte de la mañana llegó a su casa ubicada en el número 1906 de la calle Aguacate, que está aproximadamente de la casa de JESÚS RAÚL BELTRÁN LEÓN y miró bastantes carros, había de la marina y particulares también vestidos de civiles, que se metió a su casa y de su cuarto escuchó ruidos, que movían cosas, y a las siete de la mañana del domingo se percató que ahí seguían los marinos que incluso estaban tapando su cochera, y al salir ellos sólo se movieron y al regresar a la casa como a las dos de la tarde se dio cuenta que ya no estaban los marinos.

Estas pruebas de descargo, para este Tribunal, contrario a la valoración que de ellas hizo el Juez de Distrito, merecen valor probatorio indiciario de conformidad con lo previsto por el artículo 285 del Código Federal de Procedimientos Penales, por reunir los requisitos contenidos por el 289 de ese mismo ordenamiento, considerándose irrelevante el parentesco que dos de ellas tienen con el inculpado, puesto que de las actas que las contienen no se advierte preparación o adoctrinamiento que permita considerar lo contrario, sino una narración natural y espontánea, a su vez apoyada en el dicho de las otras testigos de descargo, testimoniales de descargo que corroboran la versión del inculpado sobre la hora y lugar de su detención.



SEGUNDO TRI
DEL QUIN
HERMOSIL

En relación con lo anterior se invoca la Jurisprudencia de la Primera Sala de la Suprema Corte de Justicia de la Nación, visible en la página 275 del Apéndice 2000, Tomo II, Penal, Sexta Época, cuyo rubro y tenor es el siguiente:

*"TESTIGOS. APRECIACIÓN DE SUS DECLARACIONES.- Las declaraciones de quienes atestiguan en un proceso penal deben valorarse por la autoridad jurisdiccional teniendo en cuenta tanto los elementos de justipreciación concretamente especificados en las normas positivas de la legislación aplicable, como todas las demás circunstancias objetivas y subjetivas que, mediante un proceso lógico y un correcto raciocinio, conduzcan a determinar la mendacidad o*

72

**TOCA PENAL No. 6/2015**

0687



PODER JUDICIAL DE LA FEDERACIÓN

*veracidad del testimonio sub júdice".*

Ciertamente, las testimoniales de descargo corroboran la versión de JESÚS RAÚL BELTRÁN LEÓN, en el sentido que fue detenido en el interior del domicilio donde vive en compañía de su esposa Brianda Lizbeth Félix Beltrán, su menor hija, y que cuando ello aconteció a la una de la mañana, estaba presente su tía María Manuela León Ríos, sin que los marinos aprehensores contaran con orden de cateo, lo que trae como consecuencia la ineficacia probatoria e incluso la inexistencia legal de las pruebas obtenidas como consecuencia directa de esa ilegal actuación.

Lo anterior es así, en atención a las siguientes consideraciones basadas en disposiciones constitucionales.

El artículo 16 de la Constitución Política de los Estados Unidos Mexicanos, en lo conducente dice:



*"Artículo 16. Nadie puede ser molestado en su persona, familia, domicilio, papeles o posesiones, sino en virtud de mandamiento escrito de la autoridad competente, que funde y motive la causa legal del procedimiento.*

*Toda persona tiene derecho a la protección de sus datos personales, al acceso, rectificación y cancelación de los mismos, así como a manifestar su oposición, en los términos que fije la ley, la cual establecerá los supuestos de excepción a los principios que rijan el tratamiento de datos, por razones de seguridad nacional, disposiciones de orden público, seguridad y salud públicas o para proteger los derechos de terceros.*

*No podrá librarse orden de aprehensión sino por la autoridad judicial y sin que preceda denuncia o querella de un hecho que la ley señale como delito, sancionado con pena privativa de libertad y obren datos que establezcan que se ha cometido ese hecho y que exista la probabilidad de que el indiciado lo cometió o participó en su comisión.*

*La autoridad que ejecute una orden judicial de aprehensión, deberá poner al inculpado a disposición del juez, sin dilación alguna y bajo su más estricta responsabilidad. La contravención a lo anterior será sancionada por la ley penal.*

73

TOCA PENAL No. 6/2015

*La autoridad que ejecute una orden judicial de aprehensión, deberá poner al inculpado a disposición del juez, sin dilación alguna y bajo su más estricta responsabilidad. La contravención a lo anterior será sancionada por la ley penal.*

*Cualquier persona puede detener al indiciado en el momento en que esté cometiendo un delito o inmediatamente después de haberlo cometido, poniéndolo sin demora a disposición de la autoridad más cercana y ésta con la misma prontitud, a la del Ministerio Público. Existirá un registro inmediato de la detención.*

