UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 09 CR 383-16 |
| v. ) | |
| ) | Chief Judge Rubén Castillo |
| JESUS RAUL BELTRAN LEON, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the motion of Jesus Raul Beltran Leon ("Defendant") to dismiss the indictment in this case based on an "outrageous government conduct" defense. (R. 599, Mot. to Dismiss.) For the reasons stated below, the motion is denied.

## BACKGROUND

On September 11, 2014, a grand jury in this District returned a Seventh Superseding Indictment charging Defendant and others with conspiracy to import controlled substances into the United States, conspiracy to commit money laundering, and related offenses.[1] Two superseding indictments have been returned since that time, and the Ninth Superseding Indictment is currently the operative pleading in the case. (*See* R. 379, Eighth Superseding Indictment; R. 422, Ninth Superseding Indictment.) The indictment alleges that, between approximately 2005 and 2014, the Sinaloa Cartel—a transnational drug trafficking organization based in Sinaloa, Mexico—was responsible for importing large quantities of cocaine and other drugs from Mexico into various U.S. cities, including Chicago. (R. 422, Ninth Superseding

---

[1] The Seventh Superseding Indictment was filed under seal and does not appear on the public docket; however, it is the same in all material respects as the Eighth and Ninth Superseding Indictments, which have been publicly filed. (*See* R. 379, Eighth Superseding Indictment; R. 422, Ninth Superseding Indictment.)

1

Indictment at 1-26.) The indictment further alleges that Defendant acted as a "lieutenant" and narcotics broker for co-defendant Jesus Alfredo Guzman Salazar. (*Id.* at 6.) Defendant is alleged to have personally caused multi-kilogram quantities of cocaine and marijuana to be transported from Mexico into the United States in furtherance of the conspiracy. (*Id.* at 6-7.) Defendant is also alleged to have caused drug proceeds to be collected from customers in the United States and laundered and transferred from the United States to Mexico and elsewhere for the benefit of the Sinaloa Cartel. (*Id.* at 7.)

Based on these charges, on September 12, 2014, a warrant was issued for Defendant's arrest. (*See* R. 562, Resp. to Mot. for Disclosure at 3.) On or about November 10, 2014, the government submitted a provisional arrest warrant request to Mexican authorities, asking that Defendant be arrested in Mexico and detained in anticipation of a request for extradition to the United States to face trial. (*Id.*) On November 16, 2014, defendant was arrested at his home in Mexico by members of the Mexican Navy, also known as "SEMAR." (R. 549, Mot. for Disclosure at 8.) On March 27, 2015, the government submitted an extradition request to Mexican officials asking that Defendant be extradited to this District. (R. 562, Resp. to Mot. for Disclosure at 4.) Mexico granted that request in December 2016, and in January 2017, Defendant was transported to Chicago. (*Id.*) He was arraigned by this Court on January 25, 2017. (R. 490, Order.)

In December 2017, Defendant filed a motion for discovery. (R. 549, Mot. for Disclosure.) He claimed that he had been wrongfully held by SEMAR for several days after his arrest, during which time members of SEMAR allegedly threatened his family, suffocated him with plastic bags, bludgeoned him, shocked him with electrodes, and submerged him in water until he passed out, in addition to other acts of torture. (*Id.* at 8-31.) He claimed that agents of the U.S. Drug