*Sólo en casos urgentes, cuando se trate de delito grave así calificado por la ley y ante el riesgo fundado de que el indiciado pueda sustraerse a la acción de la justicia, siempre y cuando no se pueda ocurrir ante la autoridad judicial por razón de la hora, lugar o circunstancia, el Ministerio Público podrá, bajo su responsabilidad, ordenar su detención, fundando y expresando los indicios que motiven su proceder.*

*En casos de urgencia o flagrancia, el juez que reciba la consignación del detenido deberá inmediatamente ratificar la detención o decretar la libertad con las reservas de ley.*



SEGUNDO TRIBU
DEL QUINTO
HERMOSILU

*La autoridad judicial, a petición del Ministerio Público y tratándose de delitos de delincuencia organizada, podrá decretar el arraigo de una persona, con las modalidades de lugar y tiempo que la ley señale, sin que pueda exceder de cuarenta días, siempre que sea necesario para el éxito de la investigación, la protección de personas o bienes jurídicos, o cuando exista riesgo fundado de que el inculpado se sustraiga a la acción de la justicia. Este plazo podrá prorrogarse, siempre y cuando el Ministerio Público acredite que subsisten las causas que le dieron origen. En todo caso, la duración total del arraigo no podrá exceder los ochenta días.*

*Por delincuencia organizada se entiende una organización de hecho de tres o más personas, para cometer delitos en forma permanente o reiterada, en los términos de la ley de la materia.*

*Ningún indiciado podrá ser retenido por el Ministerio Público por*

**74**

0688

## TOCA PENAL No. 6/2015

FORMA A-55



PODER JUDICIAL DE LA FEDERACIÓN

*más de cuarenta y ocho horas, plazo en que deberá ordenarse su libertad o ponérsele a disposición de la autoridad judicial; este plazo podrá duplicarse en aquellos casos que la ley prevea como delincuencia organizada. Todo abuso a lo anteriormente dispuesto será sancionado por la ley penal.*

*En toda orden de cateo, que sólo la autoridad judicial podrá expedir, a solicitud del Ministerio Público, se expresará el lugar que ha de inspeccionarse, la persona o personas que hayan de aprehenderse y los objetos que se buscan, a lo que únicamente debe limitarse la diligencia, levantándose al concluirla, un acta circunstanciada, en presencia de dos testigos propuestos por el ocupante del lugar cateado o en su ausencia o negativa, por la autoridad que practique la diligencia….".*

De lo transcrito deriva un derecho subjetivo público de los gobernados de no ser molestados en su persona, familia, domicilio, papeles o posesiones, contemplando, desde luego, la inviolabilidad del domicilio.



Sin embargo, esta garantía no es absoluta, pues permite a la autoridad practicar actos de molestia a los particulares e introducirse a su domicilio, bajo ciertas condiciones o requisitos y con un propósito definido, a efecto que pueda cumplir con sus actividades, pero sin causar una molestia innecesaria al particular.

NAL UNITARIO
CIRCUITO
), SONORA

Esos actos de molestia de intromisión al domicilio, deben atender al principio de seguridad jurídica en beneficio del particular afectado, lo que implica que la autoridad debe cumplir con los requisitos establecidos en primer término en la Constitución y además en las leyes que de ella emanen; así, tratándose de la orden de cateo, ésta debe limitarse a un propósito determinado, la búsqueda de personas u objetos relacionados con un delito.

Por ello, con el afán de asegurar de manera efectiva y en favor del gobernado, la tutela de su persona, familia, domicilio, papeles y posesiones, el Constituyente estableció que las órdenes de cateo única y exclusivamente deben ser expedidas por la autoridad judicial; y en concordancia con ello, estableció diversos requisitos tendientes al sano ejercicio en su práctica, que resultan ser:

TOCA PENAL NO. 6/2015

1.- Que se emita por autoridad judicial.

2.- Que conste por escrito.

3.- Que exprese el lugar que ha de inspeccionarse.

4.- Que precise la materia de la inspección; esto es, que se señale a la persona o personas que han de aprehenderse, o bien, los objetos que se buscan.

5.- Que se levante acta circunstanciada, en presencia de dos testigos propuestos por el ocupante del lugar cateado o, en su ausencia o negativa, por la autoridad que practique la diligencia.