2

Enforcement Agency ("DEA") were present during these events and were aware of the torture to which he was subjected. (*Id.* at 15, 19, 23.) Based on these allegations, Defendant sought the turnover of a vast array of documents from the government, including but not limited to "[a]ll training materials provided by the U.S. government for training of the SEMAR unit members in Quantico, Virginia, or elsewhere," (*id.* at 74); any "written agreement" between DEA or other agencies of the U.S. government and SEMAR, (*id.*); any reports "documenting previous instances of torture or physical abuse by the SEMAR unit or members thereof," (*id.* at 75); records reflecting any equipment or funding provided to SEMAR "by any agency or other part of the U.S. government," (*id.*); "copies of all vouchers, bank statements, or receipts for payment by the U.S. government for expenses of that SEMAR unit," (*id.* at 76); "[a]ll police reports, D.E.A.-6 reports, or other official law enforcement reports in cases being prosecuted in the Northern District of Illinois concerning instances of alleged torture by Mexican government officials," (*id.* at 77); "the name of the Regional Security Officer who briefed the United States Ambassador on the operation that resulted in [Defendant's] arrest," (R. 562-1, Letter of Jan. 24, 2018, at 3); and "[t]he official teletype reports to the United States Embassy regarding [Defendant's] seizure and arrest," (*id.*). He argued that these documents would support a potential outrageous government conduct defense. (R. 549, Mot. for Disclosure at 15-74.)

In February 2017, the government tendered certain discovery to Defendant responsive to his requests, including documents pertaining to an internal investigation conducted by the DEA's Office of Professional Responsibility as a result of Defendant's allegations. The government objected to having to produce any additional documents, arguing that Defendant's broad requests were irrelevant to the charges in this case and otherwise improper. (R. 562, Resp. to Mot. for Disclosure.) After considering the parties' briefs and conducting an *in camera* review of the

3

government's document production, the Court denied Defendant's request for further discovery. (R. 595, Mem. Op. & Order.)

Despite not receiving the discovery he requested, Defendant now moves to dismiss the indictment based on an outrageous government conduct defense. (R. 599, Mot. to Dismiss.) In support, he cites to the evidence he previously presented in support of his motion for discovery, as well as to a recent book written by a former DEA agent, which in his view corroborates various aspects of his torture claim.[2] (*Id.* at 8-51.) The government objects to dismissal of the indictment. (R. 606, Resp. to Mot. to Dismiss.) In the government's view, the outrageous government conduct defense has limited viability in this Circuit and, even if it were viable, the facts alleged by Defendant would not support application of the defense in this case. (*Id.* at 3-10.) Defendant has filed a reply in support of his motion reiterating that he is entitled to dismissal of the indictment. (R. 611, Reply in Supp. of Mot. to Dismiss.) The Court heard oral arguments from the parties on August 23, 2018, and at the conclusion of the hearing, took the matter under advisement. (R. 617, Min. Entry.)

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 12(b), "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits," including that the indictment must be dismissed due to a defect or other reason. FED. R. CRIM. P. 12(b)(1), (3). A pretrial challenge to the indictment "is not a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence." *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009) (citation omitted); *see also United States v. Khan*, No. 15-CR-00286, 2017 WL 2362572, at *18 (N.D. Ill. May 31, 2017) ("[W]hile an

---

[2] Primarily the book details the close working relationship between the DEA and SEMAR. *See* ANDREW HOGAN & DOUGLAS CENTURY, HUNTING EL CHAPO 152-312 (2018). It does not actually detail any torture of detainees.

4

indictment may be dismissed if subject to a defense that raises only a question of law, a defense relating to the strength of the government's evidence ordinarily must wait for trial." (citation omitted)). Therefore, in deciding such a motion, the Court must accept the allegations contained in the indictment as true. *Moore*, 563 F.3d at 586.

## ANALYSIS

Defendant argues that this Court should dismiss the indictment with prejudice under the outrageous government conduct doctrine. (R. 599, Mot. to Dismiss at 1.) He claims that the "prolonged torture" he was subjected to by agents of SEMAR was "inflicted with the knowledge and complicity of the United States Government." (*Id.* at 9.) He further argues that "[t]he [U.S.] Government cannot be permitted to simply stand idly by while its Mexican Military partners savagely torture prisoners that they have captured in a . . . military operation to serve U.S. arrest warrants." (*Id.* at 47.) In his view, principles of fairness and decency inherent in the Due Process Clause of the Fifth Amendment require that the charges against him be dismissed. (*Id.* at 17, 47-55.)