Lo anterior tiene apoyo en la jurisprudencia 22/2007, de la Primera Sala de la Suprema Corte de Justicia de la Nación, visible en la página 111, Tomo XXVI, Agosto de 2007, del Semanario Judicial de la Federación y su Gaceta, Noveno Epoca, del rubro y texto siguiente:

*"CATEO. EN ACATAMIENTO A LA GARANTÍA DE INVIOLABILIDAD DEL DOMICILIO, LA ORDEN EMITIDA POR LA AUTORIDAD JUDICIAL, DEBE REUNIR LOS REQUISITOS PREVISTOS EN EL ARTÍCULO 16 DE LA CONSTITUCIÓN, DE LO CONTRARIO DICHA ORDEN Y LAS PRUEBAS QUE SE HAYAN OBTENIDO COMO CONSECUENCIA DIRECTA DE LA MISMA, CARECEN DE EXISTENCIA LEGAL Y EFICACIA PROBATORIA. Con la finalidad de tutelar efectivamente la persona, familia, domicilio, papeles y posesiones de los gobernados, el Constituyente estableció en el artículo 16 de la Constitución Política de los Estados Unidos Mexicanos que las órdenes de cateo única y exclusivamente puede expedirlas la autoridad judicial cumpliendo los siguientes requisitos: a) que conste por escrito; b) que exprese el lugar que ha de inspeccionarse; c) que precise la materia de la inspección; d) que se levante un acta circunstanciada en presencia de dos testigos propuestos por el ocupante del lugar cateado o en su ausencia o negativa, por la autoridad que practique la diligencia. En ese sentido, el artículo 61 del Código Federal de Procedimientos Penales, en observancia a la garantía de inviolabilidad del domicilio, establece que si no se cumple con alguno de los requisitos del octavo párrafo del citado precepto constitucional, la diligencia*



SEGUNDO TRI
DEL QUIN
HERMOSII

**76**

0689

## TOCA PENAL No. 6/2015

FORMA A-55



PODER JUDICIAL DE LA FEDERACIÓN

*carece de valor probatorio. Por tanto, las pruebas obtenidas con vulneración a dicha garantía, esto es, los objetos y personas que se localicen, su aprehensión en el domicilio registrado y las demás pruebas que sean consecuencia directa de las obtenidas en la forma referida, así como el acta circunstanciada de la propia diligencia, carecen de eficacia probatoria. En efecto, las actuaciones y probanzas cuyo origen sea un cateo que no cumpla con los requisitos constitucionales y por tanto, sin valor probatorio en términos del señalado artículo 61, carecen de existencia legal, pues de no haberse realizado el cateo, tales actos no hubieran existido."*

Tal como se consideró en esa ejecutoria, las pruebas obtenidas con vulneración a la inviolabilidad del domicilio, así como la aprehensión de las personas que ahí se localicen, carecen de eficacia probatoria alguna, pues la tutela de los derechos fundamentales debe ser el objetivo prioritario del Estado de Derecho que la Constitución consagra.



Los derechos fundamentales son la base de nuestra organización jurídico-política, en esa virtud, su vulneración, entre otras consecuencias, debe conducir a la imposibilidad de otorgar eficacia jurídica a las pruebas obtenidas con infracción de tales derechos.

.UNAL UNITARIO
O CIRCUITO
LO, SONORA

La orden de cateo presupone la comisión de un delito, la existencia de una investigación y la probabilidad de que en el mismo recinto se encuentre el activo o los objetos relacionados con el delito. Sin duda, es menester que en dicha orden se señale el lugar que ha de inspeccionarse y, según las circunstancias del caso, deberán precisarse la persona o personas que hayan de aprehenderse y los objetos que se buscan, a los cuales deberá limitarse única y exclusivamente la diligencia.

Luego, si se demuestra que el inculpado fue detenido en el interior de su domicilio, sin que los elementos de la marina contaran con una orden de cateo, tiene que determinarse la ineficacia probatoria e incluso la inexistencia legal de las pruebas obtenidas como consecuencia directa de esa ilegal acción.

TOCA PENAL No. 6/2015

Al respecto, es aplicable la jurisprudencia 21/2007, de la Primera Sala de la Suprema Corte de Justicia de la Nación, publicada en la página 224, Tomo XXVI, Agosto de 2007, en la Novena Época del Semanario Judicial de la Federación y su Gaceta, que dice:

*"INTROMISIÓN DE LA AUTORIDAD EN UN DOMICILIO SIN ORDEN JUDICIAL. EFICACIA DE LAS ACTUACIONES REALIZADAS Y DE LAS PRUEBAS OBTENIDAS, CUANDO ES MOTIVADA POR LA COMISIÓN DE UN DELITO EN FLAGRANCIA. Si bien, la diligencia de cateo prevista en el octavo párrafo del artículo 16 constitucional presupone la comisión de un delito, la existencia de una investigación ministerial y la probabilidad de que en el domicilio que se registrará se encuentra el sujeto activo o los objetos relacionados con el ilícito; ello no sucede en todos los casos, pues tratándose de flagrante delito, con fundamento en que la demora puede hacer ilusoria la investigación del delito y la aplicación de las penas, la autoridad policial no requiere necesariamente orden de cateo para introducirse en el domicilio particular en el que se está ejecutando el delito, ya que en ese caso, el propio artículo 16 constitucional señala expresamente una excepción al respecto al permitir a cualquier particular, y con mayor razón a la autoridad, detener al indiciado, además de que el Estado -como garante de los bienes de la sociedad- debe actuar de inmediato en casos de flagrancia; por lo que en esas condiciones, los medios de prueba obtenidos como consecuencia de la intromisión de la autoridad a un domicilio sin contar con orden de cateo, motivada por la comisión de un delito en flagrancia, tienen eficacia probatoria, ya que al tratarse de hipótesis distintas, a efecto de determinar su valor probatorio, no se aplican las mismas reglas que tratándose de un cateo precedido por una investigación ministerial. Así, las pruebas que se obtengan a partir de un cateo que no cumpla con los requisitos establecidos en el octavo párrafo del artículo 16 constitucional, carecen de eficacia probatoria, ello con independencia de la responsabilidad en que las autoridades que irrumpan en el domicilio pudieran incurrir; en cambio, las probanzas que se obtengan como consecuencia del allanamiento de un domicilio por parte de la autoridad policial en caso de*



SEGUNDO TRIB
DEL QUINT
HERMOSIL]

**78**

0690

**TOCA PENAL No. 6/2015**

FORMA A-55



PODER JUDICIAL DE LA FEDERACIÓN



UNAL UNITARIO
O CIRCUITO
.O, SONORA

*flagrancia tienen eficacia probatoria, aun cuando no exista orden de cateo. Debiendo precisarse que tratándose del allanamiento de un domicilio por parte de la autoridad policial en caso de flagrancia, ésta debe contar con datos ciertos o válidos que motiven la intromisión al domicilio sin orden de cateo, los cuales deben aportarse en el proceso en caso de consignarse la averiguación correspondiente a efecto de que el Juez tenga elementos que le permitan llegar a la convicción de que efectivamente se trató de flagrancia, pues de no acreditarse tal situación, las pruebas recabadas durante dicha intromisión, carecen de eficacia probatoria."*

La ejecutoria transcrita refiere que entratándose del allanamiento de un domicilio por parte de la autoridad policial o militar en caso de flagrancia, ésta debe contar con datos ciertos o válidos que motiven la intromisión al domicilio sin orden de cateo, los cuales deben aportarse en el proceso en caso de consignarse la averiguación correspondiente a efecto de que el Juez tenga elementos que le permitan llegar a la convicción de que efectivamente se trató de flagrancia, pues de no acreditarse tal situación, las pruebas recabadas durante dicha intromisión, carecen de eficacia probatoria.

Por lo tanto, si lo narrado por JESÚS RAÚL BELTRÁN LEÓN en su ampliación de declaración en el período de preinstrucción, en el sentido que fue detenido en el interior de su domicilio, quedó corroborado con los testimonios de descargo antes analizados y valorados, puesto que esas probanzas acreditan circunstancialmente que los marinos aprehensores irrumpieron en el domicilio del inculpado aproximadamente a la una de la madrugada, cuando éste estaba acompañado de su esposa, hija menor y tía encargada del cuidado de la niña.

Tal acción de los marinos fue en forma violenta y sin autorización de ninguna especie para ello, pues lo manifestado por los captores respecto de la flagrancia delictiva imputada al inculpado de portar armas, poseer cartuchos y narcóticos fedatados, lejos de estar probado, aparece desvirtuado con dichas pruebas de descargo.

De singular relevancia es que el inculpado en ningún momento

TOCA PENAL No. 6/2013

reconoció la portación y posesión de armas de fuego, así como la posesión de

cartuchos útiles y los narcóticos afectos, excepción hecha de aquélla pistola que

refirió ser de calibre .38, color negro, de cachas de madera que le regaló su

abuelo, y que estaba en un cajón de su recámara, por lo que lo narrado en el

informe de los aprehensores sobre los artefactos bélicos, cocaína y

metanfetamina en el sentido de haberlos asegurado en el interior del vehículo

que refieren conducía el inculpado, constituye una prueba sin efecto alguno por

derivar de un acto inconstitucional.