The Court has carefully reviewed Defendant's voluminous submission and, to be sure, he presents a disturbing picture of law enforcement in Mexico. According to a 2014 United Nations report, "[t]orture is generalized in Mexico. It occurs especially from the moment when a person is detained until he or she is brought before a judge, and is used as punishment and as a means of investigation." (R. 599-5, Juan E. Méndez (Special Rapporteur), *Rep. on Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment-Mission to Mexico*, U.N. Doc. A/HRC/28/68/add.3 (Dec. 29, 2014) (hereinafter "Méndez Report") at 1.) According to the report, the "deployment of armed forces to perform law enforcement functions" has only exacerbated the problem, as members of the military trained for armed combat are increasingly

5

carrying out civilian police functions for which they are not trained or accountable.[3] (*Id.* at 6.) The author of the report "observed disturbing similarities" among the accounts of alleged torture victims, including that officers subjected them to "punches, kicks and beatings with sticks; electric shocks through the application of electrical devices such as cattle prods to their bodies, usually their genitals; asphyxiation with plastic bags; waterboarding; forced nudity; suspension by their limbs; threats and insults." (*Id.* at 7.) Not only are such incidents allegedly widespread, but, according to the report, they occur with "a disturbing level of impunity." (*Id.* at 8.) The author found evidence not only of "active participation of the police and ministerial police forces from almost all jurisdictions and of the armed forces, but also of tolerance, indifference or complicity on the part of some doctors, public defenders, prosecutors and judges." (*Id.* at 18.)

From a human rights perspective, this is simply intolerable. The Court is also deeply disturbed by the accusation that American law enforcement agents may be condoning or turning a blind eye to these tactics in order to bring defendants to trial in the United States. "[T]o paraphrase Supreme Court Justice Louis Brandeis, to declare that in the administration of the criminal law 'the end justifies the means' is to declare that the government may violate fundamental principles of common fairness to secure the conviction of an alleged criminal." *United States v. Brown*, 299 F. Supp. 3d 976, 984 (N.D. Ill. 2018) (citing *Olmstead v. United States*, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting)). "Our society simply cannot accept a

---

[3] According to a 2014 report by Amnesty International, Mexican authorities "have often overlooked or even tacitly sanctioned" the use of torture and other mistreatment in cases involving organized crime or drug cartels, which they apparently view as "necessary to enable police and military to catch suspected offenders and reassure public opinion." (R. 599-12, Amnesty Int'l Report at 12 (internal quotation marks omitted).) The report noted that complaints of torture and other mistreatment have increased nearly 600 percent since 2003 "as a result of the government's 'war on drugs.'" (*Id.* at 8.) In the case of organized crime, Mexican law also permits an extended period of pre-charge detention, known as *arraigo*, whereby an arrestee can be held up to 80 days without being brought before a judicial officer. (*Id.* at 35-36.) The United Nations special rapporteur has condemned this procedure as "contrary to international law" and rife with potential for abuse. (R. 599-5, Méndez Report at 12-13.)

6

'win at all costs' mentality in the delicate world of criminal law enforcement[.]" *Id.* Notwithstanding these substantial concerns, the Court does not find Defendant's arguments legally persuasive in light of the current state of our Supreme Court and Circuit case law, which this Court must apply.

The "outrageous government conduct" defense finds its origins in *United States v. Russell*, 411 U.S. 423 (1973), where an undercover narcotics agent who was investigating the defendant and his confederates for illicitly manufacturing a drug offered them an essential ingredient that was difficult to obtain. *Id.* at 424-25. After the defendant was convicted, he appealed, and the U.S. Court of Appeals for the Ninth Circuit held that, in addition to a traditional entrapment defense, the interest in fairness dictated that "a defense to a criminal charge may be founded upon an intolerable degree of governmental participation in the criminal enterprise." *Id.* at 424 (citation omitted). The Supreme Court reversed, finding no basis to dismiss the indictment. *Id.* at 424-34. Within the opinion, the Supreme Court made the following comment: "While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed." *Id.* at 431-32 (internal citation omitted).