En apoyo de lo expuesto se cita la tesis emitida por la Primera

Sala de la Suprema Corte de Justicia de la Nación, que se localiza en la página

537 del Libro XX, Mayo de 2013, Tomo I, del Semanario Judicial de la

Federación y su Gaceta, correspondiente a la Décima Época que a la letra dice:

*"EFECTO CORRUPTOR DEL PROCESO PENAL. SUS*

*DIFERENCIAS CON LA REGLA DE EXCLUSIÓN DE LA PRUEBA*

*ILÍCITAMENTE OBTENIDA. Esta Primera Sala de la Suprema Corte de Justicia*

*de la Nación ha establecido en la tesis aislada 1ª. CLXII/2011 de rubro:*

*"PRUEBA ILÍCITA. LAS PRUEBAS OBTENIDAS, DIRECTA O*

*INDIRECTAMENTE, VIOLANDO DERECHOS FUNDAMENTALES, NO*

*SURTEN EFECTO ALGUNO.", que toda prueba obtenida, directa o*

*indirectamente violando derechos fundamentales, no surtirá efecto alguno.*

*Asimismo, ha establecido que la ineficacia de la prueba no sólo afecta a las*

*pruebas obtenidas directamente en el acto constitutivo de la violación de un*

*derecho fundamental, sino también a las adquiridas a partir o a resultas de*

*aquéllas, aunque en su consecución se hayan cumplido todos los requisitos*

*constitucionales. Tanto unas como otras han sido conseguidas gracias a la*

*violación de un derecho fundamental –las primeras de forma directa y las*

*segundas de modo indirecto-, por lo que, en pura lógica, no pueden ser*

*utilizadas en el proceso penal. A esta cuestión se le conoce como la regla de*

*exclusión de la prueba ilícitamente obtenida, la cual tiene como objetivo eliminar*

*del caudal probatorio aquellas pruebas que hayan sido obtenidas contraviniendo*

*las normas constitucionales, pero que, sin embargo, no afecta la validez del*



SEGUNDO TRI
DEL QUIN
HERMOSI

80

0691



# TOCA PENAL No. 6/2015

FORMA A-55



PODER JUDICIAL DE LA FEDERACIÓN

*proceso, ya que el juez podrá valorar el resto de pruebas no afectadas, ya sea en ese momento procesal o en una futura reposición del procedimiento. Por el contrario, cuando el juez advierta la actualización de los supuestos que actualizan el efecto corruptor del proceso penal, de acuerdo a lo establecido por esta Primera Sala, no podrá pronunciarse sobre la responsabilidad penal del acusado, ya que el actuar de la autoridad ha provocado condiciones sugestivas en la evidencia incriminatoria que conllevan la falta de fiabilidad de todo el material probatorio, viciando tanto el procedimiento en sí mismo como sus resultados, por lo que procede decretar la libertad del acusado cuando la violación produce la afectación total del derecho de defensa".*

Resulta aplicable al caso la jurisprudencia 139/2011, de la Primera Sala de la Suprema Corte de Justicia de la Nación, visible en la página 2057, libro III, Diciembre de 2011, Tomo 3, del Semanario Judicial de la Federación y su Gaceta, Novena Época, del texto y rubro siguientes:



*"PRUEBA ILÍCITA. EL DERECHO A UN DEBIDO PROCESO COMPRENDE EL DERECHO A NO SER JUZGADO A PARTIR DE PRUEBAS OBTENIDAS AL MARGEN DE LAS EXIGENCIAS CONSTITUCIONALES Y LEGALES. Exigir la nulidad de la prueba ilícita es una garantía que le asiste al inculpado durante todo el proceso y cuya protección puede hacer valer frente a los tribunales alegando como fundamento: (i) el artículo 14 constitucional, al establecer como condición de validez de una sentencia penal, el respeto a las formalidades esenciales del procedimiento, (ii) el derecho de que los jueces se conduzcan con imparcialidad, en términos del artículo 17 constitucional y (iii) el derecho a una defensa adecuada que asiste a todo inculpado de acuerdo con el artículo 20, fracción IX de la Constitución Política de los Estados Unidos Mexicanos. En este sentido, si se pretende el respeto al derecho de ser juzgado por tribunales imparciales y el derecho a una defensa adecuada, es claro que una prueba cuya obtención ha sido irregular (ya sea por contravenir el orden constitucional o el legal), no puede sino ser considerada inválida. De otra forma, es claro que el inculpado estaría en condición de desventaja para hacer valer su defensa. Por ello, la regla de exclusión de la prueba ilícita se encuentra*

*implícitamente prevista en nuestro orden constitucional. Asimismo, el artículo 206 del Código Federal de Procedimientos Penales establece, a contrario sensu, que ninguna prueba que vaya contra el derecho debe ser admitida. Esto deriva de la posición preferente de los derechos fundamentales en el ordenamiento y de su afirmada condición de inviolables".*