The import of the Supreme Court's comment in *Russell* has long been the subject of legal debate. Observers have noted that the comment appeared to conflict with an earlier holding of a three-justice plurality in *Hampton v. United States*, 425 U.S. 484 (1976), which observed that "[t]he remedy of the criminal defendant with respect to acts of government agents, which far from being resisted, are encouraged by him, lies solely in the defense of entrapment." *United States v. Bontkowski*, 865 F.2d 129, 131-32 (7th Cir. 1989) (quoting *Hampton*, 425 U.S. at 490).

7

In other words, it is unclear whether a majority of the Supreme Court would recognize an outrageous government conduct defense as distinct from an entrapment defense. *Id.* As a judge on the U.S. Court of Appeals for the Seventh Circuit explained, "some have read Justice Powell's concurring opinion" in *Hampton* as adopting an "outrageousness" defense," but "[i]f Justice Powell opened that door in *Hampton*, he shut it in *United States v. Payner*, 447 U.S. 727 (1980), writing for a majority of six." *United States v. Miller*, 891 F.2d 1265, 1272 (7th Cir. 1989) (internal citations omitted) (Easterbrook, J., concurring). In *Payner*, Justice Powell, writing for the majority, rejected an argument by the defense that improper tactics by law enforcement officers warranted suppression of evidence "under the Due Process Clause and the court's supervisory power." *Miller*, 891 F.2d at 1272 (citing *Payner*, 447 U.S. at 734). To paraphrase, the majority reasoned that even assuming the conduct of law enforcement officers "was so outrageous as to offend fundamental canons of decency and fairness, . . . the rules developed under the fourth amendment fully reflected the interests of society and suspects, and . . . replacing these rules with ill-defined supervisory or due process standards would undermine a balance properly struck." *Id.* (citing *Payner*, 447 U.S. at 737 n.9 (internal quotation marks omitted)). Other developments in the law since *Payner* "reinforce its message that appeals to 'fairness' are not satisfactory substitutes for legal rules." *Id.*

In light of the doctrine's shaky legal underpinnings, the Seventh Circuit has long declined to recognize it as a valid defense. *See, e.g., United States v. Smith*, 792 F.3d 760, 766 (7th Cir. 2015) ("We repeatedly have reaffirmed our decision not to recognize the [outrageous government conduct] defense[.]"); *United States v. Stallworth*, 656 F.3d 721, 730 (7th Cir. 2011) ("Outrageous government conduct is not a defense in this circuit."); *United States v. White*, 519 F.3d 342, 346 (7th Cir. 2008) ("[T]his circuit clearly and consistently has refused to recognize

8

any defense based on . . . outrageous government conduct." (internal quotation marks omitted)); *United States v. Jerez*, 108 F.3d 684, 719 (7th Cir. 1997) (observing that defendant invoking outrageous government conduct defense was on "very shaky ground, for both a plurality of the Supreme Court and this circuit have expressed doubt as to the validity of the doctrine of outrageous conduct" (citation and internal quotation marks omitted)); *Miller*, 891 F.2d at 1271 (observing that the Seventh Circuit has "never reversed a conviction on the basis of this defense and has questioned language looking favorably on it" (Easterbrook, J., concurring)).

In the few cases where the Seventh Circuit has even considered the potential viability of the defense, the circumstances have involved entrapment or other types of misconduct by the government in connection with the commission of the offense itself. *See United States v. Westmoreland*, 712 F.3d 1066, 1072 (7th Cir. 2013) ("[T]he defense has come into play only where the government's involvement created a crime or criminal enterprise that did not exist before, and where the government had to coerce the defendant to commit the crime by some unreasonable means."); *United States v. Dawson*, 425 F.3d 389, 398 (7th Cir. 2005) (Williams, J., dissenting) (suggesting that outrageous government conduct defense should be available if government continued the use of "bounty" agreements with confidential informants, whereby informants received a portion of narcotics sale proceeds recovered in exchange for their cooperation).