Así como también la jurisprudencia sostenida por el Noveno Tribunal Colegiado en materia Penal del Primer Circuito, bajo el número 12, visible en la página 2065, libro 3, febrero de 2014, tomo III, de la gaceta del Semanario Judicial de la Federación, Décima Epoca, que a la letra dice:

*"PRUEBA ILÍCITA. VALORACIÓN DEL PRINCIPIO DE SU PROHIBICIÓN O EXCLUSIÓN DEL PROCESO, BAJO LA ÓPTICA DE LA TEORÍA DEL VÍNCULO O NEXO CAUSAL ATENUADO EN LA DECLARACIÓN DEL INCULPADO. Un derecho fundamental que asiste al inculpado durante todo el proceso es la prohibición o exclusión de la prueba ilícita, alegando como fundamento el derecho a un debido proceso (artículo 14 de la Constitución Política de los Estados Unidos Mexicanos), a que los Jueces se conduzcan con imparcialidad (artículo 17 constitucional) y a una defensa adecuada (artículo 20, apartado B, fracción VIII, constitucional); por ende, bajo el criterio de esta prerrogativa, tanto su declaración ministerial asistido por persona de confianza y no por licenciado en derecho, carece de valor probatorio alguno, así como sus posteriores declaraciones, ministeriales o judiciales, si sólo se constriñen a su ratificación, sin que se estimen convalidadas, no obstante que sean rendidas en presencia de su defensor, licenciado en derecho y del Juez de la causa; lo anterior, según este principio de prohibición o exclusión de la prueba ilícita, pues la nulidad de dichas actuaciones no se supedita a actos posteriores que puedan interpretarse como su consentimiento o superación contraria a derecho, la cual dejó en estado de indefensión al inculpado. Sin embargo, bajo la óptica de la teoría del vínculo o nexo causal atenuado, en el escenario del proceso propiamente dicho, observando los derechos constitucionales y legales ante sede judicial, si en presencia del Juez, del Ministerio Público, del defensor, licenciado en derecho y del secretario fedatario de la diligencia, el inculpado, de*



SEGUNDO TRI
DEL QUIN
HERM   I

82

**TOCA PENAL No. 6/2015**



PODER JUDICIAL DE LA FEDERACIÓN

*manera libre, voluntaria y espontánea, declara en relación*
*imputado, ya sea en el mismo contexto de su declaración ministeria*
*diverso, admitiendo ciertos hechos, negando otros o haciendo vale*
*exclusión del delito, no obstante que esas manifestaciones pu*
*relacionadas con la ilicitud de la declaración inicial, si se advie.*
*conexión es tan tenue entre ambas, que su exclusión se*
*desproporcionada y carente de real utilidad, esa conexión causal pue*
*por rota o inexistente jurídicamente, ya que la admisión voluntaria de los*
*no puede considerarse como un aprovechamiento de la lesión inicial*
*derecho fundamental de prohibición o exclusión de la prueba ilícit.*
*consecuencia, es legal que el Juez de la causa o el tribunal de apelación, ll*
*cabo una valoración del principio de prohibición o exclusión de la prueba il*
*bajo la teoría en cuestión, ponderando cada caso en particular, en tutela judi*
*efectiva de los derechos de debido proceso, defensa adecuada, presunción*
*inocencia y sustancialmente del principio contradictorio (sustentado en lo*
*argumentos de defensa del imputado) y, conforme a su libre convicción, a la*
*reglas de la lógica, los conocimientos científicos y la máxima de la experienci*
*sometidos a la crítica racional, justiprecie lo tenue o débil del vínculo o nex*
*causal entre la prueba ilícita y la derivada, y determine incluso, su inexistenci*
*sin que sea óbice a lo anterior que el juzgador, por el contrario, conside.*
*indivisible dicho vínculo y, por tanto, aplicable la exclusión de la prueba ilícita y*
*derivada."*

En consecuencia, ante la ausencia de pruebas suficientes qu
permitan tener por demostrada con datos bastantes la probable responsabilida
penal de JESÚS RAÚL BELTRÁN LEÓN (alias) "CHUY RAÚL", en la comisi
de los delitos por los cuales el Juez Décimo de Distrito en el Estado de Sonora
dictó auto de formal prisión, procede revocar la resolución de pla
constitucional venida en apelación, para en su lugar dictar a favor del inculpa
auto de libertad por falta de elementos para procesar, con apoyo en el artíc
167 del Código Federal de Procedimientos Penales.