Here, Defendant raises no allegation that the government entrapped him into importing multi-kilogram quantities of drugs into the United States or otherwise had any involvement in the events underlying the indictment. Rather, Defendant's argument is that misconduct surrounding his arrest in Mexico months *after* the indictment was issued by a grand jury warrants dismissal of the charges. The Court finds nothing in the law of the Seventh Circuit to support such a holding.

Indeed, the Seventh Circuit expressly rejected an argument by a defendant that misconduct related to the government's efforts to bring him to trial warranted dismissal of the charges. *See Matta-Ballesteros v. Henman*, 896 F.2d 255, 260-62 (7th Cir. 1990). That case involved allegations of abuse very similar to those raised by Defendant. *Id.* at 256.

In *Matta-Ballesteros*, the defendant, a Honduran citizen, claimed that he had been arrested in his home in Honduras by Honduran military, who were "accompanied by at least four U.S. Marshals." *Id.* He claimed that, at the direction of the U.S. Marshals, members of the Honduran military tortured him during his arrest and detention, and that he was "severely beaten" and had his feet and testicles shocked with a "stun gun." *Id.* Notwithstanding the disturbing nature of these allegations, the Seventh Circuit held that the defendant could not pursue dismissal of the charges based on these allegations. *Id.* at 260-61. While noting that the defendant might have some civil remedy available, the Seventh Circuit observed that "[f]or the past 100 years, the Supreme Court has consistently held that the manner in which a defendant is brought to trial does not affect the ability of the government to try him." *Id.* at 260. It is true, as Defendant points out, that the defendant in *Matta-Ballesteros* did not specifically raise an outrageous government conduct defense. *See id.* at 263 n.9. But the Seventh Circuit expressly noted the difficulty he would have faced if he had. *Id.* In addition to questioning the "continued vitality" of the outrageous government conduct defense in light of Supreme Court cases decided after *Russell*, the Seventh Circuit observed that "[t]o the best of our knowledge, there are no cases that apply the outrageous government conduct defense to allegations of torture such as those in the present case." *Id.*

This Court reads *Matta-Ballesteros* and the other Seventh Circuit cases discussed above to foreclose Defendant's claim that misconduct by law enforcement agents during his arrest in

10

Mexico requires dismissal of the criminal charges.[4] Defendant makes a valiant effort to show that the Seventh Circuit has improperly limited the outrageous government conduct defense and/or misinterpreted Supreme Court case law, (*see* R. 599, Mot. to Dismiss at 41-44), but those are arguments that must be presented to the Seventh Circuit. This Court is bound to follow Seventh Circuit precedent. *See Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004) (observing that "district judges must follow the decisions of this court whether or not they agree" with them). Under the law of this Circuit as it presently stands, Defendant's allegations do not present a viable basis to dismiss the indictment.

To avoid this conclusion, Defendant heavily relies on *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974), and cases applying *Toscanino*. (*See* R. 599, Mot. to Dismiss at 38-40, 44.) In that case, the U.S. Court of Appeals for the Second Circuit remanded for further proceedings on a defendant's claim that his mistreatment by U.S. government agents in Uruguay warranted dismissal of the criminal charges. *Toscanino*, 500 F.2d at 281. However, the Seventh

---

[4] If in fact DEA agents were involved in Defendant's mistreatment in Mexico, he may have a civil remedy available under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). *See Matta-Ballesteros*, 896 F.3d at 262. But whatever remedy Defendant may have under civil law, the Seventh Circuit has made clear that such allegations do not impact the validity of the underlying criminal charge. *Hill v. Murphy*, 785 F.3d 242, 245 (7th Cir. 2015) ("If the police roughed up Hill . . . waved a loaded gun in his face, and so on, these outrages, constituting violations of his Fourth Amendment right not to be subjected to an unreasonable search and seizure, would entitle him to damages for physical and psychological injury resulting from the search and seizure. . . . But such violations of his rights would not exonerate him from the . . . charges[.]"); *see also Stone v. Wright*, --- F. App'x ---, 2018 WL 3998415, at *1 (7th Cir. Aug. 21, 2018) ("Wrongful arrest or detention creates a wrongful-seizure claim, plain and simple, and the constitutional objection is to wrongful custody rather than to a criminal prosecution.").