Toda vez que a la fecha JESÚS RAÚL BELTRÁN LEÓN (alia

83

TOCA PENAL No. 6/2015

"CHUY RAÚL" se encuentra privado de su libertad en el Centro Federal de

Readaptación Social No. 11 CPS "SONORA" de esta ciudad, con motivo de los

hechos por los cuales hoy se le dictó auto de libertad, gírese oficio al Director del

mismo para que lo ponga en inmediata libertad, únicamente por lo que se refiere

a la causa penal 163/2014, del índice del Juzgado Décimo de Distrito en el

Estado de Sonora, con sede en esta ciudad de Hermosillo, acompañándole

copia autorizada de esta resolución.

Como consecuencia de la anterior conclusión, también deberán

quedar sin efecto legal alguno las determinaciones relativas a la suspensión

de sus derechos políticos e identificación administrativa.

6o.- Con independencia de lo antes resuelto, de conformidad

con el artículo 1o, párrafo tercero, de la Constitución Federal; 1° de la

Convención Americana sobre derechos Humanos; 2, 6 y 7 de la Convención

Interamericana para Prevenir y Sancionar la Tortura; y 1 y 6.2 de la Convención

Contra la Tortura y Otros Tratos o Penas Crueles, Inhumanas o Degradantes,

requiérase al Delegado Estatal de la Procuraduría General de la República en

Sonora, por conducto de la Agente del Ministerio Público de la Federación

adscrita, para que ordene la apertura de la investigación de los actos de tortura

manifestados por JESÚS RAÚL BELTRÁN LEÓN (alias) "CHUY RAÚL", y se

determine si existe responsabilidad penal por parte de alguien; apercibidos

dichos servidores públicos que de no informar en el plazo de diez días hábiles el

inicio de la investigación se hará uso en su contra de los medios de apremio que

marca la ley.

En apoyo a lo anterior, se invoca la tesis sostenida  por la

Primera Sala de la Suprema Corte de Justicia de la Nación, bajo el número

CCVII/2014, visible en la página 561, del libro 6, Mayo de 2014, Tomo I, Gaceta

del Semanario Judicial de la Federación, Décima Epoca, del rubro y texto

siguientes:

*"TORTURA. OBLIGACIONES DE LA AUTORIDAD CUANDO*

*UNA PERSONA MANIFIESTA HABERLA SUFRIDO O SE TENGAN DATOS DE*

*LA MISMA. Cuando la autoridad tenga conocimiento de la manifestación de que*

**84**

0693

## TOCA PENAL No. 6/2015

FORMA A-55



PODER JUDICIAL DE LA FEDERACIÓN

*una persona ha sufrido tortura o cuando tenga datos de la misma, deberá, inmediatamente y de oficio, dar vista al ministerio público para que inicie una investigación de manera independiente, imparcial y meticulosa. Dicha investigación tiene como finalidad determinar el origen y naturaleza de la afectación a la integridad personal de quien alega la tortura, e identificar y procesar a las personas responsables. Cuando, dentro de un proceso, una persona alegue que su declaración fue obtenida mediante coacción, las autoridades deben verificar la veracidad de dicha denuncia a través de una investigación diligente. Asimismo, el hecho que no se hayan realizado oportunamente los exámenes pertinentes para determinar la existencia de tortura no exime a las autoridades de la obligación de realizarlos e iniciar la investigación respectiva; tales exámenes deben hacerse independientemente del tiempo transcurrido desde la comisión de la tortura. Por tanto, esta Primera Sala de la Suprema Corte de Justicia de la Nación considera relevante destacar que, con independencia de la obligación de los órganos de legalidad o control constitucional, en torno al reconocimiento y protección del derecho humano de integridad personal y la prohibición de la tortura como derecho absoluto, subsistirá en todo momento la obligación de instruir su investigación conforme a los estándares nacionales e internacionales para deslindar responsabilidades y, en su caso, esclarecerla como delito, con fundamento en los artículos 21 de la Constitución Federal, 1, 3, 6 y 8, de la Convención Interamericana para Prevenir y Sancionar la Tortura, así como 1o., 3o. y 11o. de la Ley Federal para Prevenir y Sancionar la Tortura".*



TRIBUNA...
UNTO CIRCU...
OSILLO, SONOR...

Por lo expuesto, fundado y con apoyo además en los artículos 363, 364, 383 y 389 del Código Federal de Procedimientos Penales; se resuelve:

**PRIMERO.-** Se REVOCA la resolución de plazo constitucional pronunciada el veintiséis de noviembre de dos mil catorce, por el Juez Décimo de Distrito en el Estado de Sonora, con sede en esta ciudad de Hermosillo, en la causa penal 163/2014, en la que dictó auto de formal prisión a JESÚS RAÚL BELTRÁN LEÓN (alias) "CHUY RAÚL" por los siguientes delitos:

TOCA PENAL NO. 8/2015

1.- Contra la Salud, en la modalidad de posesión con fines de comercio de Clorhidrato de Cocaína y Clorhidrato de Metanfetamina, previsto y sancionado en el artículo 195, primer párrafo, en relación con el 193, párrafos primero y segundo, del Código Penal Federal.

2.- Acopio de armas de fuego, previsto y sancionado en el artículo 83 Bis, fracción I, en relación con el 11, incisos a) y b), de la Ley Federal de Armas de Fuego y Explosivos.

3.- Portación de armas de fuego del uso exclusivo del Ejército, Armada o Fuerza Aérea, previsto y sancionado por el artículo 83, fracción III, con la agravante en su penúltimo párrafo, en relación con el 11, incisos c) y d), de la Ley Federal de Armas de Fuego y Explosivos; y

4.- Posesión de cartuchos para armas de fuego de uso exclusivo del Ejército, Armada o Fuerza Aérea, previsto y sancionado por el artículo 83 Quat, fracciones I y II, en relación con el 11, incisos a), b), c) y f), de la Ley Federal de Armas de Fuego y Explosivos.

**SEGUNDO.-** En su lugar se decreta auto de libertad por falta de elementos para procesar a JESÚS RAÚL BELTRÁN LEÓN (alias) "CHUY RAÚL" por los respectivos delitos mencionados en el resolutivo que antecede.



SEGUNDO TRIBUN
DEL QUINTO
HERMOSILLO

**TERCERO.-** Como consecuencia de lo anterior, gírese atento oficio al Director Centro Federal de Readaptación Social No. 11 CPS "SONORA" de esta ciudad de Hermosillo, Sonora, para que ponga en **inmediata libertad** a JESÚS RAÚL BELTRÁN LEÓN (alias) "CHUY RAÚL", en el entendido de que la misma surtirá efectos únicamente por lo que hace a tales delitos y causa penal mencionados en el resolutivo primero de esta ejecutoria.

**CUARTO.-** En atención al sentido de esta ejecutoria, deberá girarse atento oficio al Instituto Nacional Electoral, para que deje sin efecto la determinación del Juez de Distrito de suspender a JESÚS RAÚL BELTRÁN LEÓN (alias) "CHUY RAÚL", del ejercicio de sus derechos políticos.

**QUINTO.-** En su oportunidad dese cumplimiento con lo

**86**

0694



### TOCA PENAL No. 6/2015

FORMA A-55

DER JUDICIAL DE LA FEDERACIÓN

ordenado en el considerando sexto de esta resolución.

Notifíquese personalmente a las partes, haciéndolo a **JESÚS RAÚL BELTRÁN LEÓN** (alias) "CHUY RAÚL" en el lugar de su reclusión por conducto del actuario de este tribunal; háganse las anotaciones correspondientes en el libro de gobierno y estadística; expídanse las copias necesarias con testimonio de ésta resolución, devuélvase el duplicado del proceso al Juzgado de origen; y, en su oportunidad, archívese el toca como asunto concluido.

Así lo resolvió y firma el C. Magistrado del Segundo Tribunal Unitario del Quinto Circuito, Licenciado Ricardo Martínez Carbajal, ante el Licenciado José Luis Bustamante Villegas, Secretario que autoriza y da fe.- DOY FE.



5/gaby/mbbm**

IAL UNITARI
CIRCUITO
, SONOR..

RAZON: - - - En igual fecha (04-02-2015), se giraron los oficios No. 145/P, 146/P y 147/P.- CONSTE.

**87**

**TOCA PENAL No. 6/2015**

CERTIFICO QUE LA ANTERIOR, ES COPIA FIEL Y FOTOSTÁTICA DE SU

ORIGINAL, LA CUAL SE HA COMPULSADO POR MANDATO JUDICIAL,

PARA SER ENVIADA AL C. JUEZ DECIMO DE DISTRITO EN EL ESTADO DE

SONORA, CON SEDE ESTA CIUDAD DE HERMOSILLO, SONORA, A

CUATRO DE FEBRERO DEL DOS MIL QUINCE.

EL SECRETARIO DE ACUERDOS DEL SEGUNDO
TRIBUNAL UNITARIO DEL QUINTO CIRCUITO

LIC. JOSE LUIS BUSTAMANTE VILLEGAS

SEGUNDO TRIBUNAL UNITARIO
DEL QUINTO CIRCUITO
HERMOSILLO, SONORA