Circuit has expressly declined to follow *Toscanino*.[5] *See Matta-Ballesteros*, 896 F.2d at 261, 263 (observing that *Toscanino* has "ambiguous constitutional origins" and "no longer retains vitality" in light of intervening Supreme Court case law); *see also United States v. Hill*, No. 03 C 4196, 2004 WL 2064622, at *10 n.9 (N.D. Ill. Sept. 13, 2004) (observing that the Second Circuit permits dismissal of an indictment "where a defendant could prove that torture, brutality, and similar outrageous conduct during an international abduction and detention violated his due process rights" but "the Seventh Circuit has not followed suit" (citation and internal quotation marks omitted)); *United States v. Mitchell*, No. 83-CR-86, 1990 WL 132573, at *6 (E.D. Wis. Sept. 10, 1990) ("[T]his circuit declined to adopt the *Toscanino* approach[.]"). This Court must abide by the Seventh Circuit's holding regardless of its own personal views. *Reiser*, 380 F.3d at 1029.

Defendant also relies heavily on the Supreme Court's opinion in *Rochin v. California*, 342 U.S. 165 (1952), which in his view provides a clear basis for dismissal. (R. 599, Mot. to Dismiss at 29-31, 32, 34, 49-50.) The Court disagrees. As a preliminary matter, *Rochin* is factually distinguishable from Defendant's case. In *Rochin*, the Supreme Court affirmed the

---

[5] The Court recognizes that the Hon. Hubert L. Will, Senior District Judge of the U.S. District Court for the Northern District of Illinois sitting by designation, filed a well-reasoned concurring opinion in *Matta-Ballesteros*, arguing that the Seventh Circuit should not so readily foreclose future reliance on *Toscanino*. 896 F.2d at 263-64. Notwithstanding Judge Will's position, the Seventh Circuit later reaffirmed its decision not to follow *Toscanino*. *See United States v. Mitchell*, 957 F.2d 465, 470 (7th Cir. 1992). Other Circuits have also rejected *Toscanino*. *See United States v. Best*, 304 F.3d 308, 312-13 (3d Cir. 2002) ("*Toscanino* rests on shaky ground."); *United States v. Darby*, 744 F.2d 1508, 1531 (11th Cir. 1984) ("[T]he continuing validity of the *Toscanino* approach is questionable."); *United States v. Winter*, 509 F.2d 975, 986-88 (5th Cir. 1975) (declining to follow *Toscanino*). Indeed, even the Second Circuit has questioned some aspects of its holding in light of intervening Supreme Court case law. *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 157, 167 n.5 (2d Cir. 2008) ("[O]ne of *Toscanino's* holdings—that aliens may invoke the Fourth Amendment against searches conducted abroad by the U.S. government—is no longer valid[.]" (internal citation omitted)). District courts within the Second Circuit have also questioned its viability. *United States v. Umeh*, 762 F. Supp. 2d 658, 663 (S.D.N.Y. 2011) (observing that "it is reasonably clear that *Toscanino* is no longer good law" and noting that "the Second Circuit itself retreated from the *Toscanino* decision almost immediately"); *United States v. Ghailani*, 751 F. Supp. 2d 502, 507 (S.D.N.Y. 2010) (noting that "it is doubtful that *Toscanino* remains authoritative"). In light of this substantial body of law, this Court declines to rely on *Toscanino* to dismiss the indictment.

dismissal of an indictment where government agents broke down the defendant's bedroom door, attempted to forcibly remove pills from his throat, took him to a hospital, and had his stomach pumped against his will. *Rochin*, 342 U.S. at 166. The Supreme Court held that the government's use of capsules removed from the defendant's stomach to obtain a conviction for drug possession violated substantive due process principles of "fairness" and "decency." *Id.* at 169. Unlike in *Rochin*, however, the government does not intend to use any evidence obtained as a result of Defendant's capture in Mexico to convict him of a criminal offense; indeed, the alleged misconduct Defendant describes in his motion occurred months *after* a grand jury indicted him on federal criminal charges. (*See* R. 562, Resp. to Mot. for Disclosure at 6-7.) *Rochin* thus has little applicability to the present case.

In addition, Defendant fails to recognize that the law has evolved significantly in the 60 years since *Rochin* was decided. *Rochin* relied on general "due process" principles to dismiss the indictment, 342 U.S. at 169-70, but in today's world, a claim that law enforcement agents used excessive force during an arrest must be analyzed under Fourth Amendment standards. *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach" (emphasis omitted)); *see also Miller*, 891 F.2d at 1272 (observing that in *Graham*, the Supreme Court "eliminat[ed] substantive due process as the basis of damages awards for excessive force in arrests, on the ground that legal rules should follow the constitutional provisions directly applicable—in *Graham* the fourth amendment" (Easterbrook, J., concurring)). Indeed, the Supreme Court recognized this limitation in a case decided four decades after *Rochin*. *Cty. of Sacramento v.*

*Lewis*, 523 U.S. 833, 849 n.9 (1998) ("*Rochin*, of course, was decided long before *Graham v. Connor* . . . and today would be treated under the Fourth Amendment[.]" (citations omitted)). Likewise, a claim that law enforcement officers obtained a post-arrest statement from the accused through abuse or intimidation would now be analyzed under the Fifth Amendment right against self-incrimination, not under general due process principles. *See generally Miranda v. Arizona*, 384 U.S. 436 (1966); *see also Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018) ("The voluntariness of a confession depends on the totality of circumstances, including both the characteristics of the accused and the nature of the interrogation. If those circumstances reveal that the interrogated person's will was overborne, admitting the resulting confession violates the Fifth Amendment." (citation omitted)).

Since *Rochin* was decided, the Supreme Court has repeatedly cautioned lower courts against applying more general "due process" principles when a specific constitutional provision applies. *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." (citation and internal quotation marks omitted)); *Graham*, 490 U.S. at 395 ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against . . . physically intrusive governmental conduct [at that time of an arrest], that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."); *see also McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003) ("The Supreme Court has made it clear that a substantive due process claim may not be maintained when a specific constitutional provision . . . protects the

right allegedly violated."). For these reasons, the Court finds Defendant's reliance on *Rochin* unpersuasive.

Of course, the law would permit the Court to suppress evidence that was obtained in violation of Defendant's Fourth or Fifth Amendment rights through torture or other misconduct by law enforcement agents. *See generally Utah v. Strieff*, 136 S. Ct. 2056, 2060-61 (2016) (discussing Fourth Amendment exclusionary rule); *Jackson*, 888 F.3d at 265 (discussing Fifth Amendment voluntariness standards). However, the government has represented that it does not intend to rely on any evidence arising from or related to Defendant's arrest in Mexico to prove the charges in this case. (R. 562, Resp. to Mot. for Disclosure at 6-7.) Thus, at this point there is nothing to suppress. Should the government's position change, Defendant is free to reassert his allegations of torture in support of an argument that a specific piece of evidence must be suppressed. But under the law as it presently exists in this Circuit, Defendant's claim of mistreatment during his arrest does not entitle him to dismissal of the indictment. Therefore, the motion to dismiss is denied.[6]

## CONCLUSION

For these reasons, Defendant's motion to dismiss (R. 599) is DENIED. The parties shall appear for a status hearing on September 19, 2018, at 10:00 a.m.

ENTERED: _____
Chief Judge Rubén Castillo
United States District Court

**Dated: September 11, 2018**

---

[6] Because Defendant's outrageous government conduct defense is not legally viable, the Court denies his request for an evidentiary hearing to further develop the factual basis for this claim. (R. 599, Mot. to Dismiss at 49-52.) Such an endeavor would be futile given the state of the law in this Circuit.

